EXHIBIT  2

FILED
DALLAS COUNTY
3/14/2016 3:35:00 PM
FELICIA PITRE
DISTRICT CLERK

Freeney Anita

2 SOS-E-SERVE Case 3:17-cv-02971-B   Document 2-2   Filed 10/27/17   Page 2 of 77   PageID 45

1CT-E-SERVE



CAUSE NO. _____

DC-16-03036

| | | |
|---|---|---|
| MONTAGE MORTGAGE, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| PACIFIC UNION FINANCIAL, LLC, | § | |
| MICAH LAVERNE GREENE, AND | § | |
| JOHN PERRY, | § | M-298TH |
| | § | ___ JUDICIAL DISTRICT COURT |
| **Defendants.** | | |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION

Plaintiff Montage Mortgage, LLC ("Plaintiff" or "Montage") respectfully files this Original Petition  and Application for Temporary Restraining Order and Temporary and Permanent Injunction (the "Petition") against Pacific Union Financial, LLC ("PacU"), Micah Laverne Greene ("Greene") and John Perry ("Perry" and collectively with PacU and Greene, "Defendants").[1]

## I. DISCOVERY CONTROL PLAN

1.    Plaintiff requests that discovery be conducted in this case under a Level Three discovery control plan.  The amount in controversy in this matter is difficult to quantify at this time, but Plaintiff's non-monetary relief in the form of a permanent injunction is estimated to have a value to Montage in excess of $1,000,000.00.

---

[1] This Application for Temporary Restraining Order is supported by the Affidavits of Scott Leslie ("Leslie Aff.") and Lisa Durben ("Durben Aff."), attached hereto as Exhibits "A" and "B," respectively, and the appendices attached thereto.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION                                            PAGE 1**

Exhibit 2

## II. **INTRODUCTION**

2.     Montage brings this application for temporary restraining order and injunction to stop Defendants from continuing their unlawful scheme to raid Montage's confidential information, trade secrets, employees and customers.   Perry resigned from Montage on December 31, 2015.   Greene abruptly quit his employment on February 24, 2016. Greene went to work for PacU and Perry became a consultant for PacU.   After weeks and perhaps months of planning while employed by Montage, Defendants Greene and Perry have conspired to steal Montage's confidential information and solicit Montage employees away from Montage for use by PacU to the detriment of Montage.   In violation of their contractual covenants found in their agreements with Montage, and on information and belief, Montage alleges that Greene and Perry secretly stole confidential information and solicited and induced employees, including Taisha Ferrendelli and Azalea Bailey (collectively "Former Employees") to commit acts harmful to Montage but favorable to PacU in order to assist them in what they are forbidden to do—misappropriate confidential Montage information for the benefit of PacU, a competitor of Montage, and steal Montage's customer base.   The Former Employees quit their jobs at Montage on February 22, 2016.   Incontrovertible electronic evidence shows that Greene and Perry used their company-owned information, systems and technology as well as third party information, systems and technology to secretly transmit Montage's confidential information.   If Defendants are not stopped from stealing Montage's confidential information, soliciting Montage's employees, and interfering with Montage's customer relationships, Montage will suffer immediate irreparable harm.

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 2

Exhibit 2

### III. PARTIES

3.     Plaintiff Montage is a Texas limited liability company with its principal place of business in Colorado.

4.     Defendant PacU is a California limited liability company with its principal place of business in Irving, Dallas County, Texas.  PacU can be served with process in this action CT by delivering the citation and a copy of this Petition to its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

5.     Defendant Greene is an individual resident of the State of South Carolina, who has contractually consented to jurisdiction in Texas and venue in Dallas County, Texas. Greene has engaged in business in Texas pursuant to his employment contract with Montage and by sharing Montage's confidential information with PacU.  Greene's misappropriation of Montage's confidential information constitutes a tort committed, at least partially, in Texas, because PacU is a recipient of that confidential information.   Greene does not maintain a regular place of business in Texas, nor does he have a registered agent for service of process in Texas.   Accordingly, and pursuant to 17.041 *et seq.* of the Texas Civil Practice & Remedies Code, Greene can be served by serving the Texas Secretary of State with duplicate copies of process, who shall immediately mail a copy of the process to Greene's home address at 4023 Brookchase Blvd., Ft. Mill, South Carolina 28277, via certified mail, return receipt requested.

6.     Defendant Perry is an individual resident of the State of North Carolina, who has contractually consented to jurisdiction in Texas and venue in Dallas County, Texas.  Perry has engaged in business in Texas pursuant to his employment contract with Montage and by

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 3

Exhibit 2

sharing Montage's confidential information with PacU. Perry's misappropriation of Montage's confidential information constitutes a tort committed, at least partially, in Texas, because PacU is a recipient of that confidential information.   Perry does not maintain a regular place of business in Texas, nor does he have a registered agent for service of process in Texas.   Accordingly, and pursuant to 17.041 *et seq.* of the Texas Civil Practice & Remedies Code, Perry can be served by serving the Texas Secretary of State with duplicate copies of process, who shall immediately mail a copy of the process to Perry's home address at 8609 Bodkin Court, Charlotte, North Carolina 28215, via certified mail, return receipt requested.

## IV.  JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction because the amount in controversy is within the jurisdictional limits of this Court.

8.    The Court has personal jurisdiction over Defendants based on Greene's and Perry's consent to jurisdiction in Texas and upon PacU's contacts with the State of Texas, which include, among other things, PacU maintaining its principal place of business in Texas.

9.    Venue of this action is proper in Dallas County, Texas, pursuant to Section 15.002(a)(3) of the Texas Civil Practice & Remedies Code, because PacU maintains its principal office in Texas in Dallas County, and pursuant to Section 15.005 of the Texas Civil Practice & Remedies Code.

## V.  RELEVANT FACTUAL BACKGROUND

### A. Montage's Business

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                                    PAGE 4

Exhibit 2

10.    Montage is a privately held company established in 2010 that originates residential mortgages. Historically, Montage obtained customers in two primary ways. First, its employees used relationships with real estate agents and brokers to obtain potential Montage customers. Second, Montage maintains call centers staffed by its employees and solicits potential Montage customers, or leads, via customer referrals, direct mail, radio advertising and from internet lead providers such as Lending Tree, LeadPoint and other internet-based companies. Greene was Montage's Charlotte Call Center sales manager, and Perry was the IT, or information technology, manager for Montage on a company-wide basis and also served as Web and Marketing support, providing custom-created marketing materials and electronic marketing support including website development, email marketing campaigns and similar efforts. Perry quit his job at Montage on December 31, 2015 and Greene quit on February 24, 2016. The call center employees follow up on the leads paid for by Montage and work with customers to complete applications and related documents with the goal of obtaining mortgage customers. During the course of their work for Montage, Greene and Perry had access to employee names and contact information, Montage strengths and weaknesses to be used in competing unfairly against Montage, lead source provider names and effectiveness, financial information of customers and loan terms such as interest rates, fees and points being charged to customers, and finally, thousands of lead records and customer records, many containing non-public personal information according to the Graham-Leach-Bliley Act (GLBA), all of which is Montage's confidential information. Additionally, in his role as IT Manager, Perry had administrator access to most Montage systems, which gave him access to and control of virtually all data.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                     **PAGE 5**

Exhibit 2

## B. Greene's and Perry's Contracts with Montage

11.   Attached collectively to the Leslie Aff. as Appendix 1 are the Employment Confidentiality and Invention Assignment Agreements (the "Contracts") between Greene, Perry, and Montage.   The Contracts prohibit use or disclosure of Montage's confidential information without its consent, and require Greene and Perry to return all confidential information, including all copies, to Montage upon termination of their employment with Montage.   The Contracts further prohibit Greene and Perry from soliciting Montage's employees and customers for a period of two (2) years following termination of their employment with Montage.

## C. Relevant Bad Acts

12.   During his employment with Montage, Perry provided IT as well as Marketing service and support to Montage staff members.   Throughout 2015, Perry provided these services to all Montage personnel. When Perry resigned from Montage, effective December 31, 2015, he was instructed to destroy and/or return all Montage confidential material in his possession.  Upon his departure, Perry signed a statement attesting that he had done so.  *See* Leslie Aff., Appendix 2.  Shortly after his departure, Perry sent a text to Montage CEO Scott Leslie indicating he had not destroyed all Montage confidential information.  *See* Leslie Aff., Appendix 3. During his employment with Montage or immediately after his resignation from employment with Montage, Perry began a consulting relationship with PacU.  Perry is copied on a January 13, 2016 email from Fobby Naghmi, the current Vice President of Retail Lending for PacU and a former Montage employee, which says "After my meetings yesterday, I am more confident than ever that we are building something amazing at [PacU]."

---

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                          **PAGE 6**

Exhibit 2

*See* Leslie Aff., Appendix 4. Shortly after his resignation from Montage, Perry began to directly solicit Montage staff, introducing himself as a recruiter for PacU. *See* Durben Aff.

13.   On or about January 26, 2016, Greene told Lisa Durben, a Montage employee, that he had an opportunity to open a mortgage lending office in Charlotte, North Carolina, and proceeded to solicit Ms. Durben to go to work for the same "Company." *See* Durben Aff. Over the next two (2) weeks, Greene repeatedly solicited Ms. Durben for employment with the "Company," but would not identify the name of the "Company." *See* Durben Aff. Greene told Ms. Durben she would receive a call from a "recruiter" for the "Company," and shortly thereafter Perry texted Ms. Durben and asked her to call him. *See* Durben Aff. When she did, Perry identified himself as a recruiter for PacU and tried to get her to go to work for a new PacU office that was scheduled to open in Ballantyne, North Carolina. *See* Durben Aff.

14.   Less than one (1) month before his abrupt resignation from Montage, Greene sent himself an email from his Montage email address to his personal email address that includes Montage's call center commission information. *See* Leslie Aff., Appendix 5. Clearly, the information Greene sent is confidential information. On February 13, 2016, Greene emailed a checklist from his Montage email address to his personal email address that appears to include tasks and projections for Greene to open up a PacU office. *See* Leslie Aff., Appendix 6. Additional instances of Greene violating confidentiality provisions of the Contract and unlawfully retaining Montage's confidential information through the transfer of information from his Montage email to his personal email include:

- A February 2, 2016 email transmitting FHA loan documents for David Adams, a Montage customer. *See* Leslie Aff., Appendix 7.

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 7

Exhibit 2

- A February 3, 2016 email transmitting an "activity report" containing information regarding Montage customers. *See* Leslie Aff., Appendix 8.

- A February 11, 2016 email transmitting a document created by Montage and titled "New HUD Handbook 4000.1-FHA Single Family Housing Policy Updates." *See* Leslie Aff., Appendix 9.

15.    Montage originally acquired a lead for borrower QuBiiki Nash ("Nash") from one of its Internet lead sources.   The Nash lead was originally acquired by Montage on 1/31/2016.  *See* Leslie Aff.  Azalea Bailey took the lead and was able to secure information to begin preparing a loan application (Montage Loan 200160211004) for Nash.  However the Nash file was Cancelled by Greene with no explanation on 2/23/2016 at 9:47am Eastern. *See* Leslie Aff., Appendix 10.   On the same day, 2/23/2016, at 9:49am Eastern, two (2) minutes later, Greene sent to his personal email address relevant Nash file information.  *See* Leslie Aff., Appendix 11.   This suspicious behavior and commandeering of Montage's confidential customer information indicates the loan is being diverted, but Montage staff has been unable to reach Nash for more information.

16.    On 2/9/2016, Greene began a loan application for Encite Pubien ("Pubien") in the Montage system.  *See* Leslie Aff.  On Wednesday, February 10, 2016, during the middle of the workday and while still employed by Montage, Greene emailed a party associated with the loan from his personal email address.  *See* Leslie Aff., Appendix 12.   Included in the email chain was a large amount of personal information of Pubien.  *Id.*  The Pubien file was Cancelled by Greene with little explanation on 2/16/2016, yet on 3/1/2016, Greene's prior Montage email received an inexplicable transmission regarding the file.  *See* Leslie Aff., Appendix 13.  This suspicious behavior indicates the loan is being diverted, but Montage

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 8**

Exhibit 2

staff has been unable to reach Pubien for more information.

17.    Montage originally acquired a lead for borrower Jeanette Nino ("Nino") from one of its Internet lead sources.  The Nino lead was originally acquired by Montage on 11/16/2015.  Taisha Ferrendelli, one of the Former Employees, took the lead and was able to secure a loan application (Montage Loan 200151117038) for Nino.  Nino was pre-approved for a mortgage loan on 11/19/2015, by Montage staff underwriters.  On February 22, 2016, Taisa Ferrendelli resigned from.  On 2/25/16, Greene's Montage email address was copied on an email chain where the Nino loan was being diverted to PacU.  *See* Leslie Aff., Appendix 15. The loan diversion also included a request to PacU by Taisha Ferrendelli to contact the realtor associated with the transaction, which is harmful to Montage's reputation and possible future business relationship with the realtor.  *Id.*  That request was granted and handled by Michael Lassiter, the Retail Sales Coordinator for PacU.  *Id.*

## VI.  <u>CAUSES OF ACTION</u>

### A.  First Cause of Action: Breach of Contract (the Contracts)

18.    Montage incorporates the preceding allegations of this Petition as if fully set forth herein.

19.    Greene and Perry have both breached the non-solicitation and confidentiality provisions of the Contracts.  Such breaches have damaged Montage in an amount in excess of the jurisdictional limits of this Court, for which amount Montage now sues.

### B.  Second Cause of Action: Misappropriation of  Confidential Information and Trade Secrets

20.    Montage incorporates the preceding allegations of this Petition as if fully set forth herein.

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 9

Exhibit 2

21.   Greene and Perry have misappropriated confidential and propriety information belonging to Montage in violation of common law obligations by using it for their own behalf or on behalf of PacU, and/or disclosing such information to PacU, a competitor of Montage.

22.   Upon information and belief, Greene and Perry have misappropriated this confidential information in a willful manner and with the deliberate intent to injure Montage and for the Defendants' own financial gain.

23.   As a proximate result of the misappropriation of Montage's confidential information, Montage has suffered, and will continue to suffer, actual damages and Defendants will be unjustly enriched, in sums not yet ascertained.  Montage has also suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury, until Defendants' wrongful acts are preliminarily and permanently enjoined.

24.   The misappropriation and wrongful acts of Greene and Perry have been and continue to be intentional, malicious, and in bad faith and have subjected and will continue to subject Montage  to cruel and unjust hardship in conscious disregard to Montage's rights, so as to justify an award of exemplary and punitive damages according to proof at trial.

## C. Third Cause of Action: Tortious Interference with Prospective Business Relations

25.   Montage incorporates the preceding allegations of this Petition as if fully  set forth herein.

26.   Prior to the actions of Defendants, Montage enjoyed advantageous economic and contractual relations with numerous employees and customers that Montage reasonably expected would have resulted in economic benefit to Montage.  Montage expects substantial

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 10

Exhibit 2

profit from its economic and contractual relationship with said employees and customers and invested substantial sums of money in soliciting, developing and maintaining its economic relationships with said employees and customers.

27.   Given the relationship of trust and confidence developed between Montage employees and its customers, and Montage's investment of time and money in that effort, Montage reasonably expected that its contractual relationship with its employees and customers would continue in the future including obtaining additional business from such customers.

28.   Greene and Perry deliberately, wrongfully, and without justification interfered with the relationship between Montage and its employees by inducing such employees to breach their obligations to Montage, solicit other employees, and use confidential information to the detriment of Montage and to Defendants' advantage.

29.   Absent the wrongful conduct of Greene and Perry, Montage had a reasonable expectation that the Former Employees in whom Montage has invested substantial time, training and other resources would still be employed by Montage and providing a valuable benefit to Montage.

30.   By the above described acts, Greene and Perry deliberately, wrongfully and without justification interfered with the expected economic advantage between the relationships between Montage and its customers and employees.

31.   Defendants' tortious interference has caused Montage to suffer immediate and irreparable harm, and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**          **PAGE 11**

Exhibit 2

**D. Fourth Cause of Action: Intentional Interference with Contractual Relations**

32.   Montage incorporates the preceding allegations of this Petition as if fully set forth herein.

33.   Defendants, with knowledge of Montage's contractual relationships with its employees and customers, deliberately, wrongfully, and without justification interfered with the relationship between Montage and its employees and customers by, among other things, soliciting the business of Montage customers and using Montage's confidential information to the detriment of Montage and to the Defendants' advantage.

34.   Defendants' intentional interference with contractual relations has proximately caused Montage to suffer immediate and irreparable harm, and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

**E. Fifth Cause of Action: Conspiracy**

35.   Montage incorporates the preceding allegations of this Petition as if fully set forth herein.

36.   Defendants have conspired with each other to, among other things, solicit Montage's employees and misuse Montage's confidential information for the purpose of competing unfairly with Montage for the benefit of Defendants.

37.   As a direct and proximate result of the conspiracy, Montage has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

**VII.   APPLICATION FOR TEMPORARY RESTRAINING ORDER**

38.   Montage incorporates the preceding allegations of this Petition as if fully set

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 12**

Exhibit 2

forth herein.

39.   **Relevant Case Authority.**   Issuance of a temporary restraining order is subject to the trial court's discretion.  *See Jon Scott Salon, LLC v. Garcia*, 343 S.W.3d 532, 534 (Tex. App.—Dallas 2011, no pet.).  In Texas, it is well-settled that injunctive relief may be granted to the owner of a trade secret to protect against unlawful disclosure.  *See K & G Oil Tool & Serv. Co., Inc. v. G & G Fishing Tool Serv. et al.,* 314 S.W.2d 782, 790 (Tex. 1958)(stating protection of trade secrets is well-recognized objective of equity and injunctive relief).   Specifically, a temporary restraining order is appropriate when there is an imminent and  irreparable risk of a trade secret being shared with a competitor that will provide them with a competitive advantage.  Courts grant temporary restraining orders to protect violations of the confidential relationship governing the acquisition of proprietary information, such as confidential information held by Montage.

40.   In *Jon Scott Salon, Inc. v. Garcia*, the trial court granted a temporary restraining order in favor of a beauty salon to enjoin two former employees from using and disclosing trade secrets and confidential or proprietary information and soliciting customers within a ten mile radius.  343 S.W.3d at 533-34.  In enjoining the former employees, the court held that an employer may be entitled to an injunction, *even in situations without an enforceable covenant not to compete*, to protect against the disclosure of confidential information and trade secrets.  *Id.* at 535.

41.  Furthermore, in *Hill v. McLane Co., Inc.*, a wholesale grocery distributor obtained a temporary restraining order preventing two former employees from using or disclosing trade secrets or other non-public information pending a trial on the merits.  No.

---

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION**          **PAGE 13**

Exhibit 2

03-10-00293-CV, 2011 WL 56061, at *1 (Tex. App.—Austin, Jan. 5, 2011, no pet.).   Like

Greene and Perry, the employees in *Hill* signed contracts agreeing to confidentiality

provisions.   The court affirmed the district court's enjoining the former employees based on

their nondisclosure obligations.   *Id.* at *7.

42.   **Probable Right to Relief.**   Pursuant to the relevant authority above, this Court

should grant the temporary restraining order because Montage has a probable right to relief it

seeks in this Petition.   Greene and Perry, directly, and indirectly through the Former

Employees and in concert with PacU have violated contractual agreements, duties of loyalty,

misappropriated trade secret information, tortiously interfered with Montage's business and

contractual relationships, and conspired to unfairly compete with Montage.   As shown above,

Defendants have misused Montage's confidential information in order to compete with

Montage and are soliciting Montage's employees and prospective business.

43.   **Imminent Harm.**   Montage has suffered, and will continue to suffer immediate

harm if the Defendants are not enjoined from their wrongful conduct.   PacU is actively

conspiring with Greene and Perry to unlawfully compete by using Montage's confidential

information.   In possession of such information, PacU has already solicited and/or met with

at least one Montage customer without Montage's authorization or approval.   Defendants

likely will continue to use Montage's confidential information to benefit PacU, unless a court

order compels them to stop such acts.

44.   **Irreparable Injury.**   The harm that will result to Montage if a temporary

restraining order is not issued is irreparable.   An injury is irreparable if the injured party

cannot be adequately compensated in damages, or if the damages cannot be measured by any

---

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                                    **PAGE 14**

Exhibit 2

certain pecuniary standard.  Here, PacU stands to gain a head start into the marketplace based on Montage's work, money and trade secrets.  The injuries resulting to Montage from Defendants' wrongful conduct is not only the loss of revenues, but also the loss of revenues from future contracts with these relationships.  The Defendants' continued interference with Montage's business will permanently and severely damage the business of Montage.  The injury resulting from such conduct—the value of clients, the protection of confidential information, and the prevention of diminished goodwill and business reputation—is difficult, if not impossible, to quantify in dollars.  Moreover, Montage will lose its competitive advantage or cease its business if Defendants are allowed to compete against Montage using Montage's own confidential information.  The Defendants' activities are a direct threat to the business of Montage, and unless the Defendants are enjoined, they will continue to interfere with and damage Montage's business.

45.  **No Adequate Remedy at Law.**  Because of the immediate threat of harm discussed above, the law does not otherwise provide Montage with a plain, speedy, and adequate remedy.  Montage will continue to suffer the effects of Greene's and Perry's breaches of their contractual and common law obligations for an undeterminable amount of time in the future and to an undeterminable extent, making the calculation of money damages difficult, if not impossible, to ascertain.  Additionally, once confidential information is exposed and used, there is no way to restore the confidential nature of such information.  Similarly, once a customer relationship and goodwill is damaged, it is difficult—if not impossible—to repair and restore those relationships and goodwill.  If Montage were to await trial, the damage to Montage would be complete and irreversible before a fact-finder

PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 15

Exhibit 2

determined the merits of this case.  Thus, immediate injunctive relief is necessary to prevent substantial harm to Montage.

46.   This Court should issue the temporary restraining order *ex parte* because Montage will suffer irreparable injury if the temporary relief is not granted, as the evidence shows PacU has contacted at least one  Montage customer.  Montage is ready and willing to post a reasonable bond in an amount deemed appropriate by this Court.  Montage contends that only a nominal bond is necessary in this case to protect Defendants because Defendants will not be harmed, and because under the Contracts, Greene and Perry agreed that Montage was entitled to injunctive relief for breach of the confidentiality and non-solicitation provisions of the Contracts.

47.   Montage asks this Court to enjoin Defendants, their agents, co-conspirators, servants, employees, representatives, any entity in which they own a controlling interest, and all those acting in participation or concert with them from:

   (a) contacting any of Montage's customers whose names or information has been gleaned from Montage's former employees;

   (b) directly or indirectly distributing, disseminating, dispending, and/or communicating to any one, any of Montage's confidential information[2];

   (c) using, in any manner, the confidential information belonging to Montage;

   (d) destroying, altering, deleting, or in any way disposing of any Montage

---

[2] As used herein, "Confidential Information" shall mean nonpublic or proprietary information relating to Montage's business or that of any Montage customer.  Examples of Confidential Information include (but are not limited to): software (in source or object code form), databases, algorithms, processes, reports, specifications, information regarding mortgage and mortgage-related products sold, distributed or being developed by Montage  and any other non-public information regarding Montage's current and developing business, information regarding customers, prospective customers, clients, business contacts, prospective and executed contracts and subcontracts, marketing and/or sales plans, or any other plans and proposals used by Montage in the course of its business, and any non-public or proprietary information regarding Montage  or Montage's present or future business plans, financial information (to include information regarding Montage's profit margins and loss mitigation fees), or any intellectual property, whether any of the foregoing is embodied in hard copy, computer-readable, electronic, optical form or otherwise.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND TEMPORARY AND PERMANENT INJUNCTION                    PAGE 16**

Exhibit 2

hard-copy or electronic documents, books and records, and/or confidential information, including but not limited to such information found on the Defendants' personal computers, laptops, cellular phones, i-Pads, back-up storage locations, social media, and internet sites, including but not limited to AOL, Hotmail, Yahoo, Gmail, and sbcglobal domains;

(e) destroying, altering, deleting, or in any way disposing of any communications with Montage clients or related to Montage clients, with Montage employees or related to Montage employees, or any other documents related to, concerning, or regarding this litigation or possible claims of Montage, including but not limited to text messages on personal or company-provided cellular phones, computers, or i-Pads, and email messages on personal or company-provided domain names, including but not limited to AOL, Hotmail, Yahoo, Gmail, and sbcglobal domains; and

(f) directly or indirectly soliciting, causing, inducing, or encouraging any directors, officers, employees, and affiliates of Montage to leave such employment, or hiring, employing, or otherwise engaging any such individual.

Montage further requests that Defendants and all of their agents, co-conspirators, servants, employees, representatives, any entity in which they own a controlling interest, and all those acting in participation or concert with them, immediately return to Montage the original and all copies of any information or equipment belonging to Montage.

48.    Accordingly, Montage requests that this Court grant its Application for Temporary Restraining Order, and further asks this Court to set its application for temporary injunction for hearing within fourteen (14) days from the signing of the temporary restraining order, and, after hearing, issue a temporary injunction against Defendants pending final resolution at a trial on the merits of this action, and a permanent injunction after a trial on the merits of this action restraining Defendants from committing the actions more fully set forth herein.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 17**

Exhibit 2

## VIII.  PRAYER FOR RELIEF

49.   Based on the foregoing, Montage respectfully requests this Court invoke its equitable powers to enjoin Defendants from disclosing and misusing Montage's confidential information, breaching Greene's and Perry's contractual duties to Montage, and interfering with Montage's employee and customer relationships.  Montage further respectfully requests judgment, after trial or final hearing, as follows:

(1)   Permanent injunctive relief enjoining Defendants as set forth above;

(2)   Compensatory damages in an amount to be determined at trial, as to the misappropriation of confidential information claims and the tortious interference with contract claims;

(3)   Punitive and exemplary damages as to the claims set forth above;

(4)   Costs and attorneys' fees and any other relief to which Montage shows itself justly entitled.

Respectfully submitted,

/s/ Bryan D. Bruner
Bryan D. Bruner
State Bar No. 03252475
bbruner@bjplaw.com
Lynne Brooks
State Bar No. 24087215
lbrooks@bjplaw.com
BRUNER & PAPPAS, L.L.P.
3700 W. 7th Street
Fort Worth, Texas 76107-2536
Telephone:  (817) 332-6633
Facsimile:  (817) 332-6619

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2.02 of the Dallas County Local Rules, the undersigned shall notify Defendants and provide them a copy of the Petition and proposed Temporary Restraining Order at least two (2) hours before Plaintiff's Application for Temporary Restraining Order and proposed Temporary Restraining Order are presented to the Court for decision.

*/s/ Bryan D. Bruner*
Bryan D. Bruner

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 19**

Exhibit 2

## VERIFICATION

STATE OF COLORADO      §
           Denver      §
COUNTY OF ~~BOULDER~~      §

     On this day Scott Leslie personally appeared before me, the undersigned Notary Public, and after duly sworn, stated under oath that he is the Chief Executive Officer of Montage Mortgage, LLC, the Plaintiff in this action; that he has read Plaintiff's Original Petition and Application for Restraining Order and Temporary and Permanent Injunction (the "Petition"); and that every statement of fact contained in the Petition is true to the best of his knowledge.

                               Scott Leslie

     SWORN AND SUBSCRIBED before me on this 14th day of March, 2016.

                         Notary Public in and for the State of Colorado

My Commission expires:

3-19-2020

JASON EDWARD EVANS
Notary Public
State of Colorado

---

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTION**         **PAGE 20**

Exhibit 2

## CAUSE NO. _____

| | | |
|---|---|---|
| **MONTAGE MORTGAGE, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **PACIFIC UNION FINANCIAL, LLC,** | § | |
| **MICAH LAVERNE GREENE, AND** | § | |
| **JOHN PERRY,** | § | |
| | § | **___ JUDICIAL DISTRICT COURT** |
| **Defendants.** | | |

## AFFIDAVIT OF SCOTT LESLIE

| | |
|---|---|
| **STATE OF COLORADO** | § |
| | § |
| **COUNTY OF BOULDER** | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Scott Leslie, who, under oath, states the following:

1.     "My name is Scott Leslie. I am over the age of eighteen, have never been convicted of a felony or a crime of moral turpitude, and am competent to make this affidavit. All of the facts stated herein are from my personal knowledge and are true and correct.

2.     I founded Montage Mortgage, LLC ("Montage") in 2010, and have been the Chief Executive Officer of Montage since that time.

3.     Attached hereto collectively as Appendix 1 are true and correct copies of the Employment Confidentiality and Invention Assignment Agreements between Micah Laverne Greene ("Greene"), John Perry ("Perry) and Montage.

4.     Attached hereto as Appendix 2 is a true and correct copy of a statement signed by Perry upon termination of his employment with Montage on December 31, 2015.

5.     Attached hereto as Appendix 3 are screenshots of a text message conversation I had with Perry after his termination of employment with Montage.

6.     Attached hereto as Appendix 4 is a true and correct copy of a January 13, 2016 email from Fobby Naghmi, the current Vice President of Retail Lending for Pacific Union Financial, LLC ("PacU"), and a reply from Kathy Pilgrim at PacU, with a copy to Perry's Montage email address.

# EXHIBIT A

---

**AFFIDAVIT OF SCOTT LESLIE**                                                                                    1

Exhibit 2

7.     Attached hereto as Appendix 5 is a true and correct copy of a January 30, 2016 email from Greene's Montage email address to his personal email address (greenemicah@yahoo.com) forwarding an email from a Montage employee (Daphne Lash). The attachment to the email (which attachment is not included in Appendix 5 for confidentiality reasons) consisting of 18 pages of call center commission information for Montage's call center employees, and also includes customer information.

8.     Attached hereto as Appendix 6 is a true and correct copy of a February 13, 2016 email from Greene's Montage email address to his personal email address, which appears to be a checklist of tasks and projections.

9.     Attached hereto as Appendix 7 is a true and correct copy of a February 2, 2016 email from Greene's Montgage email address to his personal email address. The attachment to the email (which attachment is not included for confidentiality reasons) consists of 71 pages of loan related documents for a customer named David Adams.

10.     Attached hereto as Appendix 8 is a true and correct copy of a February 3, 2016 email from Greene's Montage email address to his personal email address. The attachment to the email (which is not included for confidentiality reasons) consists of a 47 page 'activity report' listing loan numbers, customers' names, property addresses and notes from contacts with customers.

11.     Attached hereto as Appendix 9 is a true and correct copy of a February 11, 2016 email from Greene's Montage email address to his personal email address.  The attachment to the email is a document created by Montage titled 'New HUD Handbook 4000.1-FHA Single Family Housing Policy Updates.'

12.     Montage originally acquired a lead for borrower QuBiiki Nash ("Nash") from one of its internet lead sources on January 31, 2016. Montage employee Azalea Bailey worked the lead and was able to secure information to begin preparation of a loan application (Montage Loan 200160211004). Attached hereto as Appendix 10 is a true and correct copy of a screenshot of a page for Nash from Montage's database maintained to track the loan status of its customers. The screenshot indicates that at 6:47 a.m. on February 23, 2016, Greene changed the status of Nash from 'Loan Open' to 'Loan Canceled.' Later on the same day, at 8:49 a.m., Greene sent an email, a true and correct copy of which is attached hereto as Appendix 11, from his Montage email address to his personal email address, transmitting a document that is part of Montage's file for Nash (such document is not included in Appendix 11 for confidentiality reasons).

13.     On February 9, 2016, Greene began a loan application for Encite Pubien ("Pubien") in the Montage system, and on February 10, 2016, Greene used his personal email address to request Pubien's documents to support a loan from someone at i3 Lending, Inc.  Keith Davis at i3 Lending, Inc. responded to the email, and a true and correct copy of Greene's request and Mr. Davis' response (except the attachments to Mr. Davis' response are not included for confidentiality reasons) is attached hereto as Appendix 12. The status of

---

**AFFIDAVIT OF SCOTT LESLIE**                                                                2

Exhibit 2

Pubien on Montage's system was changed by Greene to 'Cancelled' on February 16, 2016, and attached hereto as Appendix 13 is a true and correct copy of a screenshot showing the cancellation. Inexplicably, on March 1, 2016, after Greene's termination of employment with Montage, his Montage email address was forwarded Greene's request, and Mr. Davis' response, as well as the attached customer information with Mr. Davis' response.

14.    On November 16, 2015, Montage acquired a lead from one of its internet lead sources for Jeanette Nino ("Nino"). Taisha Ferrendelli, one of Montage's employees at that time, worked the lead and secured a loan application (Montage Loan 200151117038) from Nino. On November 19, 2015, Nino was pre-approved for a mortgage. On February 22, 2016, Taisha Ferrendelli resigned from Montage. On February 25, 2016, Greene's Montage email address was copied on an email chain showing that Taisha Ferrendelli, who had resigned on February 22, 2016, was asking a PacU employee to 'reach out to the Realtor of one of [her] "transition loans."' A true and correct copy of the email is attached hereto as Appendix 14. She identified the customer as Nino. The PacU employee then asked Michael Lassiter, a Retail Sales Coordinator for PacU, to call the Realtor and provide his email address for 'loan docs,' which he did."

FURTHER AFFIANT SAYETH NOT.

_____
Scott Leslie

SWORN AND SUBSCRIBED before me on this 11th day of March, 2016.

_____
Notary Public in and for the
State of Colorado

My Commission expires:
May 18, 2018

```
****************************
*    VALERIE CALVERT       *
*    Notary Public         *
*    State of Colorado     *
*    Notary ID 20144019634 *
* My Commission Expires May 13, 2018 *
****************************
```

Exhibit 2

## Employee Confidentiality and Invention Assignment Agreement

This Employee Confidentiality and Invention Assignment Agreement (this "*Agreement*") is entered into this 𝑛𝑙 day of 𝒥𝑎𝑛 , 2014 ("*Effective Date*"), between Montage Mortgage, LLC, with offices at 1050 Walnut Street, Suite 219, Boulder, Colorado 80302 ("*Company*") and ___Kean Greene___ ("*Employee*").

### 1.  PROTECTION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION.

**1.1. Definition of "Confidential Information." "*Confidential Information*"** means all nonpublic or proprietary information relating to Company's business or that of any Company customer. Examples of Confidential Information include (but are not limited to): software (in source or object code form), databases, algorithms, processes, reports, specifications, information regarding mortgage and mortgage-related products sold, distributed or being developed by the Company and any other non-public information regarding Company's current and developing business; information regarding customers, prospective customers, clients, business contacts, prospective and executed contracts and subcontracts, marketing and/or sales plans, or any other plans and proposals used by the Company in the course of its business, and any non-public or proprietary information regarding the Company or the Company's present or future business plans, financial information (to include information regarding the Company's profit margins and loss mitigation fees), or any intellectual property, whether any of the foregoing is embodied in hard copy, computer-readable, electronic, optical form or otherwise.

**1.2. Employee's Use of Confidential Information.**  Employee shall not, without Company's prior written consent, directly or indirectly disclose or use any Confidential Information in any manner except as required in the course of employment with Company.  Employee shall at all times during and after the term of this Agreement, maintain the confidentiality of the Company's Confidential Information.

**1.3. Records Containing Confidential Information. "*Confidential Records*"** means all documents and other records, including all copies, whether in paper, electronic or other form, that contain or reflect any Confidential Information.  All Confidential Records prepared by or provided to Employee are and shall remain Company's property or the property of the Company customer to which they belong.  Employee shall not, without Company's prior written consent, directly or indirectly: (i) copy or use any Confidential Record for any purpose not relating directly to Employee's work on Company's behalf; or (ii) show, give, sell, disclose or otherwise communicate any Confidential Record or the contents of any Confidential Record to any person or entity other than Company or a person or entity authorized by Company to have access to the Confidential Record in question.  This Agreement does not prohibit Employee from complying with any subpoena or court order, provided that Employee shall at the earliest practicable date provide Company with a copy of the subpoena or court order prior to disclosing Confidential Information or Confidential Records and take reasonable action to minimize the extent of the disclosure.

**1.4. Employee's Former Employers' Confidential Information.**  Employee shall not, while an Employee of Company, improperly use or disclose to Company or any Company Employee, agent or contractor any confidential or proprietary information (including that protected by patents (or the subject of patent applications of which Employee is aware) and/or copyrights) or trade secret belonging to any former employer of Employee or any other person or entity to which Employee owes a duty of nondisclosure.

*Appendix 1*

**1.5.   Return of Material.** Employee agrees that, upon request of Company or upon termination (whether voluntary or involuntary), Employee shall immediately turn over to Company all Confidential Information and Confidential Records, including all copies, and other property belonging to Company or any of its customers, including documents, disks, or other computer media in Employee's possession or under his/her control. Such material to be returned includes materials that contain or are derived from ideas, concepts, creations, inventions, trade secrets or other proprietary or Confidential Information, or are connected with or relate to Employee's services to Company or any of its customers.

## 2.   DISCLOSURE AND ASSIGNMENT OF INVENTIONS.

**2.1.   Definition of Company Inventions.** "Company Inventions" means all ideas, processes, trademarks and service marks, trade secrets, copyrights, patents, inventions, discoveries, processes and improvements to any of the foregoing, that Employee learns of, conceives, develops or creates alone or with others during Employee's employment with Company (whether or not conceived, developed or created during regular working hours) that directly or indirectly arise from or relate to: (i) Company's business, technology, products, software, or services; (ii) work or research performed for Company by Employee or any other Company officer, Employee, agent, contractor or subcontractor; (iii) the use of Company's products, technology equipment, software, or time; or (iv) access to Confidential Information and/or Confidential Records belonging to Company or a Company customer.

**2.2.   Disclosure of Company Inventions.** Whether upon Company's request or voluntarily, Employee shall promptly disclose to Company or its designee all Company Inventions that Employee has created, contributed to or knows about, regardless of the nature of that knowledge, and regardless of whether such Company Invention, or any aspect of such Company Invention, has been described, committed to writing, or reduced to practice, in whole or part, by any other person. At all other times, Employee will treat any Company Invention as Confidential Information, as that term is defined in Section 1.1 above.

**2.3.   Assignment and Disclosure of Inventions.** Employee agrees to assign and hereby assigns to Company all right, title and interest to all Company Inventions, which shall be the sole and exclusive property of Company whether or not subject to patent, copyright, trademark or trade secret protection. Employee also acknowledges that all original works of authorship that are made by Employee (solely or jointly with others), within the scope of Employee's employment with Company, and that are protectable by copyright, are "works made for hire," as that term is defined in the United States Copyright Act. To the extent that any such works, by operation of law, cannot be "works made for hire," Employee hereby assigns to Company all right, title, and interest in and to such works and to any related copyrights. The consideration for such assignment and the assistance provided in Section 2.3 shall be the normal compensation due Employee by virtue of his/her service to Company. Employee will also disclose to the President of the Company all Inventions made, discovered, conceived, reduced to practice, or developed by Employee, either alone or jointly with others, within six (6) months after the termination of his or her employment with the Company which resulted, in whole or in part, from Employee's prior employment by the Company.

**2.4.   Additional Instruments.** Employee shall promptly execute, acknowledge and deliver to Company all additional instruments or documents that Company determines at any time to be necessary to carry out the intentions of this Section. Furthermore, whether during or after Employee's employment with Company, Employee hereby agrees to perform any acts deemed necessary or desirable by Company to assist it in obtaining, maintaining, defending and enforcing any rights and/or assignment of an Company Invention. Employee shall not be held responsible, accountable or liable for any or all expenses incurred in fulfilling the acts deemed necessary to carry out the intentions of this Section. Employee hereby irrevocably designates and appoints the Company and its duly

Exhibit 2

authorized officers and agents, as Employee's agent and attorney-in-fact to act for and on his or her behalf and instead of Employee, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this section, including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

**2.5. Pre-existing Inventions.** The parties hereby acknowledge and agree that Employee has been providing services to the Company for a period of approximately ten (10) months prior to the Effective Date, beginning on April 15, 2010, in return for cash compensation, and that such services have resulted in the creation of Confidential Information, Confidential Records and Inventions, including, all of which include the original works and subsequent modifications (the "Past [Schmidt] Deliverables").   Employee hereby assigns to Company all rights, title and interest in the Past [Schmidt] Deliverables, and hereby represents and warrants to the Company that no other person or entity (including, without limitation, past employers) has any claim or rights in such Past [Schmidt] Deliverables.  It is agreed that Employee shall retain all right, title and interest in and to inventions that Employee created and owned prior to his/her service to Company (except for the Past [Schmidt] Deliverables), if any, as listed on **Schedule 1**, which may be amended if necessary.  If **Schedule 1** is left blank, Employee concedes that no such pre-existing inventions exist.  Employee shall disclose and assign to Company any modifications or improvements to such inventions that are developed during his/her employment with Company (and become Company Inventions) in accordance with this Sections 2.

**2.6. Assignment or Waiver of Moral Rights.** Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Employee hereby waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

**3.   NON-SOLICITATION.**  During Employee's employment and for two (2) years after termination of such employment for any reason, Employee will not (i) encourage any Employee, Employee, or person who was employed by the Company on the date of termination of Employee's employment (or at any time during the six (6) month period prior to termination of Employee's employment) to leave the company for any reason, nor will Employee solicit their services; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) otherwise interfere with the relationship the Employee or Employee has with the Company.  Similarly, during this two year period, Employee will not solicit any customers of the Company, on Employee's own behalf or on behalf of any third party, in connection with any goods or services that are competitive with the business of the company.

**4.   NON-COMPETITION.**  In order to protect Company's Confidential Information and trade secrets, which would cause irreparable harm to Company if disclosed to a competitor, while employed by Company and for a period of twelve (12) months following the termination of Employee's employment (or other affiliation) with Company, Employee shall not engage in any employment, independent contracting, consulting engagement, business opportunity or individual activity in the United States directly or indirectly that competes or interferes with Company's business of providing portfolio refinance and loss mitigation services, to the Company's current or prospective servicer or investor customers in the U.S. residential mortgage market and other related markets, or that inevitably will result in the disclosure or use of Company's Confidential Information. Employee

Exhibit 2

further acknowledges and agrees that in light of Employee's knowledge of and access to Company's Confidential Information and trade secrets, and the nationwide nature of Company's business, that the restrictions set forth in this Section are reasonable.

5.   **INDEMNIFICATION.**   Employee hereby agrees to indemnify, defend and hold Company harmless from and against any liability, damages, costs and expenses, including reasonable attorneys' fees, arising out of or relating to any third party suit, action or claim against the Company for use of confidential information, trade secrets or copyrights of such third party, which confidential information, trade secrets or copyrights were used and/or integrated into the Company's products or services by Employee in breach of Employee's obligations, covenants, representations or warranties set forth in this Agreement.

6.   **SURVIVAL.**   Employee's obligations under Sections 1-5 of this Agreement shall survive the termination of Employee's employment with Company regardless of the reason for the termination and whether the termination was voluntary or involuntary on the part of the Employee.  Company is also entitled to communicate Employee's obligations under Sections 1-4 of this Agreement to Employee's future or potential employer.

7.   **REMEDIES.**   Employee acknowledges that if he or she breaches any obligation under this Agreement, including a breach of provisions regarding confidentiality, non-solicitation, non-competition and disclosure of inventions, Company will suffer immediate and irreparable harm and damage and that a remedy at law would be inadequate.  Employee therefore agrees that upon such breach or threatened breach of any obligation under this Agreement, in addition to any and all legal remedies, Company shall be entitled to any injunctive relief available, in order to prevent or restrain any such breach by Employee or by Employee's partners, agents, representatives, servants, Employees, and/or any and all persons directly or indirectly acting for or with Employee.  This paragraph shall not be construed as an election of any remedy, or as a waiver of any right available to Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement.

8.   **COMPANY AUTHORIZATION FOR PUBLICATION.**   Prior to submitting, or disclosing for possible publication or general dissemination outside the Company (such as through public speaking engagements or literature), any material prepared by me that incorporates information that concerns the Company's business, Employee agrees to deliver a copy of such material to an officer of the Company for his or her review.  Within twenty (20) days following such submission, the Company agrees to notify Employee in writing whether the Company believes such material contains any Confidential Information or Inventions, and Employee agrees to make such deletions and revisions as are reasonably requested by the Company to protect its Confidential Information and Inventions. Employee further agrees to obtain the written consent of the Company prior to any review of such material by persons outside the Company.

9.   **ENTIRE AGREEMENT.**   This Agreement and the Schedule attached hereto sets forth the entire agreement between the parties and supersedes any and all prior agreements or representations, written or oral, of the parties with respect to the subject matter of this Agreement.  In the event of any direct conflict between any term of this Agreement and any term of any other agreement either written or oral, the terms of this Agreement shall control, unless explicitly stated otherwise in the subsequent agreement.  If Employee signed or signs any other agreement(s) relating to or arising from Employee's service to or employment with Company, provisions of such agreement(s) that do not directly conflict with a provision of this Agreement shall not be affected, modified or superseded by this Agreement, but rather shall remain fully enforceable according to their terms.

10. **MODIFICATION.**   This Agreement can only be modified by a subsequent written agreement

Exhibit 2

executed by a duly authorized officer of Company.

**11. HEIRS AND ASSIGNS.** In light of the unique personal services to be performed by Employee hereunder, it is acknowledged and agreed that any purported or attempted assignment or transfer by Employee of this Agreement or any of Employee's responsibilities or obligations hereunder shall be void. The Company in its sole discretion may assign this Agreement to any parent, subsidiary, affiliate or successor of Company without prior written consent of Employee.

**12. GOVERNING LAW AND VENUE.** The validity, enforceability, construction and interpretation of this Agreement are governed by the laws of the State of Texas. The parties also agree that in the event a dispute arises regarding this Agreement, the parties will submit to the jurisdiction of the courts of the State of Texas. Employee expressly waives any objection as to jurisdiction or venue in the state and federal courts located in Dallas, Texas.

**13. SEVERABILITY.** If any court of competent jurisdiction declares any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall remain fully enforceable. To the extent that any court concludes that any provision of this Agreement is void or voidable, the court shall reform such provision(s) to render the provision(s) enforceable, but only to the extent absolutely necessary to render the provision(s) enforceable and only in view of the parties' express desire that Company be protected to the greatest extent allowed by law from unfair competition and/or the misuse or disclosure of Confidential Records, Confidential Information and/or Company Inventions.

**14. AT-WILL EMPLOYMENT. THIS AGREEMENT IS NOT A GUARANTEE OR PROMISE OF EMPLOYMENT FOR A DEFINITE PERIOD OF TIME, AND EMPLOYEE'S EMPLOYMENT WITH COMPANY IS "AT-WILL" AND MAY BE TERMINATED BY EITHER PARTY AT ANY TIME, WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE.**

**15. AGREEMENT READ, UNDERSTOOD, AND FAIR.**

Employee has carefully read and considered all provisions of this Agreement and agrees that all of the restrictions set forth herein are fair and reasonable and reasonably required to protect Company's interests.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives, on the Effective Date above.

Employee's Signature: _____     Date: 06/11/14

Print name: Micah Greene

Title:   an individual


For Montage Mortgage, LLC: _____     Date: 6/11/14

Print name: M. Scott Leslie   *for M. Scott Leslie*

Title:   President

Exhibit 2

**ADDENDUM 1**

**PIMCO WORK AGREEMENT**

**WHEREAS,** the Company is engaging with PIMCO (as defined below) and may, from time to time, discuss certain business ideas and proposals, engage in business and may thereby grant access to the PIMCO organization for the Employee; and

**WHEREAS,** as a condition of Employee's continued employment and receipt of year-end bonuses, the Company desires to ensure that its Trade Secrets (as defined below) are not used or compromised by the Employee becoming employed by PIMCO;

**NOW THEREFORE,** in consideration of the premises, the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. "Trade Secrets" means the Montage web-based loan structuring tool and Montage's strategies, formulas, business processes, financial data, business strategies, product development information, marketing plans, specific information regarding the requirements and characteristics of the clients and customers of the business, and in particular, strategies, pricing and formulas to conduct the servicing of mortgage loans or refinance of distress loans using private and federally sponsored loan programs and any other idea, process or data, which by law is considered to be a trade secret.

2. "PIMCO" means PIMCO Investments, LLC, as well as its advisors, subsidiaries, any of its funds or affiliates or related parties, whether owned in whole or in part.

3. Non-Solicitation. During Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee will not (i) encourage any other employee or person who was employed by the Company to leave the company for any reason, nor will Employee solicit their services; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) otherwise interfere with the relationship such other employee or person has with the Company. Similarly, during Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee will not solicit any customers, clients, business relationships or contractors of the Company, on Employee's own behalf or on behalf of PIMCO (or a related third party), in connection with any goods or services that are competitive with the business of the company.

4. Agreement to Refrain from Employment with PIMCO. In order to protect Company's engagement with PIMCO and its Trade Secrets, which would cause irreparable harm to Company, during Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee shall not become employed by PIMCO or engage in any employment, independent contracting, consulting engagement, business opportunity pursuit or individual activity in the United States directly or indirectly that competes or interferes with Company's business of providing portfolio refinance and loss mitigation services, to the Company's current or prospective servicer or investor customers in the U.S. residential mortgage market and other related markets, or that inevitably will result in the disclosure or use of Company's Trade Secrets. Employee further acknowledges and agrees that in light of Employee's knowledge of and access to

Exhibit 2

Company's Trade Secrets, and the nationwide nature of Company's business, that the restrictions set forth in this Section are reasonable.

5. <u>Damages and Equitable Relief</u>.  Employee shall be responsible for any and all damages suffered by Montage as a result of any violation of this Addendum or unauthorized disclosure or use of the Trade Secrets.  The Employee agrees that violation of this Addendum or use of the Trade Secrets by the Employee may cause the Disclosing Party irreparable harm for which remedies at law would be inadequate.  Therefore, in addition to any other rights it may have at law, the Employee acknowledges that Montage will be entitled to seek injunctive relief.

**Employee's Signature:** _____   Date: 6/11/14

Print name: Vivian Greene

Title:   an individual

**For Montage Mortgage, LLC:** _____   Date: 6/11/14

Print name: M. Scott Leslie     _for M. Scott Leslie_

Title:   President

Exhibit 2

**SCHEDULE 1**

### PRE-EXISTING INVENTIONS

Exhibit 2

**<u>Employee Confidentiality and Invention Assignment Agreement</u>**

   This Employee Confidentiality and Invention Assignment Agreement (this "*Agreement*") is entered into this 30 day of January, 2014 ("*Effective Date*"), between Montage Mortgage, LLC, with offices at 1050 Walnut Street, Suite 219, Boulder, Colorado 80302 ("*Company*") and <u>John Perry</u> ("*Employee*").

## 1. PROTECTION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION.

   **1.1. Definition of "Confidential Information." "*Confidential Information*"** means all nonpublic or proprietary information relating to Company's business or that of any Company customer. Examples of Confidential Information include (but are not limited to): software (in source or object code form), databases, algorithms, processes, reports, specifications, information regarding mortgage and mortgage-related products sold, distributed or being developed by the Company and any other non-public information regarding Company's current and developing business; information regarding customers, prospective customers, clients, business contacts, prospective and executed contracts and subcontracts, marketing and/or sales plans, or any other plans and proposals used by the Company in the course of its business, and any non-public or proprietary information regarding the Company or the Company's present or future business plans, financial information (to include information regarding the Company's profit margins and loss mitigation fees), or any intellectual property, whether any of the foregoing is embodied in hard copy, computer-readable, electronic, optical form or otherwise.

   **1.2. Employee's Use of Confidential Information.** Employee shall not, without Company's prior written consent, directly or indirectly disclose or use any Confidential Information in any manner except as required in the course of employment with Company. Employee shall at all times during and after the term of this Agreement, maintain the confidentiality of the Company's Confidential Information.

   **1.3. Records Containing Confidential Information. "*Confidential Records*"** means all documents and other records, including all copies, whether in paper, electronic or other form, that contain or reflect any Confidential Information. All Confidential Records prepared by or provided to Employee are and shall remain Company's property or the property of the Company customer to which they belong. Employee shall not, without Company's prior written consent, directly or indirectly: (i) copy or use any Confidential Record for any purpose not relating directly to Employee's work on Company's behalf; or (ii) show, give, sell, disclose or otherwise communicate any Confidential Record or the contents of any Confidential Record to any person or entity other than Company or a person or entity authorized by Company to have access to the Confidential Record in question. This Agreement does not prohibit Employee from complying with any subpoena or court order, provided that Employee shall at the earliest practicable date provide Company with a copy of the subpoena or court order prior to disclosing Confidential Information or Confidential Records and take reasonable action to minimize the extent of the disclosure.

   **1.4. Employee's Former Employers' Confidential Information.** Employee shall not, while an Employee of Company, improperly use or disclose to Company or any Company Employee, agent or contractor any confidential or proprietary information (including that protected by patents (or the subject of patent applications of which Employee is aware) and/or copyrights) or trade secret belonging to any former employer of Employee or any other person or entity to which Employee owes a duty of nondisclosure.

Exhibit 2

**1.5. Return of Material.** Employee agrees that, upon request of Company or upon termination (whether voluntary or involuntary), Employee shall immediately turn over to Company all Confidential Information and Confidential Records, including all copies, and other property belonging to Company or any of its customers, including documents, disks, or other computer media in Employee's possession or under his/her control. Such material to be returned includes materials that contain or are derived from ideas, concepts, creations, inventions, trade secrets or other proprietary or Confidential Information, or are connected with or relate to Employee's services to Company or any of its customers.

## 2.   DISCLOSURE AND ASSIGNMENT OF INVENTIONS.

**2.1. Definition of Company Inventions.** "Company Inventions" means all ideas, processes, trademarks and service marks, trade secrets, copyrights, patents, inventions, discoveries, processes and improvements to any of the foregoing, that Employee learns of, conceives, develops or creates alone or with others during Employee's employment with Company (whether or not conceived, developed or created during regular working hours) that directly or indirectly arise from or relate to: (i) Company's business, technology, products, software, or services; (ii) work or research performed for Company by Employee or any other Company officer, Employee, agent, contractor or subcontractor; (iii) the use of Company's products, technology equipment, software, or time; or (iv) access to Confidential Information and/or Confidential Records belonging to Company or a Company customer.

**2.2. Disclosure of Company Inventions.** Whether upon Company's request or voluntarily, Employee shall promptly disclose to Company or its designee all Company Inventions that Employee has created, contributed to or knows about, regardless of the nature of that knowledge, and regardless of whether such Company Invention, or any aspect of such Company Invention, has been described, committed to writing, or reduced to practice, in whole or part, by any other person. At all other times, Employee will treat any Company Invention as Confidential Information, as that term is defined in Section 1.1 above.

**2.3. Assignment and Disclosure of Inventions.** Employee agrees to assign and hereby assigns to Company all right, title and interest to all Company Inventions, which shall be the sole and exclusive property of Company whether or not subject to patent, copyright, trademark or trade secret protection. Employee also acknowledges that all original works of authorship that are made by Employee (solely or jointly with others), within the scope of Employee's employment with Company, and that are protectable by copyright, are "works made for hire," as that term is defined in the United States Copyright Act. To the extent that any such works, by operation of law, cannot be "works made for hire," Employee hereby assigns to Company all right, title, and interest in and to such works and to any related copyrights. The consideration for such assignment and the assistance provided in Section 2.3 shall be the normal compensation due Employee by virtue of his/her service to Company. Employee will also disclose to the President of the Company all Inventions made, discovered, conceived, reduced to practice, or developed by Employee, either alone or jointly with others, within six (6) months after the termination of his or her employment with the Company which resulted, in whole or in part, from Employee's prior employment by the Company.

**2.4. Additional Instruments.** Employee shall promptly execute, acknowledge and deliver to Company all additional instruments or documents that Company determines at any time to be necessary to carry out the intentions of this Section. Furthermore, whether during or after Employee's employment with Company, Employee hereby agrees to perform any acts deemed necessary or desirable by Company to assist it in obtaining, maintaining, defending and enforcing any rights and/or assignment of an Company Invention. Employee shall not be held responsible, accountable or liable for any or all expenses incurred in fulfilling the acts deemed necessary to carry out the intentions of this Section. Employee hereby irrevocably designates and appoints the Company and its duly



Exhibit 2

authorized officers and agents, as Employee's agent and attorney-in-fact to act for and on his or her behalf and instead of Employee, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this section, including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

**2.5.   Pre-existing Inventions.**  The parties hereby acknowledge and agree that Employee has been providing services to the Company for a period of approximately ten (10) months prior to the Effective Date, beginning on April 15, 2010, in return for cash compensation, and that such services have resulted in the creation of Confidential Information, Confidential Records and Inventions, including, all of which include the original works and subsequent modifications (the "Past [Schmidt] Deliverables").   Employee hereby assigns to Company all rights, title and interest in the Past [Schmidt] Deliverables, and hereby represents and warrants to the Company that no other person or entity (including, without limitation, past employers) has any claim or rights in such Past [Schmidt] Deliverables.  It is agreed that Employee shall retain all right, title and interest in and to inventions that Employee created and owned prior to his/her service to Company (except for the Past [Schmidt] Deliverables), if any, as listed on **Schedule 1**, which may be amended if necessary.  If **Schedule 1** is left blank, Employee concedes that no such pre-existing inventions exist.  Employee shall disclose and assign to Company any modifications or improvements to such inventions that are developed during his/her employment with Company (and become Company Inventions) in accordance with this Sections 2.

**2.6. Assignment or Waiver of Moral Rights.**  Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Employee hereby waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

**3.   NON-SOLICITATION.**  During Employee's employment and for two (2) years after termination of such employment for any reason, Employee will not (i) encourage any Employee, Employee, or person who was employed by the Company on the date of termination of Employee's employment (or at any time during the six (6) month period prior to termination of Employee's employment) to leave the company for any reason, nor will Employee solicit their services; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) otherwise interfere with the relationship the Employee or Employee has with the Company.  Similarly, during this two year period, Employee will not solicit any customers of the Company, on Employee's own behalf or on behalf of any third party, in connection with any goods or services that are competitive with the business of the company.

**4.   NON-COMPETITION.**  In order to protect Company's Confidential Information and trade secrets, which would cause irreparable harm to Company if disclosed to a competitor, while employed by Company and for a period of twelve (12) months following the termination of Employee's employment (or other affiliation) with Company, Employee shall not engage in any employment, independent contracting, consulting engagement, business opportunity or individual activity in the United States directly or indirectly that competes or interferes with Company's business of providing portfolio refinance and loss mitigation services, to the Company's current or prospective servicer or investor customers in the U.S. residential mortgage market and other related markets, or that inevitably will result in the disclosure or use of Company's Confidential Information. Employee



Exhibit 2

further acknowledges and agrees that in light of Employee's knowledge of and access to Company's Confidential Information and trade secrets, and the nationwide nature of Company's business, that the restrictions set forth in this Section are reasonable.

5.   **INDEMNIFICATION.**  Employee hereby agrees to indemnify, defend and hold Company harmless from and against any liability, damages, costs and expenses, including reasonable attorneys' fees, arising out of or relating to any third party suit, action or claim against the Company for use of confidential information, trade secrets or copyrights of such third party, which confidential information, trade secrets or copyrights were used and/or integrated into the Company's products or services by Employee in breach of Employee's obligations, covenants, representations or warranties set forth in this Agreement.

6.   **SURVIVAL.**  Employee's obligations under Sections 1-5 of this Agreement shall survive the termination of Employee's employment with Company regardless of the reason for the termination and whether the termination was voluntary or involuntary on the part of the Employee.  Company is also entitled to communicate Employee's obligations under Sections 1-4 of this Agreement to Employee's future or potential employer.

7.   **REMEDIES.**  Employee acknowledges that if he or she breaches any obligation under this Agreement, including a breach of provisions regarding confidentiality, non-solicitation, non-competition and disclosure of inventions, Company will suffer immediate and irreparable harm and damage and that a remedy at law would be inadequate.  Employee therefore agrees that upon such breach or threatened breach of any obligation under this Agreement, in addition to any and all legal remedies, Company shall be entitled to any injunctive relief available, in order to prevent or restrain any such breach by Employee or by Employee's partners, agents, representatives, servants, Employees, and/or any and all persons directly or indirectly acting for or with Employee.  This paragraph shall not be construed as an election of any remedy, or as a waiver of any right available to Company under this Agreement or the law, including the right to seek damages from Employee for a breach of any provision of this Agreement.

8.   **COMPANY AUTHORIZATION FOR PUBLICATION.**  Prior to submitting, or disclosing for possible publication or general dissemination outside the Company (such as through public speaking engagements or literature), any material prepared by me that incorporates information that concerns the Company's business, Employee agrees to deliver a copy of such material to an officer of the Company for his or her review.  Within twenty (20) days following such submission, the Company agrees to notify Employee in writing whether the Company believes such material contains any Confidential Information or Inventions, and Employee agrees to make such deletions and revisions as are reasonably requested by the Company to protect its Confidential Information and Inventions.  Employee further agrees to obtain the written consent of the Company prior to any review of such material by persons outside the Company.

9.   **ENTIRE AGREEMENT.**  This Agreement and the Schedule attached hereto sets forth the entire agreement between the parties and supersedes any and all prior agreements or representations, written or oral, of the parties with respect to the subject matter of this Agreement.  In the event of any direct conflict between any term of this Agreement and any term of any other agreement either written or oral, the terms of this Agreement shall control, unless explicitly stated otherwise in the subsequent agreement.  If Employee signed or signs any other agreement(s) relating to or arising from Employee's service to or employment with Company, provisions of such agreement(s) that do not directly conflict with a provision of this Agreement shall not be affected, modified or superseded by this Agreement, but rather shall remain fully enforceable according to their terms.

10.  **MODIFICATION.**  This Agreement can only be modified by a subsequent written agreement



Exhibit 2

executed by a duly authorized officer of Company.

**11. HEIRS AND ASSIGNS.** In light of the unique personal services to be performed by Employee hereunder, it is acknowledged and agreed that any purported or attempted assignment or transfer by Employee of this Agreement or any of Employee's responsibilities or obligations hereunder shall be void. The Company in its sole discretion may assign this Agreement to any parent, subsidiary, affiliate or successor of Company without prior written consent of Employee.

**12. GOVERNING LAW AND VENUE.** The validity, enforceability, construction and interpretation of this Agreement are governed by the laws of the State of Texas. The parties also agree that in the event a dispute arises regarding this Agreement, the parties will submit to the jurisdiction of the courts of the State of Texas. Employee expressly waives any objection as to jurisdiction or venue in the state and federal courts located in Dallas, Texas.

**13. SEVERABILITY.** If any court of competent jurisdiction declares any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall remain fully enforceable. To the extent that any court concludes that any provision of this Agreement is void or voidable, the court shall reform such provision(s) to render the provision(s) enforceable, but only to the extent absolutely necessary to render the provision(s) enforceable and only in view of the parties' express desire that Company be protected to the greatest extent allowed by law from unfair competition and/or the misuse or disclosure of Confidential Records, Confidential Information and/or Company Inventions.

**14. AT-WILL EMPLOYMENT. THIS AGREEMENT IS NOT A GUARANTEE OR PROMISE OF EMPLOYMENT FOR A DEFINITE PERIOD OF TIME, AND EMPLOYEE'S EMPLOYMENT WITH COMPANY IS "AT-WILL" AND MAY BE TERMINATED BY EITHER PARTY AT ANY TIME, WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE.**

**15. AGREEMENT READ, UNDERSTOOD, AND FAIR.**

Employee has carefully read and considered all provisions of this Agreement and agrees that all of the restrictions set forth herein are fair and reasonable and reasonably required to protect Company's interests.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives, on the Effective Date above.

Employee's Signature: _____   Date: 1/30/14

Print name: John Perry

Title:   an individual


For Montage Mortgage, LLC: _____   Date: 1/30/14

Print name: M. Scott Leslie

Title:   President

*SP*

Exhibit 2

## ADDENDUM 1

## PIMCO WORK AGREEMENT

**WHEREAS,** the Company is engaging with PIMCO (as defined below) and may, from time to time, discuss certain business ideas and proposals, engage in business and may thereby grant access to the PIMCO organization for the Employee; and

**WHEREAS,** as a condition of Employee's continued employment and receipt of year-end bonuses, the Company desires to ensure that its Trade Secrets (as defined below) are not used or compromised by the Employee becoming employed by PIMCO;

**NOW THEREFORE,** in consideration of the premises, the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  "Trade Secrets" means the Montage web-based loan structuring tool and Montage's strategies, formulas, business processes, financial data, business strategies, product development information, marketing plans, specific information regarding the requirements and characteristics of the clients and customers of the business, and in particular, strategies, pricing and formulas to conduct the servicing of mortgage loans or refinance of distress loans using private and federally sponsored loan programs and any other idea, process or data, which by law is considered to be a trade secret.

2.  "PIMCO" means PIMCO Investments, LLC, as well as its advisors, subsidiaries, any of its funds or affiliates or related parties, whether owned in whole or in part.

3.  Non-Solicitation.  During Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee will not (i) encourage any other employee or person who was employed by the Company to leave the company for any reason, nor will Employee solicit their services; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) otherwise interfere with the relationship such other employee or person has with the Company.  Similarly, during Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee will not solicit any customers, clients, business relationships or contractors of the Company, on Employee's own behalf or on behalf of PIMCO (or a related third party), in connection with any goods or services that are competitive with the business of the company.

4.  Agreement to Refrain from Employment with PIMCO.  In order to protect Company's engagement with PIMCO and its Trade Secrets, which would cause irreparable harm to Company, during Employee's employment with the Company and for two (2) years after termination of such employment for any reason, Employee shall not become employed by PIMCO or engage in any employment, independent contracting, consulting engagement, business opportunity pursuit or individual activity in the United States directly or indirectly that competes or interferes with Company's business of providing portfolio refinance and loss mitigation services, to the Company's current or prospective servicer or investor customers in the U.S. residential mortgage market and other related markets, or that inevitably will result in the disclosure or use of Company's Trade Secrets. Employee further acknowledges and agrees that in light of Employee's knowledge of and access to



Exhibit 2

Company's Trade Secrets, and the nationwide nature of Company's business, that the restrictions set forth in this Section are reasonable.

5. <u>Damages and Equitable Relief</u>. Employee shall be responsible for any and all damages suffered by Montage as a result of any violation of this Addendum or unauthorized disclosure or use of the Trade Secrets. The Employee agrees that violation of this Addendum or use of the Trade Secrets by the Employee may cause the Disclosing Party irreparable harm for which remedies at law would be inadequate. Therefore, in addition to any other rights it may have at law, the Employee acknowledges that Montage will be entitled to seek injunctive relief.

**Employee's Signature:** _____     Date: 1/30/14

Print name: John Perry

Title:   an individual

**For Montage Mortgage, LLC:** _____     Date: 1/30/14

Print name: M. Scott Leslie

Title:   President

Exhibit 2



**MONTAGE MORTGAGE**

1401 17th Street, Suite 560
Denver, CO 80202
Tel: 720-465-1700 | Fax: 720-465-1701
www.montagemortgage.com

December 31. 2015

Mr. John Perry
8609 Bodkin Court
Charlotte, NC  28215

RE: Resignation dated December 17, 2015

With regard to your voluntary resignation and in accordance with **_Section 1.5 Return of Material of the Employee Confidentiality and Invention Assignment Agreement_** dated January 30, 2014, this letter serves to document that you have complied with all aspects of this agreement, including returning all Confidential Information and Confidential Records previously in your possession back to Montage Mortgage, LLC., including

* All copies and other property belonging to the company or any of its customers, including documents, disks or other computer media in Employee's possession or under his / her control

By signing below, you certify to the best of your knowledge full compliance with the above mentioned agreement.
Once certified, you will be paid all earned but unused vacation owed to you as of December 31, 2015.
Thank you for you service to Montage Mortgage and best of success in the future.

**John Perry, an individual**

**Michael Scott Leslie, President and CEO**



●●○○○ AT&T  LTE          **11:54 AM**          ◀ 77% ▬▬▬

‹ Messages          **John**          Details

Sat, Jan 2, 11:02 AM

Send me Facebook admin please

Sat, Jan 2, 2:26 PM

Send me Facebook admin please

Sat, Jan 2, 3:54 PM

Hi Scott - will send this to you this evening.

Thank you

Wed, Jan 6, 1:51 PM

Curiously a lot of the old retail desktop users are deleted from VMWare.  Did you make images of their desktops and place them somewhere?

Hi Scott - they should all be there, they are turned off but I kept all user's Desktops intact.

 iMessage          Exhibit 2          

●●○○○ AT&T  LTE            11:54 AM            ◢ 77% ▇▇▌

‹ Messages            **John**            Details

vMware. Did you make images
of their desktops and place
them somewhere?

Hi Scott - they should all be
there, they are turned off but I
kept all user's  Desktops intact
- unless the user wasn't active
on it, like the LOs that lasted a
short period.

Kathy Keller gone completely

Fobby and Michaelene turned
off but there

I didn't delete Kathy or anyone
else of interest - but I also made
you a backup of Kathy's that I
think I may still have - I'll take a
look.

Thu, Jan 7, 2:42 PM

Kathy and others are gone.
Please find what you have

I'll take a look - I'm positive that I

 iMessage        Exhibit 2        

●●○○○ AT&T  LTE          11:54 AM            ✈ 77% ▅▅▅

‹ Messages          **John**              Details

~~think I may still have~~ — ~~I'll take a~~
look.

Thu, Jan 7, 2:42 PM

Kathy and others are gone.
Please find what you have

I'll take a look - I'm positive that I
retained all of the outside retail
Desktops, none were recycled -
are you certain they aren't in
another pool?

I think I know what may have
happened - restore all of the
unassigned Desktops, I bet they
are in there.

Desktops don't get deleted
unless they are recycled -
positive that I didn't recycle any
of importance.

Thu, Jan 14, 2:50 PM

Where is the realtor database
we acquired while you were at
Montage?

 iMessage          Exhibit 2          

●●○○○ AT&T  LTE          11:54 AM              ✈ 77% ▮▮▮▯

‹ Messages          **John**              Details

ui importance.

Thu, Jan 14, 2:50 PM

Where is the realtor database
we acquired while you were at
Montage?

Hi Scott - I sent it to Catherine
and Tri.

As with other items you were
involved with here, this is not to
be provided to PacU personnel
as part of your engagement with
them

Wouldn't do that - and I'm
developing webinars for them,
nothing to do with leads.

Ok thanks.

Read 1/14/16

Mon, Feb 1, 10:28 AM

Where are all the windows
recovery discs and licenses?

   iMessage          Exhibit 2          

**Bryan Bruner**

| | |
|---|---|
| **From:** | Pilgrim, Kathy <Kathy.Pilgrim@loanpacific.com> |
| **Sent:** | Wednesday, January 13, 2016 10:08 AM |
| **To:** | Naghmi, Fobby |
| **Cc:** | Parra, Shirley; Keller, Kathy; john.perry@montagemortgage.com; Lapre, Jay; Lanzoni, Edward |
| **Subject:** | Re: Flying Today |

I am ready!!!!!!!   Can't wait to hear more.

Safe travels - hope you dodge the bumps!

Sent from my iPhone

On Jan 13, 2016, at 10:46 AM, Naghmi, Fobby <Fobby.Naghmi@loanpacific.com> wrote:

> Just boarded my flight and will be unplugging for this one.
>
> After my meetings yesterday, I am more confident than ever that we are building something amazing at PUF.
>
> Hope you guys are are ready for an awesome year!!!
>
> Talk soon.
>
>
> Thank you,
>
> **Fobby H. Naghmi**
> **VP, Retail Lending**
> NMLS# 202352
>
>
> 
>
> Pacific Union Financial | NMLS# 2221
> 4035 Ridge Top Dr
> Suite 200
> Fairfax, VA 22032
> (Office) 571-386-2049
> (cell) 703-473-2340
> (Fax) 708-589-6290
> email: fobby @loanpacific.com
>
>
> Sent from my iPhone

*Appendix 4*

Exhibit 2

CONFIDENTIALITY NOTICE: This communication from Pacific Union Financial, LLC. may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you receive this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or re-disclose such information for any purpose other than to provide the services for which you are receiving the information.

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Saturday, January 30, 2016 11:51 AM |
| **To:** | greenemicah@yahoo.com |
| **Subject:** | FW: |
| **Attachments:** | 02052016 NC Call Center Commission (2000).pdf |



**Micah Greene**| Sales Manager | Originator NMLS ID 962913
**Montage Mortgage, LLC** | Company NMLS ID 762069
15801 Brixham Hill Dr, Suite 320, Charlotte, NC 28277
**P:** 704-719-2435 **F:** 888-745-2208
**Online** at: www.MontageMortgage.com
**Email**: Micah.Greene@montagemortage.com

**From:** Daphne Lash
**Sent:** Thursday, January 28, 2016 12:40 PM
**To:** Micah Greene <micah.greene@montagemortgage.com>
**Subject:**



**Daphne Lash  NMLS 1055635**
**Vice President**
**Montage Mortgage, LLC** | Company NMLS ID 762069
11016 Rushmore Drive, Suite 200, Charlotte, NC 28277
**P:** 941-504-7546 | **F:** 877-244-4009
**Online** at: www.MontageMortgage.com
Email: Daphne.lash@montagemortgage.com

*Appendix 5*

Exhibit 2
1

- Consumer Notice and Disclaimer -

This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Saturday, February 13, 2016 11:46 AM |
| **To:** | greenemicah@yahoo.com |
| **Subject:** | Pac union |

Pac union

Paperless mortgage
Lo comp
Mgr comp
Marketing budget
Lead budget
Remote work ability
Type of insurance
401 k
Training
Ability to change pricing/comp- quarterly?
How do we handle new hire on boarding
New licenses/fees
Realtor in office


Time to get office up and running
Start/open date


4-6 LO's 1-3 months $3 million
6-8 LO's 6-9 months $6-8million
Max LO's??? Maybe 10- expectation will be $8-10 million

$50k base 1.00bps(personal) .25bps(branch)

$250,000 covers draw
$500, 000 $6k

TBD's treat da the same way

List of DPA program for each state
Realtor open house- when and where
USDA-information and marketing material for Ballantyne area-door flyers
Builder fallout material
Lo to lo relationship
Craiglist advertising
Facebook advertising
Bilingual advertising

Al-3
Grey-3

Exhibit 2
1
Appendix 6

Jan-2
Lisa-2
Tai-3
Az-2

Total units-15 avg loan amt $185k=$2,775,000

Sent from my iPhone
Consumer Notice and Disclaimer: This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means.  Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Tuesday, February 02, 2016 3:38 PM |
| **To:** | greenemicah@yahoo.com |
| **Subject:** | Fwd: FHA Loan |
| **Attachments:** | Adams 1003.pdf; ATT00001.htm; Adams MTG statement.pdf; ATT00002.htm; Adams DL.pdf; ATT00003.htm; Adams MTG statement.pdf; ATT00004.htm; Adams 2013 tax transcripts.pdf; ATT00005.htm; adams 2013 w2.pdf; ATT00006.htm; adams 2014 tax ranscripts.pdf; ATT00007.htm; adams 2014 w2.pdf; ATT00008.htm; Adams appraisal.pdf; ATT00009.htm; adams hoi.pdf; ATT00010.htm; adams id.pdf; ATT00011.htm; adams paystubs.pdf; ATT00012.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Renato Paz" <renato.paz@cardinalfinancial.com>
> **To:** "Micah Greene" <micah.greene@montagemortgage.com>
> **Subject: FHA Loan**
>
> Hey, here is the info on that guy. I included the 1003 and all his docs. you will need to update some.
>
> David Adams Jr
> 803-663-1403
>
>
>
> --
> **Renato Paz** | Loan Originator  | Originator NMLS ID 164585
> **Cardinal Financial Company, Limited Partnership** |  Company NMLS ID 66247
> 3701 Arco Corporate Drive, Suite 200, Charlotte, NC 28273
> W: (704) 288-5724 | F: (704) 665-0732
> **APPLY NOW at renatopaz.cardinalfinancial.com**
> After you obtain a rate lock questions related to your loan should be directed to
> our Client Care team at 1-855-561-4944 or clientcare@cardinalfinancial.com
>
> 
>
> This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. This message contains confidential information and is intended only for the individual named. If you are not the named addressed you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited

- Consumer Notice and Disclaimer -
This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged,

Exhibit 2 *Appendix 7*



confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Wednesday, February 03, 2016 4:12 PM |
| **To:** | greenemicah@yahoo.com |
| **Subject:** | ammortization table |
| **Attachments:** | Report new.csv |



**Micah Greene**| Sales Manager | Originator NMLS ID 962913
**Montage Mortgage, LLC** | Company NMLS ID 762069
15801 Brixham Hill Dr, Suite 320, Charlotte, NC 28277
**P:** 704-719-2435 **F:** 888-745-2208
**Online** at: www.MontageMortgage.com
**Email**: Micah.Greene@montagemortage.com

- Consumer Notice and Disclaimer -

This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

*Appendix P*

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Thursday, February 11, 2016 4:41 PM |
| **To:** | greenemicah@yahoo.com |
| **Subject:** | FW: New FHA 4000.1 Handbook Guidance |
| **Attachments:** | New HUD 4000 Changes 20150914.pdf |



**Micah Greene**| Sales Manager | Originator NMLS ID 962913
**Montage Mortgage, LLC** | Company NMLS ID 762069
15801 Brixham Hill Dr, Suite 320, Charlotte, NC 28277
**P:** 704-719-2435 **F:** 888-745-2208
**Online** at: www.MontageMortgage.com
**Email**: Micah.Greene@montagemortgage.com

**From:** Thomas Black
**Sent:** Tuesday, September 15, 2015 4:37 PM
**To:** Montage All Employees <montageall@montagemortgage.com>; all@montagemtg.com; All Employees <all@montagewholesale.com>
**Subject:** New FHA 4000.1 Handbook Guidance

Please see attached Montage New FHA 4000.1 Handbook Guidance..

I would recommend either reaching out to scenarios@montagemortgage.com or reading the actual section in 4000.1 for any complex issues.

Thanks

---

Thomas Black
Montage Mortgage, LLC
11016 Rushmore Drive, Suite 200
Charlotte, NC 28277
(704) 926-4344
tom.black@montagemortgage.com

**\*\*CONFIDENTIAL\*\***
This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. They are intended solely for the use of the intended recipient. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. If you have received this communication in error, please immediately return this communication to the sender and delete the original message and any copy in your possession.

1
Exhibit 2

*Appendix 9*

**From:** Yvonne Gillett
**Sent:** Tuesday, September 15, 2015 11:08 AM
**To:** Montage All Employees; all@montagemtg.com; All Employees
**Subject:** Daily Operations Status

**_Underwriting_**          Reviewing 9/11 files submitted

**_Condition Review_**      Reviewing conditions from 9/10 (3 files) and 9/11

**_PreDoc QC_**             Reviewing files submitted 9/14

**_Docs_**                  Contact the Closing Dept.


Yvonne Gillett


 MONTAGE
MORTGAGE

Montage Mortgage
600 Anton Blvd Suite 1010
Costa Mesa, CA 92626
Direct Line – (866)708-0281


Information contained in this e-mail transmission is privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 510-2521, and all applicable state and local laws, statutes, rules, ordinances, and regulations. If you are not the intended recipient, do not read, distribute, or reproduce this transmission. If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.  Thank you in advance for your cooperation.


- Consumer Notice and Disclaimer -
This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

**NEW HUD HANDBOOK 4000.1 – FHA SINGLE FAMILY HOUSING POLICY UPDATES**

FHA has published the new handbook on Single Family Housing Policy 4000.1 which encompasses origination through post-closing process and policy. The new handbook will become effective from case assignment dates as early as September 14th, 2015.

Below are a few significant changes that have been incorporated in the new handbook for FHA Single Family Housing – Origination/Processing Policies 4000.1.

## UNDERWRITING THE BORROWER

### TOTAL SCORE CARD / AUTOMATED UNDERWRITING

### CREDIT HISTORY

- If cumulative payment of all the installment accounts which will be paid off within 10 months is less than or equal to 5% of borrower's gross monthly income, then those accounts can be excluded from ratio analysis.

- Deferred student loans cannot be excluded from ratio analysis. Either of the following need to be considered as monthly payment for ratio analysis:
  - o The actual payment listed on the credit report or payment letter (if available); or
  - o 2% of the outstanding balance.
  - o If actual payment is 0 or not available, 2% of the outstanding balance must be used.

- If payment is not available on deferred non-student loans (installment or revolving), 5% of the outstanding balance must be used in calculating the DTI.

- Accounts for which the Borrower is an authorized user must be included in a Borrower's DTI ratio unless the Borrower can document that the primary account holder has made all required payments on the account for the previous 12 months. . If less than three payments have been required on the account in the previous 12 months, the payment amount must be included in the Borrower's DTI.

- If credit report shows that borrower has paid the outstanding balance for 30 day charge account in full for the past 12 months, account can be excluded from ratio analysis. If credit report reflects any late in the last 12 months, 5% of the outstanding balance will be considered as borrower monthly debt for ratio analysis.

- Child Support, Alimony or Maintenance expense must be treated as a recurring liability. The amount of monthly obligation will be the greater of:
  - o The amount shown on the most recent decree or agreement establishing the Borrower's payment obligation; or
  - o Amount of Child Support, Alimony or Maintenance as verified from borrower's pay stub covering no less than 28 consecutive days.

- When a self-employed Borrower states debt appearing on their personal credit report is being paid by their business, there must be documentation to support that the debt is paid out of company funds and that the debt was considered in the cash flow analysis of the Borrower's business.

- Borrower is not required to provide an explanation for Collection, Charge-Off, Judgments or accounts with late payments within the last 24 months.

### JUDGMENTS: EXCEPTION POLICY CLARIFICATION

Verification is required that the court-ordered Judgments are resolved or paid off prior to or at closing.

Exception:

- A judgment is considered resolved if the Borrower has:
  - o Entered into a valid agreement with the creditor to make regular payments on the debt;
  - o Has made timely payments for at least three months of scheduled payments; and
  - o The judgment will not supersede the FHA-insured mortgage lien.

- The borrower cannot prepay scheduled payments in order to meet the required minimum of three months of payments.

*Note: All judgment liens must be subordinated.*

### INCOME REQUIREMENT

- For borrowers who are paid hourly and whose hours vary, the effective income will be calculated based on the average of income over the previous 2 years. If increase in pay rate can be documented, then effective income can be calculated based on the most recent 12 months average of hours at the current pay rate.

- If the Borrower has changed jobs more than 3 times in the previous 12 months, or changed line of work; then following needs to verified to document the stability of the income:
  - o Transcripts of training and education demonstrating qualifications for a new position; or
  - o Employment documentation evidencing continual increase in income and/or benefit.

- Effective income for self-employed income will be calculated by using the lesser of:
  - o The average gross Self-Employment Income earned over the previous 2 years; OR

Exhibit 2

- o The average gross Self-Employment Income earned over the previous year.

- For VA Disability benefit, VA Form 26-8937 (Verification of VA Benefits) is required, showing the amount of assistance and the expiration date of the benefits, if any. One of the following documents is also required:
  - o Federal tax returns; OR
  - o The most recent bank statement evidencing receipt of the income from the VA.

- The percentage of Non-Taxable Income that may be added cannot exceed greater of 15 percent or the appropriate tax rate for the income amount, based on the Borrower's tax rate for the previous year. If the Borrower was not required to file a federal tax return for the previous tax reporting period, may gross up the Non-Taxable Income by 15 percent.

## EMPLOYED BY FAMILY BUSINESS

Required Documentation:

- The following documents can be accepted to verify that the Borrower is not an owner in the family owned business:
  - o Corporate resolutions or other business organizational documents, business tax returns or Schedule K-1 (IRS Form 1065), U.S. Return of Partnership Income, or an official letter from a certified public accountant on their business letterhead.
- Signed personal tax returns or tax transcripts of the borrower must also be submitted.

- Montage will not allow recent increase in income and will average income earned over the period.

## ASSET REQUIREMENT

- Documentation for earnest money deposit (EMD) is required if EMD exceeds 1% of purchase price or appears excessive based on borrower history of accumulated saving.

- Where real estate taxes are paid in the arrears, the seller's real estate tax credit may be used to meet MRI (minimum required investment); if it is documented that:
  - o Borrower has sufficient assets to meet the MRI and the Borrower paid closing costs at the time of underwriting.
  - o Note: This permits the borrower to bring a portion of their MRI to the closing and combine that portion with the real estate tax credit for their total MRI.

- For recently opened accounts and recent individual deposits of more than 1% of the adjusted value, Documentation is required. Deposits of more than 1 percent of the adjusted value are considered a Large Deposit. This will be applicable to both purchases and refinances. Multiple deposits of more than 1% that do not conform to Borrower's saving pattern will also be included in the requirement of Documentation.

- Access letter is required from joint owner of account; even if joint account holder is spouse.

- Donor bank statement is required whenever Gift fund is being used. 1 month donor bank statement is required to make a reasonable determination that the gift funds were not provided by an unacceptable source.

- Gift is allowed from family member. The definition of family member has changed per the updated HUD 4000.1 Handbook. Family member includes:
  - o Spouse or Domestic Partner.
  - o Child, foster child, parent or grandparent.
  - o A child is defined as a son, stepson, daughter or stepdaughter;
    - A parent or grandparent includes a step-parent/grandparent or foster parent/grandparent;
    - Legally adopted son or daughter, including a child who is placed with the Borrower by an authorized agency for legal adoption.
  - o Brother, step-brother and sister, step-sister;
  - o Uncle or Aunt.
  - o Son-in-law, daughter-in-law, father-in-law, mother-in-law, brother-in-law or sister-in-law of the Borrower.

## DOCUMENT VALIDITY

- Maximum Document validity period for general documents cannot exceed 120 days from loan disbursement date for both existing and new construction properties. Day one to be considered as the day after the effective date or issue date of the document, whichever is later.

- 120 day validity period can be extended for 30 days if:
  - o Loan is approved or HUD commitment is issued prior to expiration of the appraisal OR
  - o Borrower signed a valid sales contract prior to expiration date of the appraisal.

- Appraisal update must be performed before the initial appraisal is expired (without extension). The validity period for the updated appraisal is 240 days after the effective date of the initial appraisal report.

Exhibit 2

- Any online printout of documents must indicate the Uniform Resource Locator (URL) address, as well as the date and time the documents were printed. If the main website affiliated in the URL is not verified as valid and a password protected site, then the documents may not be considered as a valid document and further documentation will be requested.

## INITIAL DOCUMENTS AND/ OR DISCLOSURES

- A signed copy of initial 1003 and initial 92900-A need to be submitted before the loan can be submitted for underwriting; irrespective of interview type.
  - o If loan has been submitted without signed 1003, the file will not be processed for underwriting until the signed copy is received.

- The purchase contract must have a clause or addendum to affirm that the borrower has received EPA-approved information pamphlet on identifying and controlling lead-based paint hazards ("Protect your family from Lead in your Home"). It is to be verified that either borrower was given a 10 day period before becoming obligated to purchase the home for inspection or borrower has waived the requirement.
  - o If the clause is not present in the purchase contract, then a signed addendum verifying the above information must be submitted prior to closing.

- Form HUD-92564-CN "For Your Protection: Get a Home Inspection" is required to be provided in initial disclosures for all purchase transactions, including Pre-Qualification.

## NON-BORROWING SPOUSE REQUIREMENTS

- Non-borrowing spouse consent and authorization for any Non-Borrowing spouse residing in a Community Property State and/ or the Subject Property is located in a Community Property State must be included in the loan file.

- The debt of the non-borrowing spouse must be on the initial 1003 if the subject property is in a community property state.

- SSN Verification is required for borrower as well as non-borrowing spouse, wherever applicable. Therefore, an executed copy of non-borrowing spouse consent (form SSA-89) needs to be submitted on all loans.

## POWER OF ATTORNEY & MILITARY PERSONNEL

- For Military Personnel, a POA cannot be used on both 1003 (initial and final.) Borrower has to sign at least one of the documents.

- POA could be used if service member is on overseas tour; and
  - o Borrower Signature cannot be obtained by fax or mail; and
  - o Specific POA is used and it is acceptable to Montage.

- Military Personnel who are on active duty can be considered as an Owner Occupied borrower if a family member resides at the principal residence or the borrower intends to occupy the subject property upon discharge from military services.
  - o A copy of the Borrower's military orders evidencing the borrower's active duty status and duty station is more than 100 miles from the subject property needs to be submitted prior to closing.

## MIXED USE PROPERTY

- Not allowed by Montage

## RENTAL INCOME

History of Rental Income and Calculation:

- Where the Borrower has a history of Rental Income from the subject property since the previous tax filing year, verify and document the existing Rental Income by obtaining the Borrower's most recent tax returns, including Schedule E, from the previous two years.

- For properties with less than two years of Rental Income history, Documentation verifying the date of acquisition is required by providing the deed, settlement statement or similar legal document.

- If Borrower does not have a history of rental income because the property was recently acquired; effective income is as lesser of:
  - o The monthly income reported on Freddie Mac Form 998 (operating income statement) OR;
  - o 75% of the lesser of:
    - Fair Market Rent reported by appraiser;
    - The rent reflected in the lease or other rental agreement.
- If Borrower has history of rental income; then effective Income is calculated as:
  - o Average of Income reported on Income Tax Return. If owned for < 2 years, income to be annualized for the length of the ownership period.

Documentation of Rental Income received from Departing Residence:

- If Rental Income is claimed from departing residence; then:
  - o Borrower must be relocating in an area more than 100 miles from departing residence.
  - o A lease agreement for at least 1 year must be submitted.
  - o Evidence of the payment of the security deposit or first month's rent must be submitted.
  - o Borrower must have 25% equity in converting residence.

Documentation of Rental Income received from another property:

- If Borrower does not have history of rental income from the property since previous tax filing:

Exhibit 2

- o Borrower must have at least 25% equity in the property verified from an appraisal.
- o For one-unit property, Single Family Comparable Rent Schedule (FNMA form 1007) and Operating Income Statement (FNMA for 216) and lease is required if available.
- o For two-four unit property, Small Residential Income Property Appraisal Report (FNMA Form 1025) is required.

Note: *Vacancy factor should be considered as 25% only, regardless of HOC vacancy and maintenance factor.*

## INDUCEMENT TO PURCHASE

Rent below Fair Market:

- Rent may be an inducement to purchase when the sales agreement reveals that the Borrower has been living in the Property rent-free or has an agreement to occupy the Property at a rental amount considerably below fair market rent.

- Rent below fair market is not considered an inducement to purchase when a builder fails to deliver a Property at an agreed-upon time, and permits the Borrower to occupy an existing or other unit for less than market rent until construction is complete.

Defining Inducement to Purchase:

- Contributions exceeding 6 percent of the purchase price;

- Contributions exceeding the origination fees, other closing costs and discount points.

- Decorating allowances, repair allowances;

- Excessive rent credit;

- Moving costs; paying off consumer debt;

- Personal Property;

- Sales commission on the Borrower's present residence; and

- Below-market rent, except for Borrower's who meet the Identity-of-Interest exception for Family Members.

## NON TAXABLE INCOME

Non-Taxable Income can be grossed up as follows:

- The amount of continuing tax savings attributed to Non-Taxable Income may be added to the Borrower's gross income.

- The percentage of Non-Taxable Income that may be added cannot exceed the greater amount of 15 percent or the appropriate tax rate for the income amount, based on the Borrower's tax rate for the previous year.

- If the Borrower was not required to file a federal tax return for the previous tax reporting period, Non-Taxable Income may be grossed up by 15 percent.

- Any additional adjustments and / or allowances based on the number of dependents for the Borrower are not allowed.

- Must document and support the amount of income to be grossed up for any Non-Taxable Income source and the current tax rate applicable to the Borrower's Income that is being grossed up.

## MAXIMUM MORTGAGE AMOUNTS - REFINANCE

Adjusted value for a refinance transaction is calculated based on the length of ownership which is determined at the time of case assignment.

- For properties acquired by the Borrower within 12 months of the case assignment date, the adjusted value is the lesser of:
  - o The original purchase price, plus any documented improvement made subsequent to purchase; or
  - o The Property Value/Appraised Value

- For properties acquired within 12 months of case assignment date by inheritance/gift OR properties acquired greater than or equal to 12 months of the case assignment date, adjusted value is the property value.

## MAXIMUM LOAN TO VALUE (LTV) LIMITS FOR IDENTITY OF INTEREST TRANSACTIONS

Maximum LTV limit for a transaction with identity of interest:

- Limited to 85%, unless any of the exceptions mentioned below are met:
  - o Family Member transaction, where borrower purchases:
    - ▪ The principal residence of another family member; or
    - ▪ A property owned by another family member, where the borrower has been a tenant for at least 6 months predating the sales contract date. A lease or other evidence of occupancy must be provided prior to the closing of the mortgage.
  - o If an employee of a builder, who is not a family member, purchases one of the builders properties as a principal residence.
  - o Tenant purchase transaction:
    - ▪ If tenant has rented the property for at least six months immediately predating the sales contract date. A lease or other evidence of occupancy must be provided prior to the closing of the mortgage.

Exhibit 2

## DELINQUENT FEDERAL TAX & NON-TAX DEBT

Borrowers with delinquent tax debt are ineligible for FHA mortgage unless borrower has entered into a valid agreement with federal agency and has made timely payments for at least three months.

- Documentation from the IRS evidencing the payment agreement and verification of payment proof must be submitted prior to approval of the loan.

Borrowers with previous federal non-tax debt must provide documentation evidencing the federal debt has been successfully paid or borrower is in agreement with federal agency to pay the debt per the requirements of the agency.

- Borrowers will be ineligible for FHA mortgage if federal non-tax debts are verified as currently delinquent from CAIVRS, public records, credit report or any other public sources.

## MINIMUM PROPERTY REQUIREMENTS AND MINIMUM PROPERTY STANDARDS

Overhead Electric Power:

- Overhead Electric Power Transmission Lines must not pass directly over any dwelling, structure or related property improvement, including pools.
  - The power line must be relocated for a Property to be eligible for FHA-insured financing.
  - The residential service drop line may not pass directly over any pool, spa or water feature.

Built in Appliances:

- Must ensure that cabinets and built-in appliances that are considered Real Property are present and operational.

Water Supply System – Individual Water Supply:

- The water quality of any individual water supply of the property must meet the requirements of the health authority of jurisdiction.
  - If there are no local (or state) water quality standards, then water quality must meet the standards set by the EPA, as presented in the National Primary Drinking Water regulations.
  - A water test is a mandatory requirement for any individual water supply which needs to be conducted by an independent third party.
    - Note: Soil poisoning is an unacceptable method for treating termites unless the satisfactory assurance is submitted that the treatment will not endanger the quality of the water supply.

Water Supply System – Shared Well:

- If a property is serviced by a shared well:
  - A shared Well Agreement will be required to determine eligibility.

- Connection to a public or community system is not feasible.
- Each dwelling unit is assured of 3 gallons per minute supply.
- Provide safe and portable water and require same inspection as individual well.
- Has a valve on each service line.
- Service no more than 4 living units or properties.

## NEW CONSTRUCTION

Before ordering of an Appraisal on New Construction:

- A fully executed form HUD-92541, Builder's Certification of Plans, Specifications and Site, dated no more than 30 days prior to the date of the appraisal order will be required.

- When New Construction is less than 90% complete at the time of the appraisal, the Appraiser must document the floor plan, plot plan, and exhibits necessary to determine the size and level of finish.

## APPRAISAL TRANSFER

As per updated HUD 4000.1 Guidelines, the appraisal must be transferred within 5 days to the new lender, when any loan is canceled and a request is received to transfer the new appraisal. This includes any appraisal that has been transferred to Montage from a prior lender.

Exhibit 2

## MANUAL UNDERWRITING OF THE BORROWER

The mortgage must be manually underwritten on applications where:

- TOTAL issues a Refer;

- Applications that were downgraded to a manual underwrite; OR

- Application for FHA Programs for which the program requires manual underwriting.

## LOAN HAS TO BE MANUALLY DOWNGRADED IF THE FOLLOWING REQUIREMENT IS NOT MET:

- Information or documentation that cannot be entered into or evaluated by Total Score card.

- Minimum waiting period is not met for major derogatory event. Waiting period will be measured from case assignment date.

- Borrower has $1,000 or more collectively in Disputed derogatory Credit Accounts;

- Self-employment income shows a decline greater than 20% over the analysis period.

- Borrower has any undisclosed debt. Montage will require borrowers to execute the undisclosed debt obligation acknowledgment prior closing of the loan. If a mortgage debt is not reported on the credit report or on the loan application and mortgage payment is not considered by AUS, the loan will need to be manually downgraded.

- For Purchase and No Cash Out Refinance, any mortgage trade line, including mortgage line-of-credit payments, during the most recent 12 months reflect:
  - 3 or more late payments of greater than 30 Days;
  - 1 or more late payments of 60 Days plus 1 or more 30-Day late payments; OR
  - 1 payment greater than 90 Days late.

- For Cash Out Refinances; any mortgage trade line, including mortgage line-of-credit payments reflect:
  - A current delinquency
  - Any delinquency within 12 months of the case number assignment date.

## CREDIT REQUIREMENTS

Credit Score:

- The same credit report and credit scores that were used for TOTAL Scorecard Evaluation will be utilized.

## NON TRADITIONAL AND INSUFFICIENT CREDIT

Borrowers without a credit score must either obtain a:

- Non-Traditional Mortgage Credit Report (NTMCR); or

- Independently develop the Borrower's credit history.

Independent Verification of Non-Traditional Credit Providers:

- Through public records the existence of each credit provider;

- A published address or telephone number for the credit provider; and

- Obtain the most recent 12 months cancelled checks or equivalent proof of payment.

## SUFFICIENCY OF CREDIT REFERENCES

- To be sufficient to establish the Borrower's credit, the credit history must include three credit references, including at least one or more from the list below:

  - Rental Housing payments;
  - Telephone Service (cellphone is acceptable); and
  - Utilities (not included in rent)
    - Gas;
    - Electric;
    - Water;
    - Television service; and
    - Internet.

- Two credit references can be used from the list provided below:

  - Insurance premiums not payroll deducted;
  - Payment to child care providers (business);
  - School tuition;
  - Retail store credit cards;
  - Rent-to-own;
  - Patient obligation for medical bills;
  - A documented 12-month history of savings evidenced by regular deposits resulting in an increased balance to the account that:
    - were made at least quarterly;
    - were not payroll deducted, and;
    - caused no insufficient funds (NSF) checks;
  - An automobile lease;
  - A personal loan from an individual with repayment terms in writing and supported by cancelled checks to document the payments; or
  - A documented 12-month history of payment by the Borrower on an account for which the Borrower is an authorized user.

Authorized User Accounts:

- Borrower Authorized User Accounts may be used as a credit reference. However, documentation must be provided to evidence that the Borrower:
  - Has been making regular on-time payments during the previous 12 months;
  - Does not have a history of delinquent payments on the loan; and

Note: *The debt payment is to be included in the Borrower's DTI ratio.*

Exhibit 2

## PAYMENT HISTORY ON HOUSING OBLIGATIONS

Verification of the Borrower's Housing Obligation payment history is required. This to be verified through:

- The Credit Report

- Verification of rent received directly from the landlord (for landlords with no Identity of Interest with the Borrower);

- Verification of Mortgage received directly from the mortgage servicer; or

- A review of cancelled checks that cover the most recent 12-month period.

For Borrower's who indicate that they are living rent-free, verification from the property owner where they are residing indicating that the borrower has been living rent-free and the amount of time the Borrower has been living rent-free is required.

## EVALUTATING MORTGAGE HISTORY FOR A MODIFIED MORTGAGE

A Mortgage that has been modified must utilize the payment history in accordance with the modification agreement for the time period of the modification in determining late housing payments.

Mortgages in which a modification incorporated a deficiency balance are not to be considered delinquent.

## MEDICAL COLLECTIONS

The Borrower must provide a letter of explanation, which is supported by documentation, for each outstanding collection account. This includes medical collections.

## CREDIT INQUIRIES

A written explanation from the Borrower for all inquiries shown on the credit report that were made in the last 90 days is required.

## JUDGMENTS

Verification that the court-ordered Judgments are resolved or paid off prior to or at closing is required.

Judgments of a non-borrowing spouse in a community property state must be resolved or paid in full, with the exception of obligations excluded by state law.

A judgment is considered resolved if the Borrower has:

- Entered into a valid agreement with the creditor to make regular payments on the debt;

- Has made timely payments for at least three months of scheduled payments prior to case assignment date; and

- The Judgment will not supersede the FHA-insured mortgage lien.

Note: *The borrower cannot prepay scheduled payments in order to meet the required minimum three months of payments. Also, all judgment liens must be subordinated.*

Exhibit 2

## LOAN PROGRAM AND PRODUCTS

FHA has made the following changes in loan program and purpose in the new Handbook.

- FHA has introduced a new loan purpose as Simple Refinance and removed streamline with appraisal.

- Streamline refinance will refer to streamline without appraisal refinance only.

- Streamline 203K program will be referred as Limited 203K.

- Paying off an unrecorded land contract will be considered as purchase transaction.

- FHA also includes Short Refinance and 235 Refinance which Montage currently does not offer.

## SIMPLE REFINANCE

Simple Refinance refers to a no cash-out refinance of an existing FHA-insured Mortgage in which all proceeds are used to pay the existing FHA-insured mortgage lien on the subject Property and costs associated with the transaction.

Simple Refinance can be underwritten using AUS or manually. Refer to HUD handbook for payment history requirement on manually underwritten simple refinance loans.

## OCCUPANCY REQUIREMENT

Montage will only allow simple refinance for Owner Occupied principal residence. Investment properties are not permitted. Occupancy needs to be justified by Borrower's employment documentation or utility bills. Occupancy must be verified to evidence the Borrower currently occupies the property as their principal residence.

## MAXIMUM LTV/CLTV

The maximum LTV/CLTV ratio for a Simple Refinance is 97.75 percent.

## MORTGAGE PAYMENT HISTORY

Borrower may not have any mortgage late(s) within the last six months and no more than 1 x 30 day late in the preceding 6 months.

## MAXIMUM MORTGAGE AMOUNT

The maximum mortgage amount or a Simple Refinance is the lesser of:

- The Nationwide Mortgage Limit;

- The Maximum LTV ratio allowed; or

- The sum of existing debt and costs associated as follows:
  - Allowed costs associated with the new Mortgage; and
  - Borrower-paid repairs required by the appraisal

*Less any refund of UFMIP (if financed in original Mortgage.)*

## UFMIP AND ANNUAL MIP

The UFMIP and annual MIP will be based previous FHA mortgage. Refer to Appendix 1.0 in Handbook 4000.1 for more details.

## INELIGIBLE LIEN TO PAY OFF THROUGH SIMPLE REFINANCE

The transaction cannot be considered as Simple Refinance if following debt is included:

- Unpaid principal balance of any Non FHA lien

- The unpaid principal balance of any junior liens over 12 months old as of the date of mortgage Disbursement. If the balance or any portion of an equity line of credit in excess of $1,000 was advanced within the past 12 months and was for purposes other than repairs and rehabilitation of the Property, that portion above and beyond $1,000 of the line of credit is not eligible for inclusion in the new Mortgage;

- ex-spouse or co-Borrower equity

- any prepayment penalties assessed;

- Recorded Land Contracts

Existing debt to which *can* be included:

- Unpaid principal balance of the FHA –insured first mortgage as of the month prior to mortgage disbursement

- Interest due on the existing Mortgage

- MIP due on existing Mortgage

- Late charges; and

- Escrow shortages

## STREAMLINE REFINANCE

FHA has removed the appraisal requirement for streamline refinance. Streamline Refinance has to be manually underwritten.

## OCCUPANCY REQUIREMENT

Montage will only allow simple refinance for Owner Occupied principal residence. Occupancy needs to be justified by Borrower's employment documentation or utility bills.

## SEASONING REQUIREMENT

Seasoning will be measured from case assignment date and following needs to be met:

- The Borrower must have made at least six payments on the FHA-insured Mortgage that is being refinanced;

- At least six full months must have passed since the first payment due date of the Mortgage that is being refinanced;

- At least 210 Days must have passed from the closing date of the Mortgage that is being refinanced; and

Exhibit 2

- If the Borrower assumed the Mortgage that is being refinanced, they must have made six payments since the time of assumption.

## CREDIT QUALIFICATION

Streamlines loan can be non-credit qualified or credit qualified.

A credit qualifying streamline refinance will be required if any borrower is removed from note and title (at least one borrower from the existing mortgage must remain on the new mortgage). Refer handbook 4000.1 for more details on Non Credit qualification and credit qualification.

## MAXIMUM LTV AND CLTV

There will be no maximum CLTV on Streamline Refinances. There will also be no restriction on LTV based on the FICO score for credit qualifying refinances.

## ASSET VERIFICATION

If assets are needed to close in excess of the total mortgage payment of the new loan, then asset must be verified to determine the acceptability of the assets to be utilized of all assets needed for closing for all streamline refinance.

## SUBORDINATE FINANCING

The Combined Loan to Value limit (CLTV) has been removed on streamline refinance. Existing subordinate refinance does not have to pay off. Montage will not allow new subordinate financing in streamline refinance.

## NET TANGIBLE BENEFIT

NTB has been simplified and is now considered a reduced Combined Rate. NTB is now defined as:

- Reduced combined rate (Combined Rate refers to the interest rate on the Mortgage plus the Mortgage Insurance Premium (MIP) rate);
- Reduction in term (provided the new interest rate does not exceed the current interest rate; and combined PITI of the new mortgage does not exceed combined PITI of the refinanced mortgage by more than $50); or
- A change from ARM to fixed rate Mortgage that results in a financial benefit to the Borrower.

The reduction in the rate has to meet below table.

| Fixed Rate | At least 0.5 percentage points below the prior Combined Rate | At least 2 percentage points below the prior Combined Rate | At least 2 percentage points below the prior Combined Rate |
|---|---|---|---|
| Any ARM With Less Than 15 Months to Next Payment Change Date | No more than 2 percentage points above the prior Combined Rate | At least 1 percentage point below the prior Combined Rate | At least 1 percentage point below the prior combined Rate. |
| Any ARM With Greater Than or Equal to 15 Months to Next Payment Change Date | No more than 2 percentage points above the prior Combined Rate. | At least 2 percentage points below the prior Combined Rate. | At least 1 percentage point below the prior Combined Rate |

## CASH OUT REFINANCE

## OCCUPANCY REQUIREMENT

Occupancy Seasoning Requirement:

- The property securing the cash-out refinance must have been owned and occupied by the Borrower as their principal residence for 12 months prior to the date of the case number assignment. An exception to this would be for properties acquired through inheritance which have not been used for investment (rental property) at any point since inheritance of the property.
- Must review the borrower's employment documentation or obtain utility bills to evidence the Borrower currently occupied the property to determine the length of time the borrower has occupied the subject property as their Principal Residence.

## SEASONING REQUIREMENT

Cash Out Refinance Payment History Requirement:

- Borrower must have made all payments for ALL mortgages within the month due for the previous 12 months or since the borrower obtained the Mortgages, whichever is less.
- Additionally, the payments for all Mortgages secured by the Subject Property must have been paid within the month due for the month prior to mortgage disbursement.
- Properties with Mortgages must have a minimum of six months of Mortgage Payments. Properties owned free and clear may be refinanced as cash-out transactions.

| From | To | | |
|---|---|---|---|
| | Fixed Rate New Combined Rate | One-Year ARM New Combined Rate | Hybrid ARM New Combined Rate |

Exhibit 2

## RATE AND TERM REFINANCE

OCCUPANCY SEASONING REQUIREMENT AND MAXIMUM LTV

- Verify Borrower's employment documentation or obtain utility bills to evidence the Borrower currently occupies the property and determine the length of time the Borrower has occupied the subject property as their Principal Residence.

- 97.75% for properties that have been Owner-Occupied for the previous 12 months, or Owner-Occupied since acquisition date if acquired within 12 months at case number assignment;

- 85 percent for a Borrower who has occupied the Subject Property as their Principal Residence for fewer than 12 months prior to the case number assignment date; or if owned less than 12 months, has not occupied the Property for that entire period of ownership.

## MAXIMUM MORTGAGE

The maximum mortgage amount for a Rate and Term refinance is the lesser of:

- The Nationwide Mortgage Limit;

- The maximum LTV based on the Maximum LTV Ratio; or

- The sum of existing debt plus allowed costs, which include all Borrower paid costs, associated with the new Mortgage; and any Borrower paid repairs required by the appraisal.

*Less any refund of the Upfront Mortgage Insurance Premium (UFMIP), if financed in the original Mortgage.*

Exhibit 2



Scott Leslie
President
Montage Mortgage
C: (303) 587-9490
scott@montagemortgage.com

**CONFIDENTIAL**
This message and any files transmitted with it may contain information that
is privileged, confidential, and exempt from disclosure under applicable
law. They are intended solely for the use of the intended recipient. If you
are not the intended recipient, distributing, copying, disclosing or
reliance on the contents of this communication is strictly prohibited. If
you have received this communication in error, please immediately return
this communication to the sender and delete the original message and any
copy in your possession.  NMLS 813928

- Consumer Notice and Disclaimer -

2
Exhibit 2

Appendix 10

**Bryan Bruner**

| | |
|---|---|
| **From:** | Micah Greene <micah.greene@montagemortgage.com> |
| **Sent:** | Tuesday, February 23, 2016 8:49 AM |
| **To:** | greenemicah@yahoo.com |
| **Attachments:** | QuBiiki Nash- Lease Agreement.pdf; ATT00001.txt |

Consumer Notice and Disclaimer: This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means.  Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

1
Exhibit 2   *Appendix 11*

**Bryan Bruner**

| | |
|---|---|
| **From:** | Scott Leslie |
| **Sent:** | Thursday, March 03, 2016 10:06 AM |
| **To:** | Bryan D. Bruner |
| **Subject:** | Fwd: Enite Pubien |
| **Attachments:** | 2013 2014 taxes with w2s.pdf; 2013 and 2014 taxes and w2.pdf; 2013 last paystub.pdf; Chase Online - Account Details current balace  Credit   card.pdf; Chase Online - Search Results.pdf; Executed%20Contract%202814%20Danforth306.pdf; Extension Addendum2.pdf; paystub 11 13.pdf; paystub 11 27.pdf |

Begin forwarded message:

**From:** Micah [mailto:greenemicah@yahoo.com]
**Sent:** Tuesday, March 1, 2016 7:09 PM
**To:** Micah Greene <micah.greene@montagemortgage.com>
**Subject:** Fwd: Enite Pubien

Sent from my iPhone

Begin forwarded message:

> **From:** Mounty126 <mounty126@yahoo.com>
> **Date:** February 10, 2016 at 10:06:05 PM EST
> **To:** Micah <greenemicah@yahoo.com>
> **Subject: Re: Enite Pubien**
> **Reply-To:** Mounty126 <mounty126@yahoo.com>
>
> Here ya go.
>
> **Keith Davis**
> ***i3 Lending, Inc.***
> ***Marketing Manager***
> ***Lake Mary, Florida***
> **Cell:  904 891 0915**
> **Fax:  800 881 8353**
>
> 

---

**From:** Micah <greenemicah@yahoo.com>
**To:** "mounty126@yahoo.com" <mounty126@yahoo.com>

1

Exhibit 2        *Appadix  12*

**Sent:** Wednesday, February 10, 2016 2:05 PM
**Subject:** RE: Enite Pubien

Hello Sir

My name is Micah Greene. I am the new lender working with Enite to get her purchase approved. Is it possible to get you to email me her supporting documents so I can try to rush this file.

Thank you


Sent from my iPhone


- Consumer Notice and Disclaimer -
This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

Bryan Bruner

| From: | Scott Leslie |
| Sent: | Thursday, March 10, 2016 2:25 PM |
| To: | Bryan D. Bruner |
| Subject: | Pubien cancel |



Scott Leslie
President
Montage Mortgage
C: (303) 587-9490
scott@montagemortgage.com

**CONFIDENTIAL**
This message and any files transmitted with it may contain information that
is privileged, confidential, and exempt from disclosure under applicable
law. They are intended solely for the use of the intended recipient. If you
are not the intended recipient, distributing, copying, disclosing or
reliance on the contents of this communication is strictly prohibited. If

1

Exhibit 2

*Appendix / 3*

**Bryan Bruner**

| | |
|---|---|
| **From:** | Scott Leslie |
| **Sent:** | Friday, February 26, 2016 11:45 AM |
| **To:** | Bryan D. Bruner |
| **Subject:** | Fwd: Loan Number: 30003307 |

**From:** Keller, Kathy [mailto:Kathy.Keller@loanpacific.com]
**Sent:** Friday, February 26, 2016 12:34 PM
**To:** Lassiter, Michael <Michael.Lassiter@loanpacific.com>; Willoby, Melissa
<Melissa.Willoby@loanpacific.com>
**Cc:** Micah Greene <micah.greene@montagemortgage.com>; 'Taisha Ferrendelli' <ftaisha@gmail.com>
**Subject:** RE: Loan Number: 30003307

Thank you my Friend!!!

**Kathy R. Keller**
**Area Manager, Retail Lending**
NMLS# 186784

 **PacificUnionFinancial** LLC

Pacific Union Financial | NMLS# 2221
4035 Ridge Top Dr
Suite 200
Fairfax, VA 22032
(Office) 571-386-2059
(Cell) 703-608-2691
E-mail: kathy.keller@loanpacific.com



**From:** Lassiter, Michael
**Sent:** Thursday, February 25, 2016 11:21 PM
**To:** Keller, Kathy; Willoby, Melissa
**Cc:** Micah Greene; 'Taisha Ferrendelli'
**Subject:** RE: Loan Number: 30003307

Yes this was resolved.

 **PacificUnionFinancial** LLC

1
Exhibit 2     *Appendix 14*

**Michael Lassiter**
**SLG Sales Manager**
**NMLS# 1013650**
**Pacific Union Financial** | NMLS# 2221
1603 LBJ Freeway, Suite 500
Farmers Branch, TX 75234
(Office) 469-804-1164
(cell) 469-774-8402  apply now
(Fax) 972-957-2753
email: michael.lassiter@loanpacific.com
Apply now:  http://myloan.pacificunionfinancial.com/l/mlassiter



**Mortgagee for CPL/Title:**
PACIFIC UNION FINANCIAL, LLC, ISAOA/ATIMA, 1603 LBJ Freeway, Suite 600, Farmers Branch, TX
75234, LOAN #, BORROWER'S NAME AND PROPERTY ADDRESS

**Mortgagee for Hazard and Flood:**
PACIFIC UNION FINANCIAL, LLC, ISAOA/ATIMA, P.O. Box 7071  Troy, MI  48007-7071, AS LOSS PAYEE REFLECTING
PAC UNION'S LOAN #

**From:** Keller, Kathy
**Sent:** Thursday, February 25, 2016 9:00 PM
**To:** Willoby, Melissa <Melissa.Willoby@loanpacific.com>; Lassiter, Michael
<Michael.Lassiter@loanpacific.com>
**Cc:** Micah Greene <micah.greene@montagemortgage.com>; 'Taisha Ferrendelli' <ftaisha@gmail.com>
**Subject:** RE: Loan Number: 30003307

Did this get addressed?

**Thank You Kindly.**

**Kathy R. Keller**
**Area Manager, Retail Lending**
NMLS# 186784



Pacific Union Financial | NMLS# 2221
4035 Ridge Top Dr
Suite 200
Fairfax, VA 22032
(Office) 571-386-2059
(Cell) 703-608-2691
E-mail: kathy.keller@loanpacific.com



**From:** Willoby, Melissa
**Sent:** Thursday, February 25, 2016 10:50 AM
**To:** Lassiter, Michael
**Cc:** Keller, Kathy; Micah Greene; 'Taisha Ferrendelli'
**Subject:** RE: Loan Number: 30003307

Mike,

Please call the Realtor below and provide your email for loan docs.

Thanks

**Melissa Willoby**
**Sale Coordinator, Retail Lending**
NMLS# 577087



**Pacific Union Financial | NMLS# 2221**
**4035 Ridge Top Dr., Suite 200**
**Fairfax, VA 22032**
**(office) 571-386-2131**
**(cell) 703-945-4895**
**(Fax) 224-632-1398**
**email: Melissa.Willoby @loanpacific.com**



CONFIDENTIALITY NOTICE: This communication from Pacific Union Financial, LLC. may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you receive this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or re-disclose such information for any purpose other than to provide the services for which you are receiving the information.

**From:** Taisha Ferrendelli [mailto:ftaisha@gmail.com]
**Sent:** Thursday, February 25, 2016 10:45 AM
**To:** Willoby, Melissa
**Cc:** Keller, Kathy; Micah Greene
**Subject:** Loan Number: 30003307

Hey Melissa,
This is Taisha Ferrendelli. Can you reach out to the Realtor of one of my transitional loans? The

borrower name is Jeannette Nino, her Realtor name is Heather. Heather's number is(336) 324-2685.  Heather is trying to follow up and she is sending information to my previous work email.

If you have any questions, my cell number is 980 585 7464.

Thank you!

- Consumer Notice and Disclaimer -
This Email is not intended by Montage Mortgage to constitute either an electronic record or an electronic signature, or to constitute any agreement to conduct a transaction or a loan approval by electronic means. Any language used to the contrary by an employee of Montage Mortgage is not to be relied upon. This message and any files transmitted with it may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If you are not the intended recipient, distributing, copying, disclosing or reliance on the contents of this communication is strictly prohibited. NMLS 762069

CAUSE NO. _____

| | | |
|---|---|---|
| MONTAGE MORTGAGE, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| PACIFIC UNION FINANCIAL, LLC, | § | |
| MICAH LAVERNE GREENE, AND | § | |
| JOHN PERRY, | § | |
| | § | ___ JUDICIAL DISTRICT COURT |
|     Defendants. | § | |

## AFFIDAVIT OF LISA DURBEN

| | |
|---|---|
| STATE OF COLORADO | § |
| | § |
| COUNTY OF BOULDER | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Lisa Durben, who, under oath, states the following:

1.    "My name is Lisa Durben. I am over the age of eighteen, have never been convicted of a felony or a crime of moral turpitude, and am competent to make this affidavit. All of the facts stated herein are from my personal knowledge and are true and correct.

2.    I have been a loan officer of Montage Mortgage, LLC ("Montage") since October 5, 2015.

3.    I have known Micah Greene for approximately five (5) years. In late January, 2016, Micah approached me and asked if I could 'keep a secret.' He proceeded to tell me that he might have the opportunity to start his own mortgage lending office in Charlotte, North Carolina (the "Office") and asked if I would be interested in leaving Montage and going with him. I responded that I needed more information before I would consider starting over at a new mortgage lending company and risk losing my pipeline of contacts.

4.    Micah stated that he would be the 'office director' and 'call the shots' at the Office and that I would be able to make more money than I could ever imagine. However, he would not tell me the name of the company that was opening the Office.

5.    Micah stated the company would 'take care of' me. He said I could cultivate my own leads and get paid at least 1% of every loan, receive a draw of $1,800.00 per month and the benefits would be the best he had ever seen.

# EXHIBIT B

6.     The following week, on a Friday after work, Micah approached me in the office parking lot and asked me if I had given any further consideration to his job offer. I asked him, 'Micah, who is this company and what's in it for you if I come with you?' Micah responded that he was not prepared to give me that information.

7.     During this same conversation, another Montage employee, Janet Snead, approached us. He asked her, 'can you keep a secret?' She said, 'of course,' and he proceeded to tell her about the new job opportunity and asked if she was interested. Janet responded, 'Maybe, but I would need to know more.' Micah then repeated to Janet what he already told me regarding all the new opportunities the unnamed company could give her.

8.     While we were standing there, Micah further told Janet that he had purposefully planned out her mortgage licenses and pushed to get them approved because the company only did business in North Carolina, South Carolina, Virginia, and Tennessee. Micah then looked at us both intently and said, 'Please don't tell anyone about this because if they find out what I'm doing, I could go to jail.' He ended the conversation by telling Janet and I that if we received a phone call from a strange number, to answer it because it would be the recruiter he had been talking to who would give us more details.

9.     At approximately 9:00 p.m. that same Friday night, I unexpectedly received a text message from John Perry, a former Montage employee, who asked me to call him over the weekend. Although I thought it was strange for John to text me on a Friday night, I responded that I would call him on Saturday.

10.     John did not answer when I called him on Saturday. On Sunday, however, John returned my call and said that he was a recruiter for Pacific Union. He said that because of my experience and multiple licenses, I would be a perfect fit for the new mortgage office Pacific Union was opening in three (3) weeks in Ballantyne, North Carolina. John further stated I could generate my own leads, would have my own office space, and that I would receive a draw of $1,800.00 per month.

11.     I told John that I wanted to know more, and he responded that he would send me information the following Wednesday. When I told John that I was liable for my licensing fees if I left Montage, he said 'Don't worry about that, Pacific Union would compensate you for any business losses if you decide to work for them.' I never did receive any emails or printed information from either John or Pacific Union.

12.     Later that same day, Sunday, I asked Micah if the 'unknown person' he mentioned would contact me was in fact John Perry. Micah responded that he did not know what John had contacted me about, but that I needed to make sure I talked to him.

13.     The next day, Monday, Micah, who was off work, texted me at least five (5) separate times requesting that I send him my resume. I did not respond because I had already decided I was not willing to risk leaving Montage. Micah did not contact me any further regarding the new job opportunity nor did I hear from John Perry again."

---

**AFFIDAVIT OF LISA DURBEN**                                                         2

Exhibit 2

FURTHER AFFIANT SAYETH NOT.

_____
Lisa Durben

SWORN AND SUBSCRIBED before me on this _9th_ day of _March_, 2016.

_____
Notary Public in and for the
State of North Carolina

My Commission expires:
_February 20th 2017_

**AFFIDAVIT OF LISA DURBEN**                                                          3

Exhibit 2