EXHIBIT 75

FILED
DALLAS COUNTY
9/29/2017 4:06 PM
FELICIA PITRE
DISTRICT CLERK

Christi Underwood

**CAUSE NO. DC-016-03036**

| | |
|---|---|
| Montage Mortgage, LLC, | |
| **Plaintiff,** | **IN THE DISTRICT COURT OF** |
| **v.** | **DALLAS COUNTY, TEXAS** |
| Pacific Union Financial, LLC, John Perry, Valerie Coleman, Caitlin V. Cooke, Eduardo Creque, Jessica M. Furr (Keen), Kathy Keller, Fouad Naghmi, Tammy Neal, Charles F. Peer, Michaelene Whyte, and Melissa Willoby, | **298TH JUDICIAL DISTRICT COURT** |
| **Defendants.** | |

---

### Plaintiff's Second Amended Petition

---

AND NOW, Plaintiff Montage Mortgage, LLC ("Plaintiff" or "Montage"), by and through their attorneys, Weiner Brodsky Kider PC, asserts the following causes of action against Defendants, Pacific Union Financial, LLC ("Pacific Union"), John Perry, Valerie Coleman (a/k/a Valerie Essid), Caitlin V. Cooke (a/k/a Caitlin Boehme), Eduardo Creque, Jessica M. Furr (a/k/a Jessica Keen), Kathy Keller, Fouad Naghmi, Tammy Neal, Charles F. Peer (a/k/a Chad Peer), Michaelene Whyte, and Melissa Willoby (the "Individual Defendants") (collectively, the "Defendants"). In support of its claims, Montage avers the following, all upon its most recent knowledge, information, and reasonable belief:

Exhibit 75

## PARTIES

1.   Plaintiff Montage is a Texas limited liability company with its principal place of business in North Carolina.

2.   Montage is a residential mortgage lending company and "financial institution" as defined by 18 U.S.C. §§ 20, 27.

3.   Montage originates federally related mortgage loans, as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.  12 U.S.C. § 2602.

4.   Defendant Pacific Union is a California limited liability company with its principal place of business in Irving, Texas.

5.   Defendant Valerie Coleman is an individual resident of the State of Virginia, and a former employee of Montage.  Coleman now works for Defendant Pacific Union.

6.   Defendant Caitlin Cooke is an individual resident of the State of Virginia, and a former employee of Montage.  Cooke now works for Defendant Pacific Union.

7.   Defendant Eduardo Creque is an individual resident of the State of Maryland, and a former employee of Montage.  Creque now works for Defendant Pacific Union.

8.   Defendant Jessica Furr is an individual resident of the State of Virginia, and a former employee of Montage.  Furr now works for Defendant Pacific Union.

9.      Defendant Kathy Keller is an individual resident of the State of Virginia, and a former employee of Montage.  Keller now works for Defendant Pacific Union.

10. Defendant Fouad "Fobby" Naghmi is an individual resident of the State of Virginia, and a former employee of Montage.  Naghmi now works for Defendant Pacific Union.

11. Defendant Tammy Neal is an individual resident of the State of Virginia, and a former employee of Montage.  Neal now works for Defendant Pacific Union.

Exhibit 75

12. Defendant Chad Peer is an individual resident of the State of West Virginia, and a former employee of Montage.  Peer now works for Defendant Pacific Union.

13. Defendant Michaelene Whyte is an individual resident of the State of Virginia, and a former employee of Montage.  Whyte now works for Defendant Pacific Union.

14. Defendant Melissa Willoby is an individual resident of the State of Virginia, and a former employee of Montage.  Willoby now works for Defendant Pacific Union.

15. Defendant John Perry is an individual resident of the state of North Carolina, and a former employee of Montage.  Perry also formerly worked for Defendant Pacific Union.

16. The Individual Defendants all engaged in business in the State of Texas, including the actions giving rise to this lawsuit, through actions and communications directed from and through Pacific Union's corporate office in Dallas County, Texas.

17. The Individual Defendants' misappropriations of Montage's confidential information constitute torts committed in Texas, including by misappropriating loans for borrowers in Texas and loans on Texas properties, as well as sending misappropriated data through interstate wire communications to Pacific Union employees located in the State of Texas for the purpose of processing, originating, and funding misappropriated loans.

18. Aside from the Individual Defendants, other individuals that were actively engaged in the conspiracy against Montage, include Pacific Union employees Rick Skogg (Chief Executive Officer), John Hummel (Sr. Vice President Retail Lending), Ben Schott (Vice President Retail Lending), Michael Lassiter (Specialty Lending Group loan officer), and Dustin Ross (Retail sales coordinator).

Exhibit 75

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction and the amount in controversy is within the jurisdictional limits of this Court as Plaintiff seeks monetary relief over $1,000,000.00.

20.    Pursuant to the Texas Long-Arm Statute, §17.042 of the Texas Civil Practice and Remedies Code, the Court has personal jurisdiction over Defendants based on their contacts with the State of Texas, which include, among other things, Pacific Union maintaining its principal place of business in Texas, the commission of a tort within the State of Texas, and the center of the conspiracy alleged herein being located in the State of Texas.   Each of the Individual Defendants communicated with Pacific Union employees located in Texas, including but not limited to Michael Lassiter, in order to execute the misappropriation of Montage's Protected Business Information.   Moreover, each of the Individual Defendants engaged in these communications and activities with Texas-based Pacific Union employees with the explicit expectation of profiting from the work performed in Texas, including origination, processing, and funding of misappropriated loans.

21.    Venue of this action is proper in Dallas County, Texas, pursuant to § 15.002(a)(3) of the Texas Civil Practice & Remedies Code, because Pacific Union maintains its principal office in Texas in Dallas County, and all actions alleged herein were directed from and through that principal place of business, and pursuant to § 15.005 of the Texas Civil Practice & Remedies Code.

## NATURE OF THE ACTION

22.    Montage brings this action because, in the fall of 2015 through the spring of 2016, Defendants conspired to, and carried out the misappropriation of Montage's trade secrets, confidential and proprietary business information, non-public consumer data, including customer

4

Exhibit 75

lists, active loan pipelines, lists of past Montage closed loans, and consumer loan files (Montage's "Protected Business Information").

23.     To this day, Defendants continue to be in possession of and use Montage's Protected Business Information.

24.     Montage's investigation has revealed that Defendants are engaged in an illegal racketeering conspiracy, whereby they, and other enterprise members, recruit entire branches from other mortgage companies, and reward them through enhanced compensation to misappropriate confidential trade secrets, such as entire active pipelines, loan files, and customer lists.

25.     In doing so, the enterprise members use the wires of the United States, via email communications and telephones, to make fraudulent misrepresentations to consumers and mortgage companies concerning changes in active consumer loan files.

26.     Defendants' unlawful acts resulted in the misappropriation of nearly 200 active or prospective consumers from Montage, at least three confidential customer lists, and several compilations of usernames and passwords to access Montage's protected computer systems.

27.     Conspiring together, Defendants orchestrated a scheme whereby they repeatedly obtained unauthorized access to Montage's computers and misappropriated Montage's Protected Business Information for use by or on behalf of Pacific Union.

28.     Defendants used Montage's Protected Business Information to unlawfully compete with Montage, to take, or attempt to take, Montage customers, customer lists, loan pipelines, and active customer loans and files from Montage.

29.     Pacific Union, acting in conjunction with the Individual Defendants, engaged in unlawful criminal and civil conduct, over an extended period of time, some of which occurred

5

Exhibit 75

while the Individual Defendants were Montage employees, and some of which occurred after they left Montage to work for Pacific Union.

30.     By acting and conspiring to misappropriate Montage's Protected Business Information, Defendants committed criminal acts, violated the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO"), the Defend Trade Secrets Act ("DTSA"), 19 U.S.C. §§ 1836, *et seq.,* the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 *et seq*., the Virginia Computer Crimes Act, Va. Code Ann. §§ 18.2-152.4, *et seq.*, the Texas Uniform Trade Secrets Act, Texas Civil Practice and Remedies Code §§ 134A.001, *et seq.,* the Texas Harmful Access by Computer Act, Tex. Civ. Prac. & Rem. Code, §§ 143.001-143.002, committed numerous state law torts, and either breached or solicited breaches of contract and breaches of fiduciary duties.

31.     Defendants predicate racketeering acts include multiple violations of 18 U.S.C. § 1832 (theft of trade secrets), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (financial institution fraud), and 18 U.S.C. § 1028 (fraud in connection with identification documents).

32.     Pacific Union intentionally decimated large portions of Montage's business operations so that Pacific Union could take control of Montage's mortgage lending business.

33.     Montage made numerous efforts to obtain Pacific Union's cessation of the unlawful activity complained of herein, but Pacific Union has not returned Montage's Protected Business Information.

34.     Montage was forced to expend extraordinary efforts and resources, such as funding a prolonged investigation, as well as the analysis of computers, emails accounts, and other documentary evidence that confirms Defendants' wrongdoing, conspiracy, and continuing illegal acts.

6

Exhibit 75

35.     Montage's investigation of this matter indicates that the unlawful conduct of Defendants began in 2015 and continues unabated to this day, despite Montage's efforts to influence Defendants to cease this activity.

36.     Defendants' conduct has caused and continues to cause Montage great financial harm.

37.     The harm caused by Pacific Union to Montage is immediate and irreparable as a result of Montage's ongoing loss of business and customers, loss of the confidentiality of its Protected Business Information, including trade secrets, loss of goodwill, and other harm.

38.     Beyond the harm caused to Montage, the racketeering enterprise includes new recruits from other mortgage companies that also misappropriate trade secrets, harming both consumers and the mortgage companies.

39.     Montage seeks preliminary and permanent injunctive relief, actual, punitive, and statutory multiplied damages against all Defendants, the return of Montage's stolen business information, and the cessation of all unauthorized use of Montage's Protected Business Information.

## FACTS COMMON TO ALL COUNTS

40.     Montage is a privately held company established in 2010 that originates residential mortgages.

41.     Montage and Pacific Union are competitors in the mortgage lending market.

42.     Historically, Montage obtained customers in two primary ways.  First, Montage employees used relationships with real estate agents and brokers to obtain potential Montage customers ("Retail Group").  Second, Montage maintains call centers staffed by its employees and solicits potential Montage customers, or leads, via customer referrals, advertising, and from lead

7

Exhibit 75

providers such as Lending Tree, LeadPoint and other internet-based companies ("Call Center Group").

43.     Upon information and belief, in 2015, Pacific Union took action to expand its retail lending division.

44.     Pacific Union's strategy to expand included taking its competitors' established pipelines of customers and turning those pipelines into its own.

45.     Rather than using its own resources to attract competent employees, gather data and build a pipeline of customers through legitimate means, Pacific Union misappropriates loans and confidential information its competitors, including Montage, by inducing its competitors' employees to steal on its behalf.

46.     Pacific Union's conduct included coaxing Montage's now former Retail Group and Call Center employees into providing Pacific Union with Montage's confidential client information, including, but not limited to protected customer lists, active customer pipelines, lists of active and formerly closed Montage loans, active loan files, and other Protected Business Information.

47.      Pacific Union further encouraged Montage's employees to solicit other employees to work for Pacific Union in competition with Montage.

48.     Consequently, both Montage's Retail Group and Call Center Group have suffered at the hands of Pacific Union.

49.     The illegal conspiracy to misappropriate other mortgage companies' confidential information has resulted in remarkable growth at Pacific Union in recent years.

50.     Indeed, within the four weeks immediately preceding the filing of this Second Amended Petition, Pacific Union publicly announced the addition of new branches in Denver, CO;

Boise, ID; and Radnor, PA.  The individuals hired as branch managers in Denver and Boise were branch managers at their previous companies, according to the Nationwide Mortgage Licensing System's Consumer Access webpage.

51.     According to mortgage industry publications, since 2013, Pacific Union's employee count has quadrupled, its monthly loan origination volume has grown to nearly $1.5 billion, and its loan servicing portfolio is now worth more than $21 billion.

## Montage's Retail Group

52.     In September 2015, Defendant Naghmi, the former Executive Vice President of Montage's Retail Group, unexpectedly resigned from Montage and went to work for Pacific Union.

53.     Upon information and belief, Naghmi now serves as the Vice President of Retail Lending for Pacific Union's Mid Atlantic/Northeast regions.

54.     Naghmi, like Montage's other employees, had an employment contract with Montage that prohibits use or disclosure of Montage's confidential information without its consent, and requires an employee to return all confidential information to Montage upon termination of his/her employment with Montage.  These standard employment contracts further prohibit an employee from soliciting Montage's employees and customers for a period of two years following termination of his/her employment with Montage.

55.     Moreover, during the course of their work for Montage, Retail Group and Call Center Group employees had access to employee names and contact information, the strengths and weaknesses of Montage which could be exploited in competing unfairly against Montage, financial information of customers and loan terms such as interest rates, fees and points being charged to customers, and finally, thousands of lead records and customer records, many of which contained

Exhibit 75

non-public personal information protected under the federal Graham-Leach-Bliley Act (GLBA), and qualifies as Montage's confidential information.  This information was contained in customer lists, pipeline documents, and individual customer loan files maintained by Montage.

56.     After Defendant Naghmi terminated his employment with Montage, he began soliciting other Retail Group employees to work for Pacific Union, which caused Montage to lose its ability to process loans due to a shortage of loan origination employees.

57.     Defendant Naghmi instructed the Retail Group employees to send active Montage loan files to Pacific Union, which deprived Montage of revenue to fund its operations.

58.     From late September 2015 through October 2015, Retail Group employees systematically misappropriated customer information and loan information from Montage to and sent that information to Pacific Union.

59.     Even though the Retail Group employees were employed by Montage in September and October of 2015, the Retail Group employees were actively working for Pacific Union, and without authorization, sent Montage's Protected Business Information—including sensitive non-public borrower information—to Pacific Union.

60.     To hide their illicit activities from Montage, Individual Defendants used personal email accounts to send Montage's Protected Business Information to Pacific Union.

61.     Upon discovering the Retail Group's active conspiracy to defraud Montage of its Protected Business Information, Montage CEO Scott Leslie terminated most of the Retail Group employees on or about October 22, 2015.

62.     The following examples are illustrative of the conspiracy to defraud Montage, but are not exhaustive of it:

10

Exhibit 75

a.  As early as September 30, 2015, Montage Retail Group employees were in touch with Pacific Union's "transitional loan" officer, Michael Lassiter.

b.  At Pacific Union, a "transitional loan" is the code-word for an active loan that is misappropriated from another mortgage company.

c.  On September 30, 2015, Jeff Bayer, an employee of Montage in Georgia, sent an email to Mr. Lassiter at his Pacific Union email address, noting that his branch manager at Montage, Kathy Pilgrim, advised that he could send Montage loans to Mr. Lassiter at Pacific Union.

d.  Mr. Bayer and Ms. Pilgrim were employed by Montage at this time, and they had not asked for or received authorization to send Montage's Protected Business Information to Pacific Union.

e.  As early as October 5, 2015, Pacific Union sent offers of employment to Montage Retail Group loan officers.

f.  These offers of employment included compensation incentives that paid Montage loan officers 115 basis points more per loan for loans misappropriated from Montage.

g.  A basis point is 1/100 of one percent — thus, Pacific Union incentivized Montage employees to misappropriate loans by paying them 1.15% more of the loan value than they would typically receive.

h.  On October 6, 2015, a Montage borrower emailed Defendant Cooke at her Montage email address because she did not know why Pacific Union was suddenly involved in her loan:  "We just got emails about disclosures from a mortgage place called

11

Exhibit 75

pacific union.  If this isn't from your company please let me know.  **I don't want to sign something from a scam email.**" (emphasis added).

i.    Upon information and belief, Pacific Union closed and profited off the aforementioned misappropriated loan.

j.    On October 6, 2015, Defendant Cooke sent an email to a Montage customer from her Montage email address, copying Montage employee and Defendant Peer, lying to the customer about the status of her loan:  "Unfortunately, they will not able to close you loan here due to all the late payments.  There is a company that we outsource to though that, we would like to send your file over and have them underwrite to see if they can close it.  Their name is Pacific Union."

k.    On October 7, 2015, while still employed by Montage, Defendant Keller sent an email from her personal email address to Defendants Peer and Cooke at their Montage email addresses.  The email's subject line was:  "Fw: Files for Pac U."

l.    Upon information and belief, Pacific Union instructed Montage employees to use personal emails to conceal their illicit activities from Montage.

m.   The body of the Keller email stated that Pacific Union employee Ben Schott would handle Montage files from West Virginia, and Pacific Union employee Mike Lassiter would handle Montage's files from other States.

n.    The Keller email further noted that the following items should be sent to Pacific Union for each of the loans misappropriated from Montage:  a completed loan officer submission checklist should be completed for each loan; a completed 1003 (which is the form number Fannie Mae gives to its Universal Residential Loan Application) in PDF; and supporting documents, including non-public consumer

information concerning income, assets,  credit reports and scores, and other sensitive financial information.

o.  The Keller email contained one attachment:  a document titled "Loan Officer Submission Checklist," which was created on Pacific Union letterhead.

p.  On October 7 and 8, 2015, Defendant Keller used her personal email address to send Montage's Retail Group pipeline to Defendant Naghmi at his Pacific Union email address.  The pipeline contained non-public consumer data from the months of February through September, including credit scores, total loan amount, loan number, and borrower name.

q.  On October 7, 2015, Defendant Naghmi then emailed Pacific Union CEO, Rick Skogg, forwarding him the list of Montage loans.

r.  On October 13, 2015, Defendant Keller emailed Michael Lassiter from her personal email address stating she wanted to transfer a Montage case assignment to Pacific Union.

s.  Defendant Keller did not request, or otherwise have authorization to make such a case assignment transfer.

t.  On October 15, 2015, Defendant Willoby received an email on her Montage email address from a customer.  The email included initial loan disclosures with Pacific Union on the letterhead and stated that Pacific Union was the lender, despite the fact that Ms. Willoby worked for Montage.

u.  Defendant Willoby then forwarded this email to her personal email account from her Montage email account.

13

Exhibit 75

v. Upon information and belief, Defendant Willoby then forwarded the loan disclosures to Pacific Union from her personal email account, in order to assist Pacific Union in the misappropriation of the loan.

w. On October 16, 2015, Pacific Union employee Ben Schott emailed a Montage customer, copying Montage employees Caitlin Cooke and Chad Peer at their Montage email addresses.

x. Mr. Schott's email noted that the customer's loan processor from Pacific Union would be reaching out to her soon, and together with Caitlin Cooke, would become her primary point of contact.  On October 16, 2015, Defendant Furr used her personal email address to email Pacific Union employee Michael Lassiter requesting that Mr. Lassiter "start and send credit i [sic] will forward their docs once I have contract[.]"

y. Mr. Lassiter responded to Ms. Furr at her personal email address by attaching a PDF copy of the borrower's credit report.

z. Upon information and belief, neither Defendant Pacific Union nor Defendant Furr obtained prior authorization from the borrower to send their credit report to an unsecured personal email account.

aa. On October 20, 2015, Defendant Keller used her personal email address to send a message to Defendants Furr and Naghmi (who was then working for Pacific Union) with the subject header:  "**Loans at Montage**" (emphasis added).

bb. In the email, Defendant Keller asked whether the nine Montage loans should be "added to the list of moving to Pacific Union."

14

Exhibit 75

cc. On October 20, 2015, a Montage borrower emailed a uniform residential loan application to Defendant Furr at her personal email address.  The application was dated October 19, 2015, and it listed Pacific Union employee Michael Lassiter as the loan officer, and Pacific Union as the lender.

dd. The aforementioned Montage borrower also attached a credit card authorization form printed on Pacific Union letterhead.  Defendant Furr then forwarded this email and credit card authorization to Michael Lassiter at his Pacific Union email address.

ee. In addition to Defendant Keller's theft of Montage's pipeline, Defendant Whyte independently misappropriated a copy of Montage's pipeline as well.

63.     Defendant Keller and Pacific Union negotiated that Keller would be branch manager of the Northern Virginia, or NOVA, branch at Pacific Union.  This branch consisted of, and still consists of, the loan originators located in:  West Virginia; the District of Columbia; Virginia; and Maryland.

64.     Defendant Keller instructed her subordinate Montage employees to send loans to Pacific Union while still employed by Montage.

65.     Defendant Keller also created a template "transfer letter" designed to make it appear that customers were requesting their files in-progress with Montage to be transferred to Pacific Union.  Keller instructed her subordinates to have customers complete this form to make it appear as if the customers preferred to move to Pacific Union.

66.     Defendant Naghmi and Pacific Union knew and approved of Defendant Keller's instructions on stealing loans.

67.     All Individual Defendants left Montage in unauthorized possession of Montage's Protected Business Information.

Exhibit 75

68.     None of Montage's Protected Business Information has been returned.

69.     On October 19, 2015, Defendant Keller sent an email to Montage CEO Scott Leslie titled "Exit Proposal."  In that email, Keller stated that "I have never screwed anyone over and do not intend to now," and further that Montage "ha[s] not and will not be put into any risk" concerning the Individual Defendants' departure.

70.     Defendant Keller further represented that the Individual Defendants "would not take any document" from Montage.

71.     However, the very next day, on October 20, 2015 Defendant Keller and the other individual Defendant's continued to send documents containing Montage's Protected Business Information to Pacific Union.

72.     The Individual Defendants, except Defendants Naghmi and Whyte, were terminated on or about October 22, 2015.

73.     Defendant Whyte resigned from Montage on or about October 9, 2015.

74.     The majority of Montage's Retail Group, including all of the Individual Defendants, immediately began to "officially" work for Pacific Union on or around October 22, 2015, even though they had been unofficially working for Pacific Union for weeks.

75.     Each Individual Defendant contributed to the misappropriation of Montage's Protected Business Information by theft, through unauthorized transmission of Montage Protected Business Information to their personal email accounts, and also engaged in the unauthorized transmission of Montage's Protected Business Information to Pacific Union.

76.     The Individual Defendants actively worked in concert with each other and Pacific Union prior to and after their departure from Montage and continued to make use of Montage's misappropriated Protected Business Information.

16

Exhibit 75

77.     The Individual Defendants also transferred borrower identification documents, illegally and without authorization, from Montage's protected servers to their unprotected personal email accounts, which they then forwarded on to Pacific Union.

78.     On October 9, 2015, Defendant Whyte, using her Montage email account, attached a Montage borrower's Florida driver license and sent the license to her personal email address, in order to forward that license on to Pacific Union.

79.     On October 1, 2015, former Montage employee Chuck Caggiula sent a communication from his personal email address to Michael Lassiter at his Pacific Union address, copying Defendant Neal at her personal email address, and attached a borrower's New York driver's license and social security card.

80.     On October 5, 2015, Michael Lassiter then forwarded the borrower's driver's license and social security card, along with nearly 50 other sensitive financial documents concerning other borrower's non-public information, such as bank statements and tax return, to Pacific Union employee Dustin Ross.

81.     Among the documents forwarded to Pacific Union employees were Fannie Mae 1003 Uniform Residential Loan Applications listing Montage Mortgage, LLC as the lender.

82.     On October 6, 2015, Michael Lassiter then forwarded the borrower documents to DallasDRSubmissions@loanpacific.com, requesting that the documents be uploaded into Pacific Union's loan origination systems.

83.     On October 20, 2015, former Montage employee Andrew Charron sent an email to Michael Lassiter, copying Defendants Naghmi and Keller, with a borrower's Virginia driver's license and social security card attached.

Exhibit 75

84.     On October 22, 2015, Defendant Furr sent an email from her personal email account to Michael Lassiter, copying Defendants Keller and Coleman, with several sensitive non-public borrower documents attached, including a Virginia driver's license.

85.     Pacific Union's executives knew of and approved of these actions at the highest levels.

86.     Defendant Naghmi had multiple conversations with Pacific Union's Chief Executive Officer, Rick Skogg, regarding the "onboarding" of the Montage's Retail Group, including extensive discussions regarding compensation programs for the Retail Group.

87.     Additionally, Mr. Skogg was directly involved in issues concerning loans that had originally been approved at Montage, but that he knew were misappropriated by Pacific Union.

88.     For example, on October 2, 2015, Lance Schnell, vice-president of retail support at Pacific Union, emailed Mr. Skogg stating that he needed help transferring 16 loans from Montage's branch in West Virginia.

89.     Attached to the October 2, 2015 email from Mr. Schnell was a list of the Montage borrowers, including non-public information such as the borrower's name, the loan type, and the loan amount.

90.     Mr. Skogg then discussed with Mr. Schnell which Pacific Union employees were licensed in West Virginia, because without an employee that was licensed in West Virginia, Pacific Union would not have been able to misappropriate the loans.

91.     Pacific Union ultimately identified a Texas-based loan officer named Ben Schott as a Pacific Union employee licensed in West Virginia, and assigned him to work on these loans

92.     Defendant Naghmi also sent Montage's loan pipeline to Madison Simm, Pacific Union's Chief Financial Officer; and Mike Eckrote, another senior executive at Pacific Union.

Exhibit 75

93.     In October 2015, Montage CEO Scott Leslie discovered that Pacific Union had pulled credit reports on numerous borrowers whose loan applications were actively pending with Montage.

94.     Statistically speaking, the only explanation for such a high number of Pacific Union credit pulls was that Montage's employees and/or former employees were conspiring with Pacific Union to steal Montage's Protected Business Information.

95.     In late October 2015, Mr. Leslie blocked the Retail Group employees' access to all Protected Business Information to minimize any further damage to his business and sent termination letters to the remaining employees, who have since gone to work for Pacific Union.

### Montage's Call Center Group

96.     In early 2016, after successfully soliciting Montage's Retail Group employees and misappropriating Montage's Protected Business Information in the fall of 2015, Pacific Union raided Montage's Call Center Group.

97.     Montage's Call Center Group employees follow up on the leads paid for by Montage and work with customers to complete applications and related documents with the goal of obtaining mortgage customers.

98.     Micah Greene was Montage's Charlotte Call Center sales manager.

99.     John Perry was the IT, or information technology, manager for Montage on a company-wide basis and also served as web and marketing support, providing custom-created marketing materials and electronic marketing support including website development, email marketing campaigns and similar efforts.

100.    Like Montage's Retail Group employees, the Call Center Group employees had access to Montage's Protected Business Information.

Exhibit 75

101.    The Individual Defendants all entered into contracts with Montage, which, *inter alia*, prohibited use or disclosure of Montage's confidential information without its consent, and required the Individual Defendants to return all confidential information, including all copies, to Montage upon termination of their employment with Montage.  The Contracts further prohibit the Individual Defendants from soliciting Montage's employees and customers for a period of two years following termination of their employment with Montage.

102.    Mr. Perry resigned from Montage on December 31, 2015.

103.    Although Mr. Perry worked in IT at Montage, he immediately began working for Pacific Union as a recruiter.

104.    Mr. Perry focused on recruiting Montage's Call Center Group employees, including Green.

105.    At Pacific Union's direction, Mr. Perry convinced Mr. Greene to leave Montage. Mr. Green quit Montage on February 24, 2016, and started working as a branch manager for Pacific Union's Charlotte, NC branch on February 29, 2016.

106.    While Mr. Greene was still employed by Montage, Mr. Perry, at the direction of Pacific Union, requested a list from Mr. Greene of other Call Center Group employees who could be solicited to work for Pacific Union.

107.    Mr. Greene complied and Mr. Perry solicited the individuals on that list.

108.    Thereafter, many Call Center Group employees, including Taisha Ferendelli and Azalea Bailey, left Montage to work for Pacific Union.

109.    Mr. Perry, at the direction of Pacific Union executives, requested that Mr. Greene send Montage's confidential client information to Pacific Union.

Exhibit 75

110.     Pacific Union specifically requested Montage's Call Center Group pipeline from Mr. Greene as a condition of his employment.

111.     Mr. Greene complied, sending over the entire pipeline from Montage's Call Center Group.

112.     The Call Center Group pipeline included past, current, and prospective borrowers, and contained information about the pricing of the borrowers' loans with Montage.

113.     Mr. Greene also began sending active Montage customers and loan files to Pacific Union while still working for Montage.

114.     When confronted with the misappropriation of Montage's Protected Business Information, Defendant Naghmi encouraged its continuance.

115.     On or about February 17, 2016, Defendant Perry illegally gained unauthorized access to Montage's protected computer systems nearly two months after he resigned from Montage.

116.     Defendant Perry then misappropriated an electronic file containing prospective business information and sent it to Defendants Pacific Union and Fobby Naghmi on February 18, 2016.

117.     Call Center Group employees Azalea Bailey and Taisha Ferendelli also began sending Montage's prospective customers to Pacific Union while still employed by Montage.

118.     For example, by mid-February, 2016, while still employed by Montage, Mr. Greene, Ms. Bailey, and Ms. Ferendelli had collectively submitted at least seven loans to Pacific Union, in addition to the pipeline solicited by Pacific Union, which were in various stages of the application process by this time.

Exhibit 75

119.     Defendant Keller noted the progress of these "inbound files from NC" in an email to John Hummel, who at the time was Pacific Union's Executive Vice President of Distributed Retail.

120.     Defendant Pacific Union also carried out its fraudulent procurement of loan documents via fax.

121.     For example, on March 15, 2016 at 4:46 p.m., Micah Greene received several pieces of loan documentation related to a borrower from Montage at his Pacific Union email address (Micah.Greene@loanpacific.com).

122.     On March 15, 2016 at 12:13 p.m., Micah Greene instructed a different Montage borrower to fax him a letter of explanation concerning credit issues to fax number 704-817-3095

### The Specialty Lending Group

123.     Pacific Union maintained an internal group, known as the Specialty Lending Group, whose primary function was to assist new loan originators with "transitional loans."

124.     "Transitional loans" is the internal term used by Pacific Union to refer to loans misappropriated from other companies.

125.     Pacific Union maintains lists of "transitional loans," including the dates such loans were received and who the referring loan officer is.

126.     Michael Lassiter was the primary employee of the Specialty Lending Group, and is licensed to originate loans in nearly all states in the union.

127.     Montage loans that were misappropriated by Pacific Union often had Michael Lassiter listed as the loan officer on the loan documents.

Exhibit 75

128.     Many "transitional loans" that were misappropriated from Montage's Retail Group were taken by Pacific Union prior to the termination or departure of the Montage employee originally involved in the loan.

129.     Pacific Union tries to obtain as many "transitional loans" as possible.  In fact, Mr. Greene's employment with Pacific Union was contingent on the number of "transitional loans" he could bring from Montage to Pacific Union.

130.     According to Pacific Union's compensation plan for new branches, the payment to new branch loan originators is referred to as a "pipeline buyout."

131.     Pacific Union created a power point presentation that detailed  the functions of the Specialty Lending Group, described the various stages of a misappropriated "transitional" loan processed by Pacific Union, and gave loan officers instructions on how to carry out and complete the misappropriation for the benefit of Pacific Union

132.     The Specialty Lending Group presentation explained how misappropriated transitional loans are managed, breaking them up into three categories:

   a.   "Active application" loans, defined as loans currently in progress with another mortgage company and that have a complete loan file;

   b.   "Partial application" loans, defined as loans currently in progress with another mortgage company and the loan file is still in progress; and

   c.   "New application" loans, which would include loans where the customer has had contact with another mortgage company, but the loan files are not yet "in progress."

133.     To carry-out their conspiracy to defraud Montage, the Individual Defendants sent all of the underlying loan documentation from the "active application" and "partial application" transitional loans to Pacific Union's Specialty Lending Group.  Individual Defendants sent as

much information as they had regarding "new applications" to Pacific Union's Specialty Lending Group.

134.    Upon information and belief, none of the Defendants obtained prior authorization from Montage's customers to send their non-public confidential financial information to Pacific Union, in violation of GLBA.

135.    The Specialty Lending Group presentation further explained that "Active Application can be tricky as borrowers will have established rapport with their current Loan Officer.  As such, borrowers will almost always require the continued involvement of their current Loan Officer for the duration of the origination lifecycle."

136.    Pacific Union's job description for loan officers in the Specialty Lending Group includes taking applications directly from on-boarded pipelines of borrowers.  Moreover, the description explicitly states that these applications must be taken by phone or in person, an action that would not create a paper trail for the misappropriated loan.

137.    Loan originators are prohibited by law from originating loans for more than one company.

138.    Pacific Union needed the "original loan officer" to remain involved with the borrower from a client relations standpoint, but the original loan officer could not be listed as the official loan officer until they worked for Pacific Union and were officially sponsored by and associated with Pacific Union under the Nationwide Mortgage Licensing System (NMLS).

139.    Upon information and belief, Defendants violated state and federal law by engaging in unlicensed loan origination activity.

Exhibit 75

140.     Pacific Union regularly sent messages to its new employees tracking the progress of transitional loans, including multiple emails with the title: "Matching Transitional Loan with **Actual Referring Loan Officer**" (emphasis added).

141.     These emails were sent from Pacific Union to the Individual Defendants' personal email addresses, requesting each of the Individual Defendants to identify which "transitional loans" were associated with each Individual Defendant.

142.     Upon information and belief, Pacific Union and the Individual Defendants had to track the "actual referring loan officer" in order to pay that loan officer enhanced compensation for the misappropriated loan.

143.     Defendant Creque, in order to track his personal compensation for misappropriated loans, forwarded the transitional loan spreadsheet from his personal email account, to his Pacific Union email account.

144.     Pacific Union's transitional loan tracking emails were accompanied by excel spreadsheets with information misappropriated from Montage concerning the loans.

145.     To further conceal their surreptitious activity, Pacific Union required misappropriated customers to submit applications through their online portal, making it appear as if the individuals had originally applied for a loan with Pacific Union.

146.     In other Specialty Lending Group presentations, Pacific Union directed loan officers that were not yet employed with the company to submit loans to the Specialty Lending Group by telephone, as opposed to email.

147.     Pacific Union required non-employees to submit loans and leads by telephone to prevent any evidentiary trail showing that the loan had been misappropriated.

Exhibit 75

148.     Pacific Union used its Specialty Lending Group to misappropriate loans from competitors, including from Montage, fueling its rapid growth over the past four years.

**Pacific Union's and the Individual Defendants' Continuing Violations of the DTSA**

149.     Montage has identified, to date, the following Montage protected business information that has been misappropriated by Pacific Union:

a.   At least three separate sets of confidential customer lists/pipelines, all of which were compiled by individuals while employed by Montage;

b.   Usernames and passwords for a variety of business programs and third party software utilized by Montage;

c.   198 loans and/or loan prospects;

d.   At least 38 of the misappropriated loans and/or loan prospects closed at Pacific Union.

150.     On March 28, 2016, Pacific Union entered into a Temporary Restraining Order, issued by this Court, in which it agreed, among other things, to stop contacting customers whose information "has been gleaned from Montage's former employees."

151.     But only 3 days later, on March 31, 2016, Pacific Union intentionally violated the TRO by submitting a request from a borrower to transfer his loan from Montage to Pacific Union.

152.     Pacific Union closed or performed considerable work on at least 5 misappropriated loans after May 11, 2016.

153.     For example, on one misappropriated loan, Pacific Union issued a loan disclosure on May 19, 2016, and noted a change of circumstance on May 20, 2016.  The same loan was identified as an active loan in Pacific Union's systems on June 16, 2016.

154.     Other loans were also identified as having closing dates well into June 2016.

26

Exhibit 75

155.    Pacific Union utilizes software common to sales-oriented industries called customer relationship management software, or CRM, for short.  Pacific Union uses at least one CRM, called "Top of Mind."

156.    Pacific Union required its new employees to upload past customers and prospective customers, including ones obtained from competitors such as Montage, into its CRM. For example, Andrew Charron, a former Montage employee working for Pacific Union in its Fairfax County office, submitted a customer list that included more than 50 prospective customers introduced to him through his work at Montage.

157.    Pacific Union continued to contact Montage customers through its CRM throughout 2016, including access and use after May 11, 2016 of Montage customers identified only through Pacific Union's and the Individual Defendants' misappropriation.  For instance, Montage customers were still being contacted in August 2016 through the CRM.

158.    Upon information and belief, Pacific Union and the Individual Defendants continue to use these misappropriated trade secrets to this day.

159.    An email from one customer to Kathy Keller on May 31, 2016 is illustrative of the length and breadth of the scheme.  The borrower wrote to Defendant Keller to complain about how long the process was taking, noting that her loan started at Montage and she was convinced by a departing loan officer to bring her loan to Pacific Union.  This borrower initially inquired about a loan with Montage in February 2015.

160.    Pacific Union actively worked on this loan from February 2016 through June 2016.

Exhibit 75

161.     On June 9, Pacific Union issued a closing disclosure for a closing to occur on June 10, 2016 on this misappropriated loan.   Pacific Union used Montage's Protected Business Information to undercut the interest rate originally offered by Montage.

## The Racketeering Enterprise

162.     Defendant Pacific Union, the Individual Defendants, Pacific Union's employees in the Specialty Lending Group, and new loan officer recruits that send loans to Pacific Union prior to their employment with Pacific Union are engaged in a racketeering enterprise, pursuant to 18 U.S.C. § 1962(c).

163.     The aforementioned members are associated together for a common purpose of misappropriating trade secrets and business information from mortgage companies.

164.     In doing so, each of the enterprise members profits off of each misappropriated loan.

165.     The Individual Defendants joined the enterprise prior to employment with Pacific Union, when they agreed to misappropriate Montage's Protected Business Information while they still worked at Montage.

166.     The racketeering enterprise is ongoing and includes new recruits from other mortgage companies.

167.     Pacific Union's website indicates that "onboarding" of loans from other companies is a recruitment tool, and that Pacific Union "offers the Specialty Lending Group to assist with your potential applications as your MLO license sponsorship is transferred."  *See* Loan Officer Support and Training, *available at* https://www.pacificunionfinancial.com/careers/loan-officer-support/#Servicing (last visited Sept. 28, 2017).

Exhibit 75

168.    In another recruitment brochure, Pacific Union reassures new recruits that "transitional loans" will not "fall through the cracks" because the "Specialty Lending Group is there to support you and your referral so that your hard work doesn't go to waste."

169.    The racketeering enterprise continues to grow as Pacific Union adds new branches from other mortgage companies, and continues to "onboard" transitional loans from other mortgage companies.

170.    One such onboarding took place in January 2016, when Pacific Union opened a branch formerly associated with another mortgage company, reporting to Defendant Naghmi.

171.    On March 18, 2016, the branch manager for that location, Edward Lanzoni, inquired with his superior, Defendant Naghmi, about when he and his loan officers could expect compensation for the transitional loans that were taken from his previous mortgage company.  Mr. Lanzoni was not a former employee of Montage.

172.    Pacific Union continues to add new branches at an astonishing rate.  For example:

a.    On June 2, 2017, Pacific Union announced that it opened a new branch in Virginia Beach, VA.

b.    On June 28, 2017, Pacific Union announced that it opened a new branch in Lisle, IL.

c.    On July 5, 2017, Pacific Union announced that it opened a new branch in Rocky Hill, CT.

d.    On July 18, 2017, Pacific Union announced that it opened a new branch in Boca Raton, FL.

e.    On August 15, 2017, Pacific Union announced that it opened a new branch in Denver, CO.

29

Exhibit 75

f.      On August 23, 2017, Pacific Union announced that it opened a new branch in Radnor, PA.

g.      On September 14, 2017, Pacific Union announced that it opened a new branch in Boise, ID.

173.    The aforementioned examples indicate why Specialty Lending Group employees, such as Michael Lassiter, need to be licensed to conduct mortgage origination activity in 49 states.

174.    Defendant Pacific Union, and members of the racketeering enterprise, are constantly working to expand the enterprise with new outside recruits from other mortgage companies.

175.    Internally, Pacific Union refers to on-boarded branches as "acquisitions."

176.    However, Pacific Union does not pay for, or otherwise negotiate the terms of, the so-called acquisition.

177.    Instead, the enterprise members conspire to take over the branch, and to misappropriate the loans and trade secrets of the target mortgage company.

178.    With respect to Montage, executives at Defendant Pacific Union referred to the acquisition of the Call Center Group as the "Charlotte Deal."

179.    However, no one at Defendant Pacific Union ever contacted anyone at Montage with the power or authority to sell Montage's Retail Branch or Call Center.

180.    Instead, the enterprise members conspired, and all agreed to take Montage's Confidential Business Information without authorization, and by illegal means.

Exhibit 75

**CAUSES OF ACTION**

**COUNT ONE –DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq*.**

(Against All Defendants)

181.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

182.     As set forth more fully above, Montage's confidential and proprietary trade secrets include, without limitation, Montage's non-public financial information, customer lists, active and closed loan pipelines, customer information, loan files and supporting loan documentation, pricing of past customer loans, pricing for prospective customers, and all such similar information necessary for Montage to conduct its business in a competitive marketplace.

183.     Montage's trade secrets relate to products and services used in, or intended for use in, interstate commerce, including federally-related mortgage loans.

184.     Montage took reasonable measures to protect the secrecy of its trade secrets, including having employees sign confidentiality agreements, restricting confidential information to those with a need to know such information, and ensuring that all information was password protected on computer systems and networks only accessible by those with authorization to do so.

185.     Montage's trade secrets were not generally known or available to individuals or entities outside of Montage.

186.     Montage's trade secrets have independent value from not being generally known to or readily ascertainable through proper means by other persons.

187.     Montage's trade secrets are of value to Pacific Union, as Montage's competitor. The immense value that the trade secrets add to Pacific Union's business is demonstrated by the

Exhibit 75

extent to which the Individual Defendants engaged in the gathering, misappropriation, and transfer of such information to representatives of Pacific Union and their efforts to conceal these actions.

188.     The Individual Defendants knew of the existence and the nature of the trade secrets and had the opportunity to acquire them by virtue of the trust placed in them by the Montage.

189.     The Individual Defendants breached their duty owed to Montage by illegally acquiring Montage's trade secrets.

190.     The Individual Defendants wrongfully misappropriated the Trade Secrets by sharing and using items such as, but not limited to, loan pipeline information, customer pricing information, loan files and supporting documentation, and customer lists from their Montage email accounts to members of Pacific Union's "Transitional Loan Team" via their personal email accounts, in an attempt to obfuscate their actions.

191.     Pacific Union was aware of the nature of Montage's trade secrets.

192.     Pacific Union induced the Individual Defendants to abuse their positions to misappropriate Montage's trade secrets, including by compensating solicited employees 115 basis points more for loans misappropriated from Montage.

193.     As further set forth above, the Defendants misappropriated Montage's trade secrets by acquiring them through unlawful means, disclosing and using them on behalf of Pacific Union, a competitor of Montage, and in derogation of Montage's interest, and continuing to retain possession of them to this day, all in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

32

Exhibit 75

194.     Defendants continue to use Montage's trade secrets to this day, including by continuing to contact consumers only identified through the theft of Montage's protected business information.

195.     As a direct and proximate result of Defendants' wrongful conduct, Montage has suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

196.     The losses and harm to Montage is ongoing and cannot be remedied by damages alone.

197.     Montage has no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

198.     Defendants' actions were willful and malicious.

199.     As a result of Defendants' actions described herein, Montage is entitled to have and recover damages from Defendants, including damages for the actual losses incurred as a result of Defendants' actions, and damages for any unjust enrichment gained by Defendants as a result of the misappropriation, plus exemplary damages, up to recovery of double damages.

200.     Montage is also entitled to have and recover its attorneys' fees as a result of Defendants' willful and malicious misappropriation.

201.     WHEREFORE, Montage demands judgment in its favor for Defendants' violation of the Defend Trade Secrets Act, and request actual and multiplied damages, preliminary and permanent injunctive relief, including, but not limited to, the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained,

Exhibit 75

in whole or in part, through the use of Montage's confidential and proprietary information, attorneys' fees, and such other and further relief available under the Defend Trade Secrets Act as this Court deems just.

## COUNT TWO – VIOLATION OF VIRGINIA'S UNIFORM TRADE SECRETS ACT

(Against All Defendants)

202.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

203.     As set forth more fully above, Montage's confidential and proprietary trade secrets include, without limitation, Montage's non-public financial information, details on loan transactions, negotiations with existing and prospective clients, business strategies, loan servicing lists, and all such similar information necessary for Montage to conduct its business in a competitive market place.

204.     Montage's trade secrets are of value to Pacific Union, who are competitors of Montage, as is clearly demonstrated by the extent to which the Individual Defendants engaged in the gathering, misappropriation, recruiting of other employees, and transfer of such information and employees to representatives of Pacific Union and their efforts to conceal these actions.

205.     Montage derived independent economic value from the fact that the trade secrets were confidential and were critical to the success of Montage's mortgage business.

206.     Montage undertook considerable efforts to ensure the maintenance of the secrecy of such information, including requiring all employees with access to agree to and sign non-disclosure agreements prior to the start of employment.  All Individual Defendants were aware that Montage's trade secrets were not to be disclosed to others.

Exhibit 75

207.    Pacific Union and their representatives knew that the information being obtained from Montage's computers and other sources was confidential and constituted trade secrets. Nevertheless, Pacific Union chose not only to passively receive this information, but also made concerted efforts to obtain it.

208.    Pacific Union and their representatives, including the Individual Defendants, were aware that Montage's trade secrets were being derived from or through a person who had improperly utilized the confidence given to them to transmit the trade secrets back to Pacific Union.

209.    As further set forth above, the Individual Defendants and representatives of Pacific Union misappropriated Montage's trade secrets by acquiring them through unlawful means and disclosing and using them on behalf of Montage's competitor, and in derogation of Montage's interest, all in violation of the Virginia Uniform Trade Secrets Act, Va. Code Ann. § 59.1-336, *et seq*.

210.    Defendants' misappropriation occurred between 2015 and 2016, and its use of the trade secrets continues to this day.

211.    As a direct and proximate result of Defendants' wrongful conduct, Montage has suffered and will continue to suffer incalculable financial losses, imminent and permanent harm, loss of the confidentiality of its trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

212.    The losses and harm to Montage continue and cannot be remedied by damages alone.

213.    Montage has no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

Exhibit 75

214.     Defendants have acted willfully, maliciously, and with reckless disregard to the rights of the Montage, entitling Montage to recovery of double damages and recovery of their reasonable attorneys' fees.

215.     WHEREFORE, Montage demands judgement in its favor for Defendants' violation of the Virginia Uniform Trade Secrets Act, and request actual and multiplied damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, attorneys' fees, and such other and further relief as this Court deems just.

## COUNT THREE – BREACH OF DUTY OF LOYALTY

(Against Individual Defendants Only)

216.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

217.     The Individual Defendants, all of whom had access to critical proprietary and business information and trade secrets belonging exclusively to Montage, owed a duty of loyalty to Montage, which they were required to exercise in good faith in the performance of their duties.

218.     Defendants misappropriated trade secrets, misused confidential information, and solicited Montage's potential consumers and other employees prior to the termination of their employment in violation of their duty of loyalty owed to Montage as their employer.

219.     The Individual Defendants breached their duties of loyalty to Montage by the following conduct, which partially continues to this day:

a. Failing to act solely for the benefit of Montage during their employment with Montage;

36

Exhibit 75

b. Using Montage's information, facilities, property, and computer systems to promote their personal interests and the interests of Pacific Union in derogation of Montage's interest;

c. Unlawfully disclosing and providing to third parties, including Montage's competitors, Montage's confidential, proprietary, and business information;

d. Submitting current and potential loans in the Montage pipeline for closing with Pacific Union, and utilizing Montage's Protected Business Information gained while employed with Montage;

e. Removing and failing to return to Montage all confidential proprietary and other business information upon their departure from employment with Montage.

220.     As a direct and proximate result of the Individual Defendants' unlawful actions, Montage has suffered, is suffering, and will continue to suffer incalculable financial loss, imminent and permanent irreparable harm, loss of the confidentiality of its proprietary business information, goodwill, business opportunity, and other damages.

221.     The Individual Defendants have acted intentionally, willfully, maliciously, and with reckless disregard for Montage's rights.

222.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

223.     WHEREFORE, Montage demands judgement in its favor for the Individual Defendants' breaches of their duty of loyalty, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers

Exhibit 75

obtained in whole or in part through the use of Montage's confidential and proprietary information, and such other and further relief as this Court deems just.

## COUNT FOUR – BREACH OF FIDUCIARY DUTY

(Against Individual Defendants Only)

224.    Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

225.    Each of the Individual Defendants named in this Complaint were employees and/or branch managers for Montage Mortgage.

226.    As employees and branch managers, these Individual Defendants owed fiduciary duties to Montage, which encompass the duty of care as well as the duty of loyalty to Montage in carrying out their employment obligations.

227.    Rather than comply with their fiduciary duties to Montage, each of these named Individual Defendants misappropriated, disclosed, and used Montage's confidential protected business information for their own benefit and the benefit of Pacific Union.

228.    In taking the actions set forth above, and in conspiring with Pacific Union to take Montage's customers through unlawful means, each of the named Individual Defendants breached their fiduciary duty to Montage.

229.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties to Montage, has suffered, is suffering, and will continue to suffer incalculable financial loss, imminent and permanent irreparable harm, loss of the confidentiality of its proprietary business information, goodwill, business opportunities, and other damages.

230.    The Individual Defendants have acted intentionally, willfully, maliciously, and with reckless disregard for Montage's rights.

38

Exhibit 75

231.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

232.     WHEREFORE, Montage demands judgement in its favor for the Individual Defendants' breaches of their fiduciary duty, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, disgorgement of all profits arising from the illegal activity, and such other and further relief as this Court deems just.

## COUNT FIVE – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Against Pacific Union Only)

233.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

234.     Each of the Individual Defendants owed a fiduciary duty to Montage, which they breached, as set forth above.

235.     Pacific Union knew of the fiduciary duties the Individual Defendants owed to Montage.

236.     Pacific Union knowingly assisted and encouraged the Individual Defendants to breach such duties to Montage, by promising them employment at significant sums, offering positions of management and authority within Pacific Union, and accepting and using Montage's confidential protected business information that the Individual Defendants provided for the benefit of Pacific Union.

Exhibit 75

237.     Pacific Union intentionally and knowingly sought to profit and did profit from the Individual Defendants' breach of their fiduciary duties to Montage.

238.     As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties to Montage, has suffered, is suffering, and will continue to suffer incalculable financial loss, imminent and permanent irreparable harm, loss of the confidentiality of its proprietary business information, goodwill, business opportunities, and other damages.

239.     The Individual Defendants have acted intentionally, willfully, maliciously, and with reckless disregard of the rights of Montage.

240.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

241.     WHEREFORE, Montage demand judgement in their favor for Pacific Union's aiding and abetting breach of fiduciary duty, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, disgorgement of all profits arising from the illegal activity, and such other and further relief as this Court deems just.

## COUNT SIX – BREACH OF CONTRACT

(Against Individual Defendants Only)

242.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

243.     All of the Individual Defendants, as employees of Montage, signed and executed

40

Exhibit 75

an contracts as conditions of their employment in exchange for their compensation.  There was a valid and enforceable Employee Contract between each of the Individual Defendants and Montage.

244.     During the time of employment of the Individual Defendants with Montage, Montage consistently upheld its end of the Employee Contract through financial benefits, including compensation and commissions.

245.     As further set out above, the Employee Contract contained clauses specifically prohibiting the transfer of Montage confidential proprietary information to any competitor, and prohibiting the solicitation of Montage employees for a period of two years after termination of employment with Montage.

246.     The Individual Defendants, in direct breach of their respective Employee Contracts, failed to fulfill their responsibilities and did transfer Montage confidential and proprietary information to a competitor, Pacific Union.  Similarly, Defendants Naghmi, Perry, and Keller solicited Montage employees in breach of their contracts.

247.     As a direct and proximate result of the Individual Defendants breach of their Employee Contracts, Montage has suffered, is suffering, and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, and the loss of the confidentiality of its proprietary business information and trade secrets, goodwill, business opportunities, and other damages.

248.     The Individual Defendants have acted intentionally, willfully, maliciously, and with reckless disregard of the rights of Montage.

249.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

Exhibit 75

250.    WHEREFORE, Montage demands judgement in its favor for the Individual Defendants' breach of contracts, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, and such other and further relief as this Court deems just.

## COUNT SEVEN – UNJUST ENRICHMENT

(Against Pacific Union Only)

251.    Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

252.    All Defendants sought to be enriched and were enriched by their unlawful misappropriation of Montage's trade secrets and other confidential and proprietary business information.

253.    In using Montage's protected business information, such as customer pricing and equipment data, drawings, information about future business opportunities, and existing and prospective customers, the Individual Defendants were unjustly enriched by obtaining business for Pacific Union and its subsidiaries that it could not have obtained otherwise.

254.    Defendants improperly utilized such information for their own enrichment and to the detriment and harm of the Montage, in derogation of its rights.

255.    Defendants are obligated to disgorge the benefits derived from their unlawful conduct, and to compensate Montage in the amount of all wrongfully obtained business, profits, and benefits.

Exhibit 75

256.     Further, it would be unequitable, unfair, and unconscionable for Defendants to be allowed to continue to benefit from their unlawful conduct without paying appropriate compensation to Montage.

257.     As a direct and proximate result of the Defendants' actions, Montage Montage has suffered, is suffering, and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, and the loss of the confidentiality of its proprietary business information and trade secrets, goodwill, business opportunities, and other damages.

258.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

259.     WHEREFORE, Montage demands judgement in its favor for unjust enrichment, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, and such other and further relief as this Court deems just.

## COUNT EIGHT – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Pacific Union Only)

260.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

261.     As more fully set forth above, Montage has long-standing existing relationships, including contractual relationships with customers in the form of mortgage loan contracts.

262.     All Defendants were aware of Montage's existing contractual relationships with the aforementioned and numerous other customers.

Exhibit 75

263.     Defendants intentionally and tortuously, without justification or excuse, interfered with Montage's contractual relationships, for the personal gain of all Defendants, and to the detriment of Montage by churning loans that were held by Montage and inducing the customers to refinance and transition their loans to Pacific Union, thereby severing the contractual relationship between the customers and Montage.   Additionally, Pacific Union induced the Individual Defendants to breach their non-solicitation clauses.

264.     Pacific Union was aware of the Individual Defendants' confidentiality, fiduciary, and loyalty duties to Montage and, in intentional disregard of those duties, acted in concert with the Individual Defendants to interfere with Montage's contractual relationships.

265.     Pacific Union knew that, as they prepared to leave Montage and after they did so, the individual Defendants were gathering information to pass on to Pacific Union for the expressed purpose of interfering with Montage's contractual relationships.

266.     As a direct and proximate result of Defendants' unlawful conduct, Montage has suffered and will continue to suffer incalculable financial loss, imminent and permanent irreparable harm, and the loss of the confidentiality of their proprietary business information, goodwill, business opportunities, and other damages.

267.     Defendants have acted intentionally, willfully, maliciously, and with reckless disregard of Montage's rights and of the obligations of the Individual Defendants to Montage.

268.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendant' unlawful conduct.

269.     WHEREFORE, Montage demands judgement in its favor for Defendants' tortious interference with contractual and business relationships, and request actual and punitive damages, preliminary and permanent injunctive relief, an Order directing all Defendants to refrain from

Exhibit 75

using Montage's protected business information and equipment, and to cease doing business with all customers obtained, in whole or in part, through the use of Montage's protected business information, and such other further relief as this Court deems just.

## COUNT NINE – TORTIOUS INTERFERANCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONSHIPS

(Against All Defendants)

270.      Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

271.      As further set forth in full above, Montage not only had existing but also prospective contractual relationships, including potential loans listed by Pacific Union as "transitional loans" that had been obtained using proprietary Montage techniques and pipelines.

272.      Defendants knew of these prospective loan relationships and intentionally and tortuously, without justification or excuse, interfered with and are continuing to interfere with those relationships in furtherance of their own interests and to the derogation of Montage's rights and interests by churning loans that were in a Montage pipeline, ready to be signed and closed, then inducing the customers to transition their loans to Pacific Union, thereby severing the potential contractual relationship between the customers and Montage.

273.      As a direct and proximate result of the Defendants' actions, Montage has suffered, is suffering, and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, and the loss of the confidentiality of its proprietary business information and trade secrets, goodwill, business opportunities, and other damages.

274.      The Defendants have acted intentionally, willfully, maliciously, and with reckless disregard of the rights of Montage.

45

Exhibit 75

275.     Montage has no adequate remedy at law to compensate for the losses it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

276.     WHEREFORE, Montage demand judgement in its favor for Defendants' tortious interference with prospective contractual and business relationships, and request actual and punitive damages, preliminary and permanent injunctive relief, including but not limited to the immediate return of all of Montage's confidential and proprietary business information, an Order directing all Defendants to refrain from using such confidential information and to cease doing business with all customers obtained in whole or in part through the use of Montage's confidential and proprietary information, and such other and further relief as this Court deems just.

## COUNT TEN– RICO – U.S.C. § 1962(c)

(Against All Defendants)

277.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

278.     The Individual Defendants perpetrated a scheme with Pacific Union whereby they misappropriated and used Montage's trade secrets in violation of the Defend Trade Secrets Act, as set forth above in Count I of this Complaint.

279.     Pacific Union is an enterprise engaged in and whose activities affect interstate commerce, including originating and servicing federally-related mortgage loans.  The Individual Defendants are employed by or associated with Pacific Union.  The Individual Defendants constitute an enterprise, as they engaged in and acted in concert with each other to execute various acts for the express purpose of unlawfully misappropriating Montage's trade secrets.

280.     Pursuant to and in furtherance of this fraudulent scheme, Defendants committed multiple related acts of racketeering and wire fraud, including using channels of interstate

46

Exhibit 75

commerce and the Internet to transmit trade secrets from their original Montage email accounts to Pacific Union via their own personal email accounts in an attempt to hide their illegal activities.

281.     In furtherance of their fraudulent schemes, Defendants willfully and with actual knowledge committed multiple acts over a long span of time between 2015 to the present time, including, but not limited to, the unlawful theft and continuing misappropriation of Montage's and other competitors' trade secrets, the unlawful theft and delivery of Montage's and other competitors' computerized information, and the use of electronic means to transmit such information through interstate commerce.  These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

282.     All Defendants directly and indirectly participated in the conduct of the enterprises' affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1961(c).

283.     As a direct and proximate result of the racketeering activities of Defendants, Montage has been injured in its business and property, including loss and misappropriation of trade secrets and protected business information, to further the interests of Pacific Union in derogation of Montage's rights.

284.     WHEREFORE, Montage demands judgment in its favor for Defendants' racketeering under 18 U.S.C. § 1961(c), and request all available statutory remedies, actual, multiplied, and punitive damages, preliminary and permanent injunctive relief, an Order directing al Defendants to refrain from using Montage's protected business information and equipment, and to cease doing business with all customers obtained, in whole or in part, through the use of Montage's protected business information, and such other and further relief as this Court deems just.

Exhibit 75

## COUNT ELEVEN – RICO – U.S.C. § 1962(d)

### (Against All Defendants)

285.    Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

286.    The Individual Defendants perpetrated a scheme with Pacific Union whereby they misappropriated Montage's trade secrets in violation of the Defend Trade Secrets Act, as set forth above in Count I of this Complaint.

287.    Pacific Union is an enterprise engaged in and whose activities affect interstate commerce, including originating and servicing federally-related mortgage loans.  The Individual Defendants are employed by or associated with Pacific Union.  The Individual Defendants constitutes an enterprise, as they acted in concert with each other to execute various acts for the express purpose of unlawfully misappropriating Montage's trade secrets.

288.    Pursuant to and in furtherance of this fraudulent scheme, Defendants committed multiple related acts of racketeering and wire fraud, including using channels of interstate commerce and the Internet to transmit trade secrets from their original Montage email accounts to Pacific Union via their own personal email accounts in an attempt to hide their illegal activities.

289.    In furtherance of their fraudulent schemes, Defendants willfully and with actual knowledge committed multiple acts over a long span of time between 2015 to the present time, including, but not limited to, the unlawful theft and continuing misappropriation of Montage's and other competitors' trade secrets, the unlawful theft and delivery of Montage's and other competitors' computerized information, and the use of electronic means to transmit such information through interstate commerce.  These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

Exhibit 75

290.     All Defendants conspired to directly and indirectly participate in the conduct of the enterprises' affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1961(d).

291.     As a direct and proximate result of the racketeering activities of Defendants, Montage has been injured in its business and property, due to the misappropriation of trade secrets and protected business information, that have been used to further the interests of Pacific Union in derogation of Montage's rights.

292.     WHEREFORE, Montage demands judgment in its favor for Defendants' racketeering under 18 U.S.C. § 1961(c), and request all available statutory remedies, actual, multiplied, and punitive damages, preliminary and permanent injunctive relief, an Order directing al Defendants to refrain from using Montage's protected business information and equipment, and to cease doing business with all customers obtained, in whole or in part, through the use of Montage's protected business information, and such other and further relief as this Court deems just.

**COUNT TWELVE – COMPUTER FRAUD AND ABUSE ACT - 18 U.S.C. § 1030**

(Against Defendants Pacific Union, Fouad Naghmi, and John Perry)

293.     Montage incorporates by reference paragraphs 1 through 180 as if set forth fully herein.

294.     Defendants Pacific Union, Naghmi, and Perry violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a protected computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a protected computer, and by obtaining information from such a protected computer.

49

Exhibit 75

295.     Defendant Perry violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing information contained in the financial records of a financial institution, using that information without authorization or by exceeding authorized access, and thereby obtaining information from the financial records of a financial institution.

296.     The computer system or systems that Defendant Perry accessed as described, including but not limited to Montage's email servere and other loan origination software and systems, all of which constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

297.     Montage's losses caused by the aforementioned actions exceed $5,000 in value.

298.     Perry performed these actions at the direction of Pacific Union, and its management-level employee, Defendant Naghmi.

299.     WHEREFORE, Montage demands judgment in its favor for Defendants' violations of 18 USC § 1030 and requests all available statutory remedies, preliminary and permanent injunctive relief—including, but not limited to, the immediate return of all of Montage's confidential and proprietary business information and an Order directing all Defendants to refrain from using Montage's protected business information and equipment, and such other and further relief as this Court deems just.

## COUNT THRITEEN – TEXAS UNIFORM TRADE SECRETS ACT

(Against All Defendants)

300.     Montage incorporates by reference paragraphs 1 through 176 as if set forth fully herein.

301.     Montage's customer lists and other confidential information as discussed herein constitute a trade secret within the meaning of the Texas Uniform Trade Secrets Act ("TUTSA"),

§§ 134A.001 *et seq.* of the Texas Civil Practice and Remedies Code, in that it is information that derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

302.   Defendants misappropriated confidential and propriety information belonging to Montage in violation of TUTSA by using it for their own behalf or on behalf of Pacific Union, and/or disclosing such information to Pacific Union, a competitor of Montage.

303.   Defendants have misappropriated this confidential information in a willful manner and with the deliberate intent to injure Montage and for the Defendants' own financial gain.

304.   As a proximate result of the misappropriation of Montage's confidential information, Montage has suffered and will continue to suffer actual damages and Defendants will be unjustly enriched in sums not yet ascertained.  Montage is therefore entitled to damages for actual loss and the unjust enrichment caused by the misappropriation for which Montage seeks to hold Defendants jointly and severally liable.

305.   WHEREFORE, Montage demands judgment in its favor for Defendants' violations of TUTSA, and requests all available statutory remedies, actual, multiplied, and punitive damages, preliminary and permanent injunctive relief—including, but not limited to, the immediate return of all of Montage's confidential and proprietary business information and an Order directing all Defendants to refrain from using Montage's protected business information and equipment and to cease doing business with all customers obtained, in whole or in part, through the use of Montage's protected business information—and such other and further relief as this Court deems just.

Exhibit 75

## COUNT FOURTEEN – BREACH OF COMPUTER SECURITY, <u>HARMFUL ACCESS BY COMPUTER</u>

(Against All Defendants)

306.     Montage incorporates by reference paragraphs 1 through 176 as if set forth fully herein.

307.     The Individual Defendants, while employed by Plaintiff Montage and after, did knowingly and intentionally accessed Montage's computer systems, networks, and private files without authorization or consent, for the purpose of obtaining Montage's Protected Business Information, in violation of TEX. PENAL CODE § 33.02, TEX. CIV. PRAC. & REM. CODE § 143.001.

308.     The Individual Defendants obtained unauthorized access to Montage's computer networks for the purpose of gathering and transferring Montage's Protected Business Information for use by and on behalf of Pacific Union.

309.     In doing so, the Individual Defendants intended to defraud Montage, and to obtain and use Montage's files, data and proprietary information stored on its network systems, despite their contractual agreements which forbid them to do so.

310.     These actions occurred starting in September 2015 and continuing through at least February 2016.

311.     As a direct and proximate result of Defendants' wrongful conduct, Montage has suffered and will continue to suffer incalculable financial losses, imminent and permanent harm, loss of the confidentiality of its trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

312.     WHEREFORE, Montage demands judgment in its favor for Defendants' violations, and requests all available statutory remedies, actual, multiplied, and punitive damages,

Exhibit 75

preliminary and permanent injunctive relief—including, but not limited to, the immediate return of all of Montage's confidential and proprietary business information and an Order directing all Defendants to refrain from using Montage's protected business information and equipment and to cease doing business with all customers obtained, in whole or in part, through the use of Montage's protected business information—and such other and further relief as this Court deems just.

## COUNT FIFTEEN – CONSPIRACY

(Against All Defendants)

313.  Montage incorporates by reference paragraphs 1 through 176 as if fully stated herein.

314.  Defendants have conspired with each other to, among other things, solicit Montage's employees, misappropriate Montage's trade secrets, interfere with Montage's prospective business relations, interfere with Montage's contractual relations, misuse Montage's confidential information, and breach fiduciary duties owed to Montage, all for the purpose of competing unfairly with Montage for the benefit of Defendants.  Pacific Union further conspired with the Individual Defendants to, among other things, solicit Montage's employees, misappropriate Montage's trade secrets, interfere with Montage's prospective business relations, interfere with Montage's contractual relations, misuse Montage's confidential information, and breach fiduciary duties owed to Montage, all for the purpose of competing unfairly with Montage for the benefit of Pacific Union.

315.  Defendants had a meeting of the minds to solicit Montage's employees, misappropriate Montage's trade secrets, interfere with Montage's prospective business relations, interfere with Montage's contractual relations, misuse confidential information, and breach fiduciary duties owed to Montage.  In doing so, all members of the conspiracy committed an unlawful, overt act in furtherance of the conspiracy.

316. As a direct and proximate result of the conspiracy, Montage seeks actual damages

53

Exhibit 75

and disgorgement of profits jointly and severally from Defendants as such profits were received by and for the benefit of Defendants.

### COUNT SIXTEEN – ATTORNEY'S FEES, COSTS OF COURT AND INTEREST

317.   By reason of the foregoing claims, Montage has been forced to retain attorneys and incur legal fees and court costs.   Montage requests judgment for an award of reasonable and necessary attorney's fees and costs of court incurred through the date of trial, entry of final judgment, and any appeals against Defendants under applicable Texas law, including but not limited to, Chapter 38 and § 134A.005 of the Texas Civil Practice and Remedies Code.

318.   Montage also seeks a conditional award of reasonable attorney's fees and court costs for any appeals as follows: (1) in the event Montage ultimately prevails in any appeal to the Court of Appeals; (2) in the event Montage ultimately prevails in any Petition for Review filed with the Supreme Court of Texas; and (3) in the event Montage ultimately prevails if a Petition for Review is granted by the Supreme Court of Texas.

319.   Montage further requests pre-judgment and post-judgment interest to the extent and in an amount allowed by law.

### COUNT SEVENTEEN – EXEMPLARY AND PUNITIVE DAMAGES

305. Montage seeks exemplary and punitive damages against all Defendants pursuant to Chapter 41 and § 134A.004 of the Texas Civil Practice and Remedies Code. The misappropriation and foregoing wrongful acts of those Defendants have been willful, malicious, and in bad faith and are the result of fraud, malice or gross negligence.   Defendants' misappropriation and wrongful acts have further subjected Montage to cruel and unjust hardship in conscious disregard to Montage's rights, so as to justify an award of exemplary and punitive damages according to proof at trial.

Exhibit 75

## PRAYER FOR RELIEF

WHEREFORE, Montage requests judgment in its favor with respect to the liability of Defendants hereunder, and an order declaring their rights and Defendants' obligations an enjoining Defendants as follows:

1.       Enter an order declaring Defendants to be in violation and liable under each of the Counts for which they are named hereunder;

2.       Directing Defendants to return every copy of any nature whatsoever of any document, electronic communication, or other data containing Montage's confidential, proprietary, or other business information, including but not limited to Montage's trade secrets;

3.       Directing Pacific Union and each Individual Defendant to turn over for forensic examination all personal computers and devices of any nature, hard drives, and any other computerized or electronic collection of data for the purpose of allowing Montage to determine the extent of Defendants' violation of Montage's rights and of the Defendants' obligations to Montage;

4.       Temporarily enjoining Defendants from utilizing in any way Montage's confidential business information, whether for the benefit of the Individual Defendants or Pacific Union or any other person or entity;

5.       Personally enjoining Defendants from any further efforts to solicit, recruit, or hire Montage's employees pending the outcome of this lawsuit;

6.       Directing Pacific Union to suspend the employment of each of the Individual Defendants pending the outcome of this lawsuit;

7.       Permanently enjoining all Defendants from any further use of Montage's confidential or proprietary business information, trade secrets, or any other business information

Exhibit 75

of value to Montage that is unlawfully in the possession of any Defendant;

8.      Enjoining each Defendant from destroying any electronic or computer information pending the outcome of this lawsuit;

9.      An Order awarding or make an award of compensatory damages in an amount to be proved after the discovery of all relevant evidence and a trial;

10.     An award of exemplary, punitive, and other monetary damages allowed by law and equity;

11.     An award in Montage's favor of all costs and attorneys' fees incurred;

12.     All statutory damages permitted by law;

13.     All statutory treble damages permitted by law; and

14.     Any other relief as this Court deems just, appropriate, and equitable.

Respectfully submitted,

*/s/ Bryan D. Bruner*
Bryan D. Bruner
State Bar No. 03252475
bbruner@bjplaw.com
Lynne B. Frank
State Bar No. 24087215
lbrooks@bjplaw.com
BRUNER & PAPPAS, L.L.P.
3700 W. 7th Street
Fort Worth, Texas 76107-2536
Telephone:  (817) 332-6633
Facsimile:  (817) 332-6619

*/s/ Jason W. McElroy*
Jason W. McElroy (*Pro Hac Vice*)
Jeffrey P. Blackwood (*Pro Hac Vice*)
WEINER BRODSKY KIDER PC
1300 Nineteenth Street, NW, Fifth Floor
Washington, DC  20036
Tel:  (202) 628-2000

56

Exhibit 75

Fax:  (202) 628-2011
Email: mcelroy@thewbkfirm.com
          blackwood@thewbkfirm.com

**Counsel for Montage Mortgage, LLC**

Dated: September 29, 2017

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument was served on all counsel pursuant to the Texas Rules of Civil Procedure on September 29, 2017.

*/s/ Bryan D. Bruner*
Bryan D. Bruner
Lynne B. Frank

and

*/s/ Jason W. McElroy\**
Jason W. McElroy*
Jeffrey P. Blackwood*

* Admitted *Pro Hac Vice* by Order Dated April 27, 2017

Exhibit 75