**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Montage Mortgage, LLC<br><br>          Plaintiff,<br><br>    vs.<br><br>Pacific Union Financial, LLC, John Perry, Valerie Coleman, Caitlin V. Cooke, Eduardo Creque, Jessica M. Furr (Keen), Kathy Keller, Fouad Naghmi, Tammy Neal, Charles F. Peer, Michaelene Whyte, and Melissa Willoby,<br><br>          Defendants. | **FILED UNDER SEAL**<br><br><br>Case No.: 3:17-cv-02971-B |

**PLAINTIFF MONTAGE MORTGAGE, LLC'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... ii

ARGUMENT ............................................................................................................1

    I.    This Court has Jurisdiction Over the Individual Defendants ...................1

        A.  Standard to Address Personal Jurisdiction on a 12(b)(2) Motion .......1

        B.  RICO Gives This Court Jurisdiction Over Individual Defendants .....2

        C.  This Court Has Specific Jurisdiction Through Defendants' Contacts With Texas ........................................................................................4

            i.   Montage's Claims Arise Directly from Individual Defendants' Communications with Texas .........................................................5

            ii.  Fair and Reasonable ....................................................................15

    II.   The S.A.P. Gives Notice of Plausible Claims .......................................15

        A.  Standard to Decide 12(b)(6) Motion ..................................................15

        B.  The Employment Contracts Do Not Contain a Condition Precedent ...........................................................................................16

        C.  The Predicate Acts Are Sufficiently Pled ..........................................18

            i.   Wire Fraud ..................................................................................18

            ii.  Bank Fraud ..................................................................................19

            iii. Fraud In Connection With Identification Documents .................20

            iv. Misappropriation of Trade Secrets ..............................................20

        D.  The Individual Defendants all Participated in the Conspiracy .........21

        E.  The RICO Conspiracy Claim is Adequately Pled .............................22

        F.  The CFAA Claim is Adequately Pled ................................................23

CONCLUSION .......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al-Juburi v. Chertoff*,
  No. 3:06-CV-1270, 2007 U.S. Dist. LEXIS 58176 (N.D. Tex. Aug. 9, 2007)........................3

*Allstate Ins. Co. v. Interline Brands, Inc.*,
  997 F. Supp. 2d 501 (N.D. Tex. 2014) ................................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................................4, 23

*At the Airport, LLC v. Isata, LLC*,
  438 F. Supp. 2d 55 (E.D.N.Y. 2006) ................................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................... *passim*

*Bell v. Hood*,
  327 U.S. 678 (1946).............................................................................................................3

*Brand Energy & Infrastructure Servs. v. Irex Contracting Grp.*,
  No. 16-2499, 2017 U.S. Dist. LEXIS 43497 (E.D. Pa. Mar. 23, 2017)...........................21, 24

*Bridgewater v. Double Diamond-Delaware, Inc.*,
  No. 3:09-CV-1758-B, 2010 U.S. Dist. LEXIS 45790 (N.D. Tex. May 10, 2010) .................21

*Brown v. Flowers Indus.*,
  688 F.2d 328 (5th Cir. 1982) ...........................................................................................8, 9

*Charles Schwab & Co. v. Carter*,
  No. 04 C 7071, 2005 U.S. Dist. LEXIS 21348 (N.D. Ill. Sep. 27, 2005)..............................24

*Commercial Metals Co. v. Chazanow*,
  No. 3:09-CV-0808-B, 2009 U.S. Dist. LEXIS 107676 (N.D. Tex. Nov. 17, 2009)..........16, 18

*Donovan v. Grim Hotel Co.*,
  747 F.2d 966 (5th Cir. 1984) .............................................................................................15

*Eagle Metal Prods., LLC v. Keymark Enters., LLC*,
  651 F. Supp. 2d 577 (N.D. Tex. 2009) ..............................................................................15

*Frei v. Davey*,
  22 Cal. Rptr. 3d 429 (Cal. Ct. App. 4th 2004).....................................................................17

*Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*,
   85 F.3d 201 (5th Cir. 1996) ....................................................................................4

*Jones v. Petty-Ray Geophysical, Geosource, Inc.*,
   954 F.2d 1061 (5th Cir. 1992) ................................................................................4

*Lewis v. Fresne*,
   252 F.3d 352 (5th Cir. 2001) ..................................................................................8

*Martin K Eby Constr. Co. v. Dallas Area Rapid Transit*,
   369 F.3d 464 (5th Cir. 2004) ................................................................................15

*McFadin v. Gerber*,
   587 F.3d 753 (5th Cir. 2009) ..................................................................................1

*Meganathan v. Signal Int'l, L.L.C.*,
   No. 1:13-CV-497, 2014 U.S. Dist. LEXIS 126737 (E.D. Tex. July 2, 2014) ..........................2

*Merritt Hawkins & Assocs., LLC v. Gresham*,
   79 F. Supp. 3d 625 (N.D. Tex. 2015) ....................................................................24

*Oblio Telecom, Inc. v. Patel*,
   711 F. Supp. 2d 668 (N.D. Tex. 2008) ..............................................................2, 3

*Praxis Capital & Inv. Mgmt. Ltd. v. Gemini Holdings I, LLC*,
   No. 2:15-CV-2912, 2016 U.S. Dist. LEXIS 64090 (S.D. Ohio May 16, 2016) ...............16, 17

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)...............................................................................................22

*Rimkus Consulting Grp., Inc. v. Balentine*,
   693 F. Supp. 2d 681 (S.D. Tex. 2010) ..................................................................14

*Rolls-Royce Corp. v. Heros, Inc.*,
   576 F. Supp. 2d 765 (N.D. Tex. 2008) ...................................................................2

*Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*,
   327 S.W.3d 104 (Tex. 2010)..................................................................................16

*Stuart v. Spademan*,
   772 F.2d 1185 (5th Cir. 1985) .................................................................................2

*Swartz v. Westminister Servs.*,
   No. 8:10-cv-1722, 2010 U.S. Dist. LEXIS 93107 (M.D. Fla. Sep. 8, 2010)...........................17

*Tel-Phonic Servs., Inc. v. TBS Int'l., Inc.*,
   975 F.2d 1134 (5th Cir. 1992) ...............................................................................15

*United States v. Elliott,*
   571 F.2d 880 (5th Cir. 1978) ..................................................................21

*United States v. Faulkner,*
   17 F.3d 745 (5th Cir. 1994) ....................................................................18

*United States v. John,*
   597 F.3d 263 (5th Cir. 2010) ..................................................................24

*United States v. Kanneganti,*
   565 F.3d 180 (5th Cir. 2009) ..................................................................18

*Wagner v. Phx. Ins. Co.,*
   141 Colo. 367 (1960) ..............................................................................16

*Wien Air Alaska, Inc. v. Brandt,*
   195 F.3d 208 (5th Cir. 1999) ....................................................1, 5, 14, 15

*Wilson v. Belin,*
   20 F.3d 644 (5th Cir. 1994) ......................................................................2

**Statutes and Rules**

18 U.S.C. § 20 ...............................................................................................19

18 U.S.C. § 27 ...............................................................................................19

18 U.S.C. § 1028 ...........................................................................................20

18 U.S.C. § 1344 ...........................................................................................19

18 U.S.C. § 1965(a) ....................................................................................2, 3

Fed. R. Civ. P. 8 ...........................................................................................18

Fed. R. Civ. P. 8(a) .......................................................................................22

Fed. R. Civ. P. 8(a)(2) ..................................................................................18

Fed. R. Civ. P. 9(b) .......................................................................................18

Fed. R. Civ. P. 12(b)(6)............................................................................1, 15

Plaintiff Montage Mortgage, LLC ("Montage") respectfully submits this opposition to Defendants Valerie Coleman, Caitlin V. Cooke, Eduardo Creque, Jessica M. Furr, Kathy Keller, Fouad Naghmi, Tammy Neal, Charles F. Peer, Michaelene Whyte, and Melissa Willoby ("Individual Defendants") motion to dismiss for lack of personal jurisdiction and failure to state a claim ("Motion").  For the foregoing reasons, the Motion should be denied.

## ARGUMENT

The Motion should be denied because the Individual Defendants have the requisite "minimum contacts" necessary for this Court to exercise personal jurisdiction since: (1) RICO provides for nationwide service of process and Defendants are all residents of the United States; and (2) Defendants' communications were the tortious acts directed towards Texas that give rise to Montage's claims.  *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999).  As for Rule 12(b)(6), there is no contractual condition precedent to Montage filing suit.  Finally, Montage's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Computer Fraud and Abuse Act ("CFAA") meet all federal pleading requirements.

## I.   This Court has Jurisdiction Over the Individual Defendants

The Individual Defendants have the requisite minimum contacts with both the United States and Texas for this Court to exercise personal jurisdiction.  Because there is no dispute this Court has personal jurisdiction over Defendant Pacific Union, RICO's nationwide service of process provision is satisfied as to all of the non-resident Individual Defendants.  Even if that were not enough, Individual Defendants purposefully availed themselves to the jurisdiction of this Court by sending communications to Texas which give rise to Montage's claims.

### A.  Standard to Address Personal Jurisdiction on a 12(b)(2) Motion

On "a challenge to the court's personam jurisdiction, a plaintiff must make only a prima facie showing of the predicate facts" establishing jurisdiction.  *McFadin v. Gerber*, 587 F.3d

1

753, 758 (5th Cir. 2009).   Allegations in the complaint should be accepted as true, and any

conflicts of facts in affidavits should be resolved in Plaintiff Montage's favor.  *Wilson v. Belin*,

20 F.3d 644, 648 (5th Cir. 1994).   Moreover, to determine jurisdiction, the Court may consider

"affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized

methods of discovery."  *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

### B.  RICO Gives This Court Jurisdiction Over Individual Defendants

Civil RICO claims may be "instituted in the district court of the United States for any

district in which such person resides, is found, has an agent, or transacts his affairs."  18 U.S.C. §

1965(a).  Courts in this District have interpreted this provision to mean that RICO "provides for

nationwide service of process."  *See Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 779

(N.D. Tex. 2008); *see also Oblio Telecom, Inc. v. Patel*, 711 F. Supp. 2d 668, 675 (N.D. Tex.

2008) (collecting cases).   Nonetheless, "before a defendant is subject to nationwide service of

process under § 1965(b), the plaintiff must establish personal jurisdiction over at least one

defendant under § 1965(a)."  *Rolls-Royce*, 576 F. Supp. 2d at 779-80.

In this case, there is no dispute that this Court has jurisdiction over Defendant Pacific

Union pursuant § 1965(a).  *See* S.A.P.  ¶ 4 (Pacific Union maintains "its principal place of

business in Irving, Texas").  Indeed, the attached Certificate of Fact from the Texas Secretary of

State verifies that Defendant Pacific Union is an active corporate entity within the state of Texas.

Ex. A (App. 002) (signed and sealed November 21, 2017).  Further, Pacific Union maintains a

registered agent at 1999 Bryan St., STE. 900 Dallas, Texas 75201.  *Id.*  Because Defendant

Pacific Union resides, is found, and has an agent in the Northern District of Texas, RICO's

nationwide service of process provision is met as to all of the Individual Defendants.  *See*

*Meganathan v. Signal Int'l, L.L.C.*, No. 1:13-CV-497, 2014 U.S. Dist. LEXIS 126737, at *6

(E.D. Tex. July 2, 2014) ("all of the district courts in this Circuit have interpreted § 1965(b) to confer nationwide jurisdiction in a RICO action over nonresident defendants if the plaintiff can establish personal jurisdiction over at least one defendant under § 1965(a)").

"[O]nce the nationwide service of process requirement has been met, as it has in this case, then a court may exercise personal jurisdiction over nonresident defendants if they have minimum contacts with the United States." *Oblio Telecom*, 711 F. Supp. 2d at 675.  Individual Defendants concede this point.  Mot., at 5 ("if federal statute allows for nationwide service of process, such as RICO, the relevant analysis is whether the defendant has 'minimum contacts' with the United States.").  Here, Individual Defendants' own affidavits all establish that they have the requisite minimum contacts with the United States because they reside or work from states within this country.  Mot. Exs., A, C, E, G, I, K, M, O, Q, S; *see also Id.*, at 3 ("Individual Defendants worked from their home states while employed by Plaintiff, and have continued to work from their home states or neighboring states while working for Defendant Pacific Union."); S.A.P. ¶¶ 5-15 (listing states of residency).  This settles the jurisdiction question.

Nonetheless, Individual Defendants attempt to side-step the RICO jurisdictional analysis completely by claiming "there is no cognizable RICO claim against any of the Defendants, especially not the Individual Defendants."  Mot., At 5.  But jurisdiction is not defeated:

> by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy.

*Al-Juburi v. Chertoff*, No. 3:06-CV-1270, 2007 U.S. Dist. LEXIS 58176, at *6-7 (N.D. Tex. Aug. 9, 2007) (Fitzwater, J.) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).  Whether a claim is stated under 12(b)(6) is simply inapposite to the jurisdictional analysis.  In any event, and as

3

explained below, the S.A.P. meets *Twombly* and *Iqbal* pleading standards, so Defendants' attempt to circumvent RICO jurisdiction fails.

### C.  This Court Has Specific Jurisdiction Through Defendants' Contacts With Texas

The Individual Defendants also availed themselves to this Court's jurisdiction through their contacts with the state of Texas.  Because Texas's long-arm statute extends to the limits of due process, this court need only consider whether: (1) the Individual Defendants purposefully availed themselves of the benefits and protections of the forum state of Texas by establishing "minimum contacts" with Texas, such that they would reasonably anticipate being hailed into court here; and (2) exercising jurisdiction over the Individual Defendants would not offend traditional notions of fair play and substantial justice.  *Allstate Ins. Co. v. Interline Brands, Inc.*, 997 F. Supp. 2d 501, 506 (N.D. Tex. 2014) (Boyle, J.) (citing *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992)).

The "minimum contacts" prong of the due process test is met through general or specific jurisdiction, the latter of which is established through a defendant's contacts with the forum state arising from, or related to, the cause of action.  *Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.,* 85 F.3d 201, 205 (5th Cir. 1996).  The Fifth Circuit uses a three-step analysis to determine whether specific jurisdiction exists: (1) whether the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of jurisdiction is fair and reasonable.  *Luv n' care v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citation omitted).

> **i.**     ***Montage's Claims Arise Directly from Individual Defendants'***
> ***Communications with Texas***

The Motion claims that specific jurisdiction cannot be established "merely because the Individual Defendants work for Pacific Union and may have communicated with Texas-based Pacific Union in the performance of their job duties."[1]  Mot., at 8.  But Defendants' purposeful availment here is not established simply because they communicated with Pacific Union employees in Texas.  Rather, the critical issue is that the communications sent to Texas—which attached Montage's customer lists, loan documentation, and confidential customer data—are among the tortious acts that give rise to Montage's claims.  *See Wien Air*, 195 F.3d at 213 ("when the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment").

As set forth in the S.A.P., Individual Defendants sent information concerning nearly 200 active or prospective Montage customers to Pacific Union employees in Texas.  S.A.P. ¶ 26.  Micah Greene, a prior Defendant in the underlying state action, and former employee of Montage, laid out the scheme in detail in a sworn affidavit.  Ex. B (App. 004).  Mr. Greene testified that Pacific Union had a "Loan Transition Team" that would "help move loans from Montage over to Pacific Union."  *Id.*, ¶ 7.  Defendants Willoby and Whyte were on this "Loan Transition Team," along with Specialty Lending Group loan officer Michael Lassiter.  *Id.*  Mr. Greene testified that a "condition of my employment with PacU was that I bring loans from Montage to populate my New Employee Pipeline at PacU."  *Id.*, ¶ 9.  Similarly, on October 7-8, 2015, Defendant Keller emailed a Montage loan list to Defendant Naghmi at his Pacific Union

---

[1] It is worth noting that much of the tortious conduct took place while the Individual Defendants were still employed by Montage, before they were Pacific Union employees.  *See, e.g.*, S.A.P. ¶¶ 62(a) – 62(ee) (thirty-one paragraphs of conduct before employment with Pacific Union).

account.  S.A.P. ¶ 62(p).  On October 7, 2015, Defendant Naghmi then emailed Pacific Union

CEO, Rick Skogg (located in Texas), forwarding him the list of Montage loans.  *Id.*, at ¶ 62(q).

Montage loan files were sent by the Individual Defendants to Pacific Union employees in

Texas, such as Michael Lassiter, by using personal email accounts to obscure activity from

Montage.  S.A.P. ¶¶ 20, 60.  Lassiter explained the scheme to illicitly transfer Montage borrower

information to Defendants Furr and Coleman: "I put in the basic info, enough to pull a credit

report . . . Then I complete the application when the referring LO sends me the complete 1003

and all supporting docs."  Ex. C (App. 008).[2]  Once the loan files were in Texas, Pacific Union

continued to work on the files from within Texas.  For example, on October 1, 2015, Lassiter

received an email (with Defendant Neal copied on it) with a Montage borrower's driver's license

and social security card.  S.A.P. at ¶ 79.  Lassiter then forwarded the documents (along with 50

other sensitive borrower financials) to **Dallas**DRSubmissions@loanpacific.com, requesting they

be uploaded into Pacific Union's loan origination systems ("L.O.S.").  *Id.*, ¶¶ 81-82.  The end

result of this scheme is reflected in an email exchanged between Lassiter and Defendant

Coleman, in which Defendant Coleman indicates that Pacific Union "should have all" the

documents concerning two Montage borrowers.  Ex. E (App. 015).  She received confirmation

that the borrowers were in Pacific Union's L.O.S. in separate screenshots which show that

Pacific Union was the Texas loan originator working on the loans from offices in Texas.  *Id.*[3]

Individual Defendants kept track of the loans they sent to Texas in emails such as the one

described in the S.A.P., with the subject line: "Matching Transitional Loan with **Actual**

---

[2] Individual Defendants such as Defendant Furr often explicitly asked Texas based employees to
pull credit for loan files misappropriated from Montage.  *See* Ex. D (App. 013).

[3] The screenshots of Pacific Union's L.O.S. also indicate that Defendant Whyte is the assigned
loan processor on one of the misappropriated loans.

**Referring Loan Officer.**"  S.A.P. ¶ 140 (emphasis added); Ex. F (App. 019).  Individual

Defendants had to keep track of the "actual referring loan officer" so they could be paid by

Pacific Union for the misappropriated loans.  S.A.P. at ¶ 142.  Moreover, Individual Defendants

needed a loan officer such as Michael Lassiter (licensed in 49 states) to work on their loans

because they were sending loans to Pacific Union while still employed by Montage, and state

and federal law prohibits loan officers from originating loans for more than one company at a

time.  *Id.*, at ¶¶ 135-139.[4]  The practical effect of this licensing constraint was that Individual

Defendants purposefully routed dozens of misappropriated loans to Texas.  For example, on

October 26, 2015, Defendant Naghmi sent a "loan pipeline" to several Pacific Union employees

listing loans misappropriated from Montage.  Ex. G (App. 023).[5]  Notably, the "office" column

indicates that 24 of those loans were being worked on by Pacific Union's "Direct – **Texas**"

office.  *Id.* (emphasis added).  The email also indicates that Michael Lassiter and Ben Schott

were the assigned loan officers—both of whom worked from Texas.  S.A.P. ¶¶ 20, 91.

  All of these loans were sent after a *quid pro quo* email exchange between Defendant

Naghmi and the CEO of Pacific Union, Rick Skogg.  *See* Ex. H (App. 027).  As an initial matter,

that email contains a blatantly misappropriated Montage customer list with consumer credit.  *Id.*

That aside, Skogg stated that he was willing to provide a "discretionary bonus" based on how

---

[4] Pacific Union's website indicates that "onboarding" of loans from other companies is a
recruitment tool, and that Pacific Union offers the "Specialty Lending Group" to assist with
recruits potential applications as their mortgage license sponsorship is transferred.  S.A.P. ¶ 167.

[5] The timing of the email (October 21, 2015) is particularly relevant because it shows that
approximately 30 loans were "submitted" before October 20, 2015.  All of the Individual
Defendants, except Defendants Naghmi and Whyte, were terminated on or about October 22,
2015.  S.A.P. ¶ 72.  Thus, the email's "Submit_Date" column makes clear that at least 30 loans
were sent to Pacific Union by the Individual Defendants while still employed by Montage.

Defendant Furr "assists us in getting loans to our transitional LOs."[6]  *Id.* (Skogg demanding to know "WHAT WE GET" in exchange for a $25,000 sign-on bonus).  In other words, the two were discussing how much to pay Individual Defendants for loans that were misappropriated from Montage and sent to Pacific Union's "transitional" loan officers in Texas.

Thus, it is a red herring for Individual Defendants to say that they do not "live, work, or own property in Texas, and have not originated, processed, or funded loans involving customers or property located in Texas."  Mot., at 1.  Defendants' entire scheme revolves around sending loans to Texas for Pacific Union to work on and process.  The loans sent to Texas are made, originated, and funded **by Pacific Union**, as reflected in the loan documentation, which clearly reflects Pacific Union as the Texas-based lender.  *See e.g.*, Ex. I (App. 039).

This scheme alone, which is set forth in detail in the S.A.P., satisfies the "prima facie" showing Montage needs to establish purposeful availment with respect to all the Individual Defendants.  *See Luv n' Care,* 438 F.3d at 469 ("plaintiff need not, however, establish jurisdiction by a preponderance of the evidence; a prima facie showing suffices").  But even if this scheme were not enough, the Fifth Circuit has made clear that a "single act" can be "enough to confer personal jurisdiction if that act gives rise to the claim being asserted."  *Lewis v. Fresne*, 252 F.3d 352, 358-359 (5th Cir. 2001); *see also Brown v. Flowers Indus.*, 688 F.2d 328, 332-33 (5th Cir. 1982) (holding that a single telephone call initiated by the defendant was sufficient to confer personal jurisdiction).

<u>*The Acts of Defendant Keller*</u>

The S.A.P. is rife with specific allegations concerning Keller's communications that were directed and sent to Texas.  First, the S.A.P. lays out in detail Defendant Keller's plan to send

---

[6] In the mortgage industry, "LO" is an acronym for "loan officer."

Montage loans to Pacific Union in an email titled "Fw: Files for Pac U." S.A.P. ¶ 62(k). This email listed all of the documentation that the Individual Defendants would send for each loan misappropriated from Montage, and included "a document titled 'Loan Officer Submission Checklist,' which was created on Pacific Union letterhead." *Id.*, at ¶¶ 62(n), (o). Thereafter, Defendant Keller emailed Montage's entire Retail Group pipeline to Pacific Union. *Id.*, at ¶ 62(p). The Pipeline contained "non-public consumer data from the months of February through September, including credit scores, total loan amount, loan number, and borrower name." *Id.*

Further, the S.A.P. describes a former Montage borrower that complained to Defendant Keller on May 31, 2016 about how long her loan was taking at Pacific Union, noting that she started at Montage, but was convinced by a departing loan officer to bring her loan to Pacific Union. *Id.*, at ¶ 159; *see also* Ex. J (App. 042). This borrower was emailing Defendant Keller from the state of Texas, concerning a loan for a property in Texas. Ex. I (App. 039).[7]

### The Acts of Defendant Whyte

Defendant Whyte claims in her affidavit supporting the Motion that "[a]t all times relevant to Plaintiff's Second Amended Petition, I have not been assigned to support borrowers in Texas." Mot., Ex. Q. But contrary to this attestation*,* Defendant Whyte was assigned to the same Texas borrower that emailed Defendant Keller to complain on May 31, 2016, and Defendant Whyte worked on that loan file directly. *See* Ex. K (App. 045). Indeed, Defendant Whyte was well aware the borrower was from Texas, as evidenced by the email she received

---

[7] Defendant Keller was the branch manager of the Retail Group, and thus well aware that her employees were sending files to and from Texas. In one email concerning a loan that was misappropriated from Montage, a sales coordinator from the Retail Group was having issues finding the loan file in Pacific Union's systems. *See* Ex. FF (App. 102). In the reply to the sales coordinator, the Pacific Union employee copied Defendant Keller and stated "[t]he loan is in Texas so you probably don't have access to it." *Id.*

stating "BECAUSE BORROWER LIVES IN TEXAS, THEY CANNOT DO A CONFERENCE CALL; FAX ONLY. . ." Ex. L (App. 047) (emphasis in original). Finally, Pacific Union's own internal files indicate that Defendant Whyte was the loan "Processor" assigned to the file, and that she worked in conjunction with Specialty Lending Group employee Michael Lassiter. Ex. M (App. 049). And this is but one example of her repeated conduct to aid in the misappropriation of Montage's confidential information. For example, in the loan pipeline email listing misappropriated loans sent by Defendant Naghmi on October 21, 2015, Defendant Whyte is the "Processor" assigned to at least five "transitional" loans. Ex. G (App. 023). At least one of those loans was "submitted" to Pacific Union on October 2, 2015, a full week before Defendant Whyte resigned from Montage. *Id.*; *see also* S.A.P. ¶ 73 ("Defendant Whyte resigned from Montage on or about October 9, 2015.").

*The Acts of Defendant Furr*

On October 20, 2015, Defendant Keller emailed Defendant Furr "these are the loans I show at Montage for you . . . please advise if they are to be added to the list of [sic] moving to Pac U." Ex. N (App. 051). In response to this email, Defendant Furr stated that two of the Montage borrowers "are there already." *Id.* On October 26, 2015, Defendant Furr represented to Defendant Naghmi in the subject line of an email that there were "18 files to move" for her at Pacific Union. Ex. O (App. 053).

Defendant Furr was not just making plans to send loans to Pacific Union, at times, she was sending them to the Texas employees herself. For example, on October 16, 2015, Defendant Furr emailed Pacific Union employee Michael Lassiter requesting that Mr. Lassiter "start and send credit i **will forward their docs** once I have [sic] contract[.]" S.A.P. ¶¶62(x) (emphasis added). Separately, on October 20, 2015, a Montage borrower emailed a uniform residential

loan application and credit card authorization to Defendant Furr, which Defendant Furr then forwarded to Michael Lassiter.  *Id.*, at ¶ 62 (cc), (dd).  The same day, Defendant Furr sent additional borrower documentation to Lassiter, asking him to "please pull credit."  Ex. D (App. 013).

### The Acts of Defendant Naghmi

As explained above, Defendant Naghmi sent a Montage loan pipeline to Pacific Union containing non-public borrower information on October 7, 2015.  S.A.P. ¶¶ 62(p), (q).  Indeed, Defendant Naghmi was central to the conspiracy, and often acted as the intermediary to send loans from former Montage employees to Pacific Union.  For example, on November 3, 2015, Defendant Naghmi emailed Rick Skogg concerning a tax return issue with a borrower.  Ex. P (App. 055).  In that email, Defendant Naghmi plainly states that the file issue was "most urgent and was **approved at Montage**."  *Id*. (emphasis added).

### The Acts of Defendant Willoby

On October 7, 2015, Defendant Willoby emailed Pacific Union loan documentation for a Montage borrower, including federal tax returns, child support documentation, credit reports, bank statements, photo identification, and paystubs.  Ex. Q (App. 058).  Later, Defendant Willoby is reflected as the "Contact" for this borrower on loan documentation dated November 14, 2017, which lists Pacific Union's "Direct – Texas Retail" office as the "Broker" on the loan. Ex. R (Ex. 060).  Additionally, the S.A.P. explicitly references Defendant Willoby receiving "loan disclosures" at her Montage email address from a Montage borrower on October 15, 2015. S.A.P. ¶ 62(t).  However, the loan disclosures have Pacific Union in the letterhead, and Defendant Willoby then immediately sent this email on to her personal email to forward on to Pacific Union.  S.A.P. ¶ 62 (u).

11

### *The Acts of Defendant Cooke*

On October 2, 2015, a Pacific Union employee emailed CEO Rick Skogg asking for "help to get 16 loans transitioned from Fobby Naghmi's WV branch." Ex. S (App. 062).[8]  The email lists "Loan Officer Assistant: Caitlin Cook" as a point of contact for the "project," and attaches a list of Montage borrowers, most of which have a status of "FILE READY TO SHIP." *Id*.  Thereafter, on October 6, 2015, Defendant Cooke emailed Pacific Union employee Michael Lassiter several supporting loan documents for a Montage borrower, including W-2s and tax returns. Ex. T (App. 064).  On October 16, 2015, Defendant Cooke received an email from Pacific Union employee Ben Schott concerning the same borrower. S.A.P. ¶¶ 62(w).  In that email, Ben Schott makes clear to the Montage borrower that Defendant Cooke, along with another Pacific Union employee will be her "primary point of contact" moving forward. *Id.*, at ¶¶ 62(x); *see also* Ex. U (App. 066) ("FW: Your Loan Disclosures").  Three days later, Defendant Cooke emailed Pacific Union concerning several misappropriated Montage files. Ex. V (App. 071).  With respect to one Montage borrower, she makes clear that she "know(s) that file is in Texas." *Id*.

### *The Acts of Defendant Peer*

The aforementioned email from Defendant Cooke that lists the misappropriated Montage loan files is titled "Active  Files – Chad Peer." Ex. V (App. 071).  Defendant Peer actively sent Montage loans to Pacific Union in several instances.  For example, on September 30, 2015, Defendant Peer emailed Defendant Naghmi and stated "[p]lease see the attached spreadsheet for the files that I will be sending ASAP. . ." Ex. W (App. 073).  Attached to this email is a

---

[8] The reference to "Fobby Naghmi's WV branch" is actually referring to a Montage licensed branch.  Defendant Naghmi did not own Montage's West Virginia branch or otherwise have any authority to transfer loans assigned to the branch to Pacific Union.

spreadsheet with sixteen Montage borrowers with a status indicating the file is "READY TO

SHIP." *Id.* Thereafter, on October 5, 2015, in an email to one of the borrowers listed in the

spreadsheet, Defendant Peer admits that "[w]e have sent your file in to Pacific Union." Ex. X

(App. 076) ("RE Appraisal"). In yet another email, on October 27, 2015, Defendant Keller states

that "I need to get Chad hired at Pac U he has not done any paperwork." Ex. Y (App. 082). Yet

despite not working for Pacific Union, the email indicates that Defendant Peer had already

"referred" several Montage loans to Pacific Union throughout October 2015. *Id.*

### *The Acts of Defendant Coleman*

As indicated above, Defendant Coleman was directly involved with sending loan

documentation concerning a Montage borrower to Pacific Union. Ex. E (App. 015). The steps

of this particular misappropriation can be traced through several emails. First, Pacific Union

employee Dustin Ross requested that Defendant Coleman have the borrower sign loan

documents. Ex. Z (App. 087). Defendant Coleman then sent the borrower those loan documents

to sign. Ex. AA (App. 091). After receiving the signed documents, Defendant Coleman told

Defendant Furr that she was sending the documents to Pacific Union employee Dustin Ross "in a

few." Ex. BB (App. 094). Then Defendant Coleman did just that, as reflected in the email

showing the loan file was in Pacific Union's L.O.S. Ex. E. (App. 015).

### *The Acts of Defendant Creque*

Defendants downplay Defendant Creque's involvement in the scheme, saying the "only

communication identified by Plaintiff that involved Individual Defendant Creque was an email

he sent from his personal email address to his Pacific Union email address containing a

transitional loan spreadsheet . . .'" Mot., at 9 (citing S.A.P. ¶ 143). Defendants conclude that the

"email described has nothing to do with Texas." *Id.* But contrary to this assertion, the email

Defendant Creque is forwarding is the "Actual Referring Loan Officer" email. Ex. CC (App. 096). And the spreadsheet attached to that email indicates at least 28 of the "transitional loans" (*i.e.*, loans stolen from Montage) were being worked on directly by Pacific Union's Texas office. Ex. DD (App. 098).[9]

### The Acts of Defendant Neal

On November 4, 2015, Defendant Neal sent documentation concerning a Montage borrower to several former Montage employees at their Pacific Union email addresses. Ex. EE (App. 100). Defendant Neal lists several documents that were needed "prior to submission" to Pacific Union. However, in the body of the email, Defendant Neal lists four separate dates concerning Montage Mortgage credit inquiries, on September 14, 15, October 5, and 28. *Id*. Thus, Defendant Neal intentionally gathered and submitted loan documentation to Pacific Union for a loan she knew was misappropriated from Montage.

In conclusion, all of the foregoing tortious conduct, directed towards Texas, gives rise to Montage's claims. *Luv n' Care*, 438 F.3d at 469. Accordingly, Individuals Defendants have the requisite minimum contacts with Texas for this Court to assert personal jurisdiction. *See Wien*, 195 F.3d at 212 (jurisdiction proper when communications go to "the heart of the lawsuit").

### ii.    *Fair and Reasonable*

"Texas has a strong interest in litigation concerning the theft of trade secrets from a Texas company" such as Montage. *Rimkus Consulting Grp., Inc. v. Balentine*, 693 F. Supp. 2d 681, 688 (S.D. Tex. 2010). And Montage itself "clearly has a strong interest in determining, in its home forum, whether its trade secrets were misappropriated by its former employees and used by a direct competitor to do business in its state." *Id*. Furthermore, "as the Fifth Circuit has

---

[9] Non-relevant information was removed from this spreadsheet for purposes of filing.

stated, due process is *not* offended 'when a non-resident corporate agent or employee is made subject to personal jurisdiction in the forum state for a foreseeable consequence therein of his personal act performed elsewhere." *Eagle Metal Prods., LLC v. Keymark Enters., LLC*, 651 F. Supp. 2d 577, 586 (N.D. Tex. 2009) (emphasis original) (quoting *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 974 (5th Cir. 1984)).

The Individual Defendants had a choice when they decided to leave Montage.  They could have informed Montage of their plans to leave, and then amicably wound down their pipelines and active files.  But instead, they chose to misappropriate Montage's trade secrets and send those files to Pacific Union in Texas. S.A.P. ¶ 26.  For that reason, it is neither unfair nor unreasonable for the Individual Defendants to answer for and defend their conduct in Texas. *Wien Air*, 195 F.3d at 213 (availment is "the privilege of causing a consequence" in Texas).

## II.    The S.A.P. Gives Notice of Plausible Claims

### A.    Standard to Decide 12(b)(6) Motion

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Martin K Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004).  "A motion to dismiss an action for failure to state a claim admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts."  *Tel-Phonic Servs., Inc. v. TBS Int'l., Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992) (internal quotation and citation omitted).  The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff must plead "enough facts to state a claim for relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. At this stage "[t]he issue is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims." *Commercial Metals Co. v. Chazanow*, No. 3:09-CV-0808-B, 2009 U.S. Dist. LEXIS 107676, at *7-9 (N.D. Tex. Nov. 17, 2009) (quoting *At the Airport, LLC v. Isata, LLC*, 438 F. Supp. 2d 55, 60 (E.D.N.Y. 2006)).

### B.     The Employment Contracts Do Not Contain a Condition Precedent

In their Motion, Individual Defendants claim that Montage has "fail[ed] to plead the satisfaction of a contractual condition precedent to filing suit." Mot., at 21. But Defendants omit a critical portion of the provision on which they rely, which makes clear that mediation is not a condition precedent to filing suit. The entire provision at issue reads:

> Mediation. LOAN OFFICER Assistant and MM agree to mediate any dispute or claim arising between them out of this Agreement or any resulting transaction, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. **If** any party commences an action on a dispute or claim to which this paragraph applies, **without first attempting to resolve the matter through mediation, then that party shall not be entitled to recover attorney's fees**, even if they would otherwise be available to that in any such action.

Mot., Exs. B, D, F, H, J, L, N, P, R, T (emphasis added). Thus, the only conditional language in the provision concerns attorney's fees—there is no condition precedent to filing suit. *See Wagner v. Phx. Ins. Co.*, 141 Colo. 367, 370 (1960) (to be held as a condition precedent, contract "language must be clear and specific to that effect"); *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010) ("[T]o make performance specifically conditional, a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included . . . their absence is probative of the parties intention that a promise be made, rather than a condition imposed.")

Last year, the Southern District of Ohio analyzed a mediation provision with language verbatim to the one at issue here. *See Praxis Capital & Inv. Mgmt. Ltd. v. Gemini Holdings I, LLC*, No. 2:15-CV-2912, 2016 U.S. Dist. LEXIS 64090, at *4 (S.D. Ohio May 16, 2016) ("if any

16

party commences an action without first attempting to resolve the matter through mediation . . .
then that party shall not be entitled to recover attorneys' fees").  The court declined to compel
mediation "because the parties specifically provided for a contingency if a party refused to
mediate—specifically, that the party would be prohibited from collecting attorney fees."  *Id.*, at
6; *see also Frei v. Davey*, 22 Cal. Rptr. 3d 429, 434 (Cal. Ct. App. 4th 2004) (interpreting the
same provision only as a precondition to attorney's fees).  Because there is no condition
precedent to filing suit, the Motion should be denied.

Finally, even if the mediation provision were a condition precedent, which it is not,
dismissal pursuant to 12(b)(6) would not be appropriate relief.  "The law is clear that when
confronted with an objection that a plaintiff has initiated litigation without satisfying arbitration
or mediation requirements, courts routinely stay rather than dismiss the proceedings to allow for
implementation of the agreed-upon dispute resolution mechanism."  *Swartz v. Westminister
Servs.*, No. 8:10-cv-1722, 2010 U.S. Dist. LEXIS 93107, at *3 (M.D. Fla. Sep. 8, 2010)
(collecting cases).  Moreover, it is a question of fact whether either party substantially complied
with the contractual provision that requires "attempting to resolve the matter through mediation."
Such an issue should be determined on the basis of a complete record, and only if a party moves
for attorney's fees at a later date.[10]

---

[10] Montage disputes Individual Defendants' characterization that filing the S.A.P. was an "utter
disregard" for the mediation provision, or that Montage "filed this case without warning."  Mot.
at 24.  The Motion omits key facts such as telephone conversations, multiple emails, and an in-
person meeting with Individual Defendants' counsel concerning mediation.  A complete record
would show, for instance, Montage counsel's repeated requests for an answer concerning
whether the Individual Defendants were willing to mediate.  A complete record would also show
that Individual Defendants initially refused to mediate with Montage.

### C.     The Predicate Acts Are Sufficiently Pled

Defendants' Motion spends several pages ostensibly attacking the sufficiency of Montage's allegations concerning RICO under Federal Rules 8 and 9(b).  Mot., at 16-20. At the outset, it is worth noting that the Motion often cites to allegations within the "Counts" of the S.A.P., while ignoring the 200 plus detailed allegations that come before that section of the S.A.P.  For example, the Motion claims that the Individual Defendants do not have notice under Rule 8(a)(2) because Montage has "simply list[ed] the statutes that serve as the basis for the predicate racketeering acts."  Mot., at 16-17.  Not so.  The S.A.P. is peppered with details concerning all four of the predicate acts at issue here—wire fraud, bank fraud, fraud in connection with identification documents, and misappropriation of trade secrets.

### i.  Wire Fraud

The essential elements of wire fraud are: (1) a scheme to defraud; and (2) the use of, or causing the use of, interstate wire communications to execute the scheme.  *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994).  In the RICO context, this Court has explained that "Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Commercial Metals Co*., 2009 U.S. Dist. LEXIS 107676, at *13-14 (quoting *United States v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)).  In alleging a RICO scheme involving mail or wire fraud, "it is not necessary to assert that each defendant personally made fraudulent mailings or wires; rather Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud."  *Id*.

As explained in detail above in the Personal Jurisdiction Section, Individual Defendants' scheme was carried out almost entirely via email communications misappropriating Montage's

protected information, or via emails that laid out the conspiracy to do the same.  *See, e.g.*, S.A.P.

¶¶ 57-60.  Indeed, the S.A.P. describes dozens of communications, referenced by date, with

specific senders and recipients that were sent to defraud Montage of confidential trade secret

information, and send that information to Pacific Union.  *Id.*, at ¶¶ 62(a), 62(c), 62(j), 62(k)-(o),

62(p), 62(q), 62(r), 62(u), 62(w)-(z), 62(aa)-(bb), 62(cc)-62(dd), 69-70, 78, 84, 86-90, etc.

Several allegations also detail actual misrepresentations made by the Individual Defendants in

the emails themselves.  *Id.*, at ¶¶ 69-71 (Defendant Keller lying to Montage CEO that Individual

Defendants "would not take any document" from Montage); *Id.*, at ¶ 62(j) (Defendant Cooke

lying to a borrower, stating Montage could not close the loan due to "all the late payments. . .

[but] there is a company that we outsource to though that, we would like to send your file over

and have them underwrite to see if they can close it. Their name is Pacific Union.").

>    ii.  **Bank Fraud**

These same allegations pertinent to wire fraud are relevant to the predicate acts of bank

fraud which is established by a scheme to: (1) defraud a financial institution; *or* (2) to obtain any

of the moneys, funds, credits, assets, securities, or other property owned, or under the custody or

control of, a financial institution, by means of false or fraudulent pretenses, representations, or

promises.  18 U.S.C. § 1344.  Because the S.A.P. contains an overwhelming number of fraud

related allegations, for purposes of 12(b)(6), the only real issue is whether Montage has pled

allegations concerning its status as a "financial institution" under the statute.  And it has.  As

explained in the S.A.P., "Montage is a residential mortgage lending company and 'financial

institution' as defined by 18 U.S.C. §§ 20, 27."  S.A.P. ¶ 2.  Montage qualifies as a "financial

institution because it is a "mortgage lending business," as defined in 18 U.S.C. § 27, and because

it makes federally related mortgage loans subject to RESPA.  *See* S.A.P. ¶ 3 ("Montage

originates federally related mortgage loans, as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.").

### iii.   *Fraud In Connection With Identification Documents*

Several allegations concern the predicate act of "fraud in connection with identification documents." 18 U.S.C. § 1028. For example, on "October 9, 2015, Defendant Whyte, using her Montage email account, attached a Montage borrower's Florida driver license and sent the license to her personal email address, in order to forward that license on to Pacific Union." S.A.P. ¶ 78. The S.A.P. goes on to explain in detail circumstances related to the unauthorized communication of a borrower's New York driver's license. *See* S.A.P. ¶ 79-82 (concerning Defendant Neal). Similar allegations concern Defendant Keller and Naghmi. *See* S.A.P. ¶ 82 (Virginia driver's license). Finally, on October 22, 2015, Defendant Furr sent an additional Virginia driver's license to Pacific Union via an unauthorized communication. S.A.P. ¶ 84.

### iv.   *Misappropriation of Trade Secrets*

With respect to the predicate act of misappropriation of trade secrets, for purposes of brevity, Montage directs the Court to the allegations clearly setting forth the details surrounding the misappropriation of customer lists. *See, e.g.*, S.A.P. ¶ 62(p) ("On October 7 and 8, 2015, Defendant Keller used her personal email address to send Montage's Retail Group pipeline to Defendant Naghmi at his Pacific Union email address."), ¶62(p) ("On October 7, 2015, Defendant Naghmi then emailed Pacific Union CEO, Rick Skogg, forwarding him the list of Montage loans."), ¶¶ 87-92 (emails with Pacific Union CEO Rick Skogg concerning the misappropriation of 16 additional Montage loans), ¶¶ 109-113 (allegations concerning the misappropriation of the Call Center customer list in February 2016). All of the aforementioned

give Individual Defendants "fair notice" of the RICO predicate acts and thus also the "grounds

upon which" RICO claims rest." *Twombly*, 550 U.S., at 555.

Further, the S.A.P devotes an entire section to Defendants' continuing violations of the

Defend Trade Secrets Act ("DTSA").  *See* S.A.P. ¶¶ 149-161.  Earlier this year, the Eastern

District of Pennsylvania upheld RICO claims in a DTSA case.  *See Brand Energy &*

*Infrastructure Servs. v. Irex Contracting Grp.*, No. 16-2499, 2017 U.S. Dist. LEXIS 43497 (E.D.

Pa. Mar. 23, 2017).  In that case, the Court noted the "dozens" of violations alleged, and also the

"threat that the DTSA violations will continue because, allegedly, the defendants continue to use

[plaintiff's] trade secrets in their business affairs." *Id.*, at *27-28.  In addition to the specific

misappropriations already identified, the S.A.P. discusses Defendant Pacific Union's "customer

relationship management software," and how at least 50 prospective Montage customers were

uploaded to that software and accessed at least through August 2016.  S.A.P. ¶¶ 155-158.

"These allegations alone are sufficient to constitute a 'pattern of racketeering activity' under

RICO." *Brand Energy*, 2017 U.S. Dist. LEXIS 43497, at *28.

### D.      The Individual Defendants All Participated In The Conspiracy

Defendants claim that Montage "has not alleged how each of the Individual Defendants

participated in the operation or management of the alleged 'association-in-fact' RICO

enterprise." Mot., at 19.  But as this Court has recognized, the "proscriptions of the RICO statute

have broad reach; the 'RICO net is woven tightly to trap even the smallest fish, those

peripherally involved with the enterprise.'" *Bridgewater v. Double Diamond-Delaware, Inc.*, No.

3:09-CV-1758-B, 2010 U.S. Dist. LEXIS 45790, at *33 (N.D. Tex. May 10, 2010) (quoting

*United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978)).  The statute "makes clear that RICO

liability is not limited to those with a formal position in the enterprise," nor does it require

"primary responsibility" or "significant control." *Id.*, (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). Thus, it is "sufficient to allege . . . that each participated indirectly in the conduct of the Enterprise by approving, receiving, or communicating" the fraudulent conduct at issue. *Id.* Here, the S.A.P. does just that.

For example, the S.A.P states that the "following examples are illustrative of the conspiracy to defraud Montage, but not exhaustive of it," and then lists thirty one allegations detailing Defendants' involvement in the conspiracy. S.A.P. ¶¶ 62(a) – 62(ee). The S.A.P. goes on to describe Defendant Pacific Union's "Specialty Lending Group" with particularity, including how the Group worked with the Individual Defendants to misappropriate loans from Montage. *Id.*, at ¶ 135 ("To carry-out their conspiracy . . . the Individual Defendants sent all of the underlying loan documentation from the 'active application' and 'partial application' transitional loans to Pacific Union's Specialty Lending Group.") The S.A.P. also details how the Individual Defendants tracked "transitional loans" in order to be paid enhanced compensation. *Id.*, at ¶¶ 141-144. Such allegations, coupled with the hundreds of other allegations in the S.A.P., easily meet the "short and plain statement" standard of Fed. R. Civ. P. 8(a), and thus give the Individual Defendants "fair notice" of the RICO claims. *Twombly*, 550 U.S., at 555.

**E.     The RICO Conspiracy Claim Is Adequately Pled**

Individual Defendants claim, without explanation, that Montage "has not alleged any facts implying an agreement . . . to commit at least two predicate acts required to establish a pattern of racketeering activity." Mot., at 19. But even a cursory glance at the S.A.P. shows this is not the case.

As set forth in the S.A.P., Defendants Keller and Pacific Union agreed that Keller would be the "branch manager" of Northern Virginia branch, and that she instructed her subordinates to

send loans to Pacific Union.  S.A.P. ¶¶ 63-64.  The S.A.P also explains that the Individual

Defendants "actively worked in concert with each other and Pacific Union prior to and after their

departure from Montage."  *Id.*, at ¶ 76.  For example, on October 7, 2015, Defendant Keller sent

Defendants Peer and Cooke a detailed plan for misappropriating Montage loans in an email titled

"Fw: Files for Pac U."  *Id.*, at ¶ 62(k).  The email noted that the following items should be sent to

Pacific Union for each loan misappropriated from Montage: "a completed loan officer

submission checklist should be completed for each loan; a completed 1003 (which is the form

number Fannie Mae gives to its Universal Residential Loan Application) in PDF; and supporting

documents, including non-public consumer information concerning income, assets, credit reports

and scores, and other sensitive financial information."  *Id.*, at ¶ 62(m).  Further, on October 20,

2015, Defendant Keller emailed Defendants Furr and Naghmi (who was already officially

working for Pacific Union) with the subject header: "**Loans at Montage**."  *Id.*, at ¶ 62(aa)

(emphasis added).  In the email, Defendant Keller asked whether the nine Montage loans should

be "added to the list of moving to Pacific Union."  *Id.*, at ¶ 62(bb).  Finally, the S.A.P. details

several conversations that took place between Pacific Union CEO Rick Skogg concerning the

"onboarding" of the entire Retail Group, including how Pacific Union planned to take 16 loans

from Montage's branch in West Virginia.  *See Id.*, at ¶¶ 86-92.

Taken as true, these allegations are more than enough to be "suggestive of illegal

conduct," and therefore "state[] a ground for relief that is plausible."  *Ashcroft v. Iqbal*, 556 U.S.

662, 6969 (2009) (citing *Twombly*, 550 U.S., at 564, n.8).

### F.      The CFAA Claim Against Defendant Naghmi is Adequately Pled

Montage has pled a viable agency and indirect access theory under the CFAA as to

Defendant Naghmi.  Initially, the Fifth Circuit has taken the broad view of what constitutes

23

"without authorization" under Section 1030(a)(4) of the CFAA, finding it to mean "exceeding

the purposes for which access is 'authorized.'"  *United States v. John*, 597 F.3d 263, 272 (5th

Cir. 2010) ("'authorized access' . . . may encompass limits placed on *the use* of information

obtained by permitted access to a computer").  Further, "[a]n authorized computer user 'has

reason to know' that he or she is not authorized to access data or information in furtherance of a

criminally fraudulent scheme."  *Id.*, at 273.  Thus, "a user exceeds authorization when he

accesses information for a purpose that he knows or reasonably should know is not authorized."

*Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 634 (N.D. Tex. 2015).

Moreover, even courts in circuits that have taken the narrower view of "authorized

access" have upheld CFAA claims on a 12(b)(6) motion under a theory of "indirect access."  *See,

e.g., Brand Energy*, 2017 U.S. Dist. LEXIS 43497, at \*34; *Charles Schwab & Co. v. Carter*, No.

04 C 7071, 2005 U.S. Dist. LEXIS 21348, at \*22 (N.D. Ill. Sep. 27, 2005) (finding plausible

CFAA claim where defendants urged their agent to "access [plaintiff's] computer system beyond

his authorization for their benefit").  In those cases, "a person may be liable if he directs,

encourages, or induces someone else to access a computer that he himself is not authorized to

access."  *Id.* (citation omitted).  This theory of liability is premised on the concept that "access"

may be achieved through another person."  *Id.*  This is "especially true in our current era, and to

hold otherwise would be to ignore the nature of technological communication."  *Id.*

Here, the S.A.P. clearly alleges that Defendant Naghmi instructed Montage employees to

send Montage's trade secrets to Pacific Union, which he was also doing himself.  S.A.P. ¶¶ 57,

92.[11]  And the S.A.P. gives specifics as to how Individual Defendants did just that, often routing

---

[11] Defendant Naghmi argues for dismissal of the CFAA claim based solely on allegations
contained in the S.A.P.'s "Count" section.  Mot., at 20-21. However, this section states "Montage
incorporates by reference paragraphs 1 through 180 as if set forth fully herein." S.A.P. ¶ 293.

the trade secrets taken from Montage's computer systems directly through Defendant Naghmi. *Id.*, at ¶¶ 62(p), (q) (on October 7, 2015 Naghmi forwarded a Montage loan list he received from Defendant Keller to Pacific Union); *Id.*, at ¶ 62(aa) (on October 20, 2015 Defendant Naghmi received an email subject header "Loans at Montage" concerning loans being moved to Pacific Union).  Indeed, Defendant Naghmi knew and approved of Defendant's Keller's instructions to her subordinates to steal Montage's loan files, and also encouraged former Defendant Micah Greene to continue misappropriating Montage's trade secrets in early 2016.  *Id.*, at ¶¶ 66, 114. Finally, on February 17, 2016—nearly two months after he resigned from Montage—Defendant Perry (Montage's former IT manager) gained unauthorized access to Montage's computers and sent at least one file with prospective business information to Defendant Naghmi.  *Id.*, at ¶ 116.

Because the S.A.P. alleges with specificity how Defendant Naghmi encouraged and orchestrated Individual Defendants' unauthorized access of Montage's computer systems, which was done in the furtherance of an illegal scheme, the CFAA claim should be upheld.

## CONCLUSION

For the foregoing reasons, Individual Defendants' Motion should be denied.


Dated: November 22, 2017                    Respectfully submitted,


*/s/ Bryan D. Bruner*_____
Bryan D. Bruner
State Bar No. 03252475
Lynne B. Frank
State Bar No. 24087215
BRUNER & PAPPAS, L.L.P.
3700 W. 7th Street
Fort Worth, Texas 76107-2536
Tel:  (817) 332-6633
Fax: (817) 332-6619
Email: bbruner@bjplaw.com

25

lfrank@bjplaw.com

/s/ Jason W. McElroy_____
Jason W. McElroy
Virginia State Bar No. 71250
WEINER BRODSKY KIDER PC
1300 Nineteenth Street, NW, Fifth Floor
Washington, DC 20036
Tel: (202) 628-2000
Fax: (202) 628-2011
Email: mcelroy@thewbkfirm.com

***Attorneys for Montage Mortgage, LLC***

## <u>CERTIFICATE OF SERVICE</u>

   This is to certify that a true and correct copy of the foregoing has been served upon all parties and counsel of record via the Court's CM/ECF mechanism and USPS First Class Mail, on this 22nd day of November 2017:

William B. Mateja
mateja@polsinelli.com
D. Rockwell Bower
rbower@polsinelli.com
POLSINELLI PC

Stephan D. Selinidis
sselinidis@reedsmith.com
REED SMITH LLC
2950 N. Harwood St., Suite 2100
Dallas, Texas 75201
811 Main St., Suite 1700
Houston, TX 77002

Tyree P. Jones Jr. (Pro Hac Vice)
TPJones@reedsmith.com
REED SMITH LLC
1301 K. St., N.W., Suite 1000
East Tower
Washington, DC 20005

**ATTORNEYS FOR DEFENDANTS V. COLEMAN, C. COOKE, E. CREQUE, J. FURR, K. KELLER, F. NAGHMI, T. NEAL, C. PEER, M. WHYTE, M. WILLOBY**

Ann Marie Painter
AMPainter@perkinscoie.com
Jason R. Elliott
jelliott@perkinscoie.com
Hayden M. Schottlaender
hschottlaender@perkinscoie.com
PERKINS COIE LLP
500 N. Akard St., Suite 3300
Dallas, Texas 75201

Barak Cohen (Pro Hac Vice)
bcohen@perkinscoie.com
PERKINS COIE LLP
700 13th St. NW
Suite 600
Washington, DC 20005

**ATTORNEYS FOR DEFENDANT PACIFIC UNION FINANCIAL, LLC**

Braden M. Wayne
bwayne@settlepou.com
Daniel Tobin
dtobin@settlepou.com
SETTLEPOU
3333 Lee Parkway, 8th Floor
Dallas, Texas 75219

**ATTORNEYS FOR DEFENDANT JOHN PERRY**

27